**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

WOODHULL FREEDOM FOUNDATION,　　)
HUMAN RIGHTS WATCH, ERIC KOSZYK,　)
JESSE MALEY, a/k/a ALEX ANDREWS, and　)
THE INTERNET ARCHIVE,　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　Plaintiffs,　　　　　　　　)　　Case No. 1:18-cv-1552
　　　　　　　　　　　　　　　　　　)
　　　v.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
THE UNITED STATES OF AMERICA　　　　)
and JEFFERSON B. SESSIONS, in his　　　　)
official capacity as ATTORNEY GENERAL　)
OF THE UNITED STATES,　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　Defendants.　　　　　　　　)
　　　　　　　　　　　　　　　　　　)

**MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs Woodhull Foundation, Human Rights Watch, Eric Koszyk, Jesse Maley a/k/a Alex Andrews, and The Internet Archive, by and through counsel, and pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, hereby respectfully move this Court for a preliminary injunction that enjoins the enforcement of the Allow States and Victims to Fight Online Sex Trafficking Act of 2017, Pub. L. No. 115-164 ("FOSTA" or "the Act"), as codified at 18 U.S.C. § 2421A, 18 U.S.C. § 1591(e)(4), and 47 U.S.C. § 230(e)(5), during the pendency of this case.  A Memorandum of Law Supporting Plaintiffs' Motion for Preliminary Injunction is filed concurrently herewith, and a draft order preliminarily enjoining FOSTA is attached.  **Plaintiff requests oral hearing of this Motion, and action is respectfully requested by August 1, 2018, given the threat FOSTA poses to Plaintiff Woodhull Foundation's ability to engage in protected online speech in connection with its annual Sexual Freedom Summit on August 2-5, 2018, as outlined in the supporting memorandum.**

In support of this Motion, Plaintiffs submit a supporting memorandum of points and authorities and declarations, and state as follows:

1.     Plaintiffs are advocacy and human rights organizations, two individuals and the leading archival collection of Internet content.  Each either operates online services like web-sites, social media accounts, and applications as part of speech and advocacy in support of sex workers; otherwise provides resources and information to sex workers; hosts the speech of others who provide such information; or relies on platforms in order to seek information or share their own speech.  FOSTA's direct prohibitions on speech "facilitating the prostitution of another person" and other vague, ambiguous and overbroad provisions conflating sex work with sex trafficking cast serious doubt on the legality of Plaintiffs' speech, or, in the case of Plaintiff Koszyk, have left him without a platform to advertise his non-sexual services.

2.     The Court should grant preliminary injunctive relief in this case "to maintain the status quo pending a final determination of the merits" of Plaintiffs' constitutional challenge to FOSTA, *Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 78 (D.D.C. 2010) (citation omitted) because "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

3.     A preliminary injunction will be granted when the plaintiff demonstrates likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest.  *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

4.     Plaintiffs are likely to succeed on the merits of their First and Fifth Amendment claims because FOSTA as a whole is both overbroad and fails to satisfy First Amendment strict

scrutiny, its individual provisions are vague, and it contains an unconstitutional *ex post facto* provision.  FOSTA targets online speech by (1) creating a new federal offense for anyone who "owns, manages, or operates an interactive computer service" with the intent to "promote" or "facilitate" prostitution, (2) expanding potential liability for federal sex trafficking offenses based on speech, and (3) diluting the speech-protective immunity provision provided for online platforms that host third party speech in the Communications Decency Act of 1996, 47 U.S.C. § 230.  FOSTA §§ 3(a), 4(a) & 5; 18 U.S.C. § 2421A(a); 47 U.S.C. § 230(e)(5).  These new, entirely content-based prohibitions impose harsh criminal penalties and authorize heavy civil liability for online publishers based on expansive but undefined terms regarding "promotion" or "facilitation" of "prostitution" and/or "reckless disregard" of conduct that "contributes to sex trafficking."  FOSTA's provisions are subject to but cannot satisfy strict scrutiny, *see United States v. Stevens*, 559 U.S. 460, 468 (2010); *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015); are overbroad insofar as a substantial number of its applications are unconstitutional judged in relation to its plainly legitimate sweep, *Stevens*, 559 U.S. at 473; are unconstitutionally vague in their failure to give people of ordinary intelligence fair warning of what conduct is prohibited, *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); unconstitutionally impose liability for distributing expressive materials absent proof of scienter; *Smith v. California*, 361 U.S. 147 (1959); and turn Section 230's online intermediary immunity into a tool for censorship. *See Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1174 (9th Cir. 2008).  Plaintiffs will also succeed on their claim that the law violates the *Ex Post Facto* Clause.  U.S. Const. art. I, §§ 9-10; *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994).

5.     Plaintiffs *have already suffered* irreparable harm, and will continue to do so, absent a preliminary injunction because they face unlawful restrictions on their ability to engage in constitutionally protected speech.  *Pearson v. Shalala*, 130 F. Supp. 2d 105, 119 (D.D.C. 2001) (citing *Elrod*, 427 U.S. at 373; *New York Times Co. v. United States*, 403 U.S. 713 (1971); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758 (1988)).

6.     Moreover, the balance of the equities tips strongly in Plaintiffs' favor.  *See*, *e.g.*, *Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012) (when First Amendment rights are implicated, factors for granting preliminary injunction essentially collapse).  The government will experience minimal harm, or none at all, from an order temporarily preserving the *status quo* of laws that only recently took effect, particularly given preexisting criminal laws that remain in effect, and because "no substantial harm to others can be said to inhere" in allowing violations of constitutional rights to continue.  *Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*, 274 F.3d 377, 400 (6th Cir. 2001).  If anything, in view of the adverse impact FOSTA is having in preventing sex trafficking and endangering sex workers, a preliminary injunction would, in fact, *serve* that particular public interest as well – and in any case, the public interest is served, as always, by safeguarding constitutional rights and preserving laws that have fostered a free and open Internet.  *PHE, Inc. v. U.S. Dep't of Justice*, 743 F. Supp. 15, 26 (D.D.C. 1990); *Pursuing America's Greatness v. FEC*, 831 F.3d at 511-12; *Google v. Hood*, 96 F. Supp. 3d 584, 601 (S.D. Miss. 2015), *rev'd on other grounds*, 822 F.3d 212 (5th Cir. 2016).

WHEREFORE, Plaintiffs respectfully request that this Court enter an order preliminarily enjoining the enforcement of FOSTA.

DATED:  June 28, 2018

Respectfully submitted,

_____/s/ Robert Corn-Revere_____
ROBERT CORN-REVERE
D.C. Bar No. 375415
RONALD G. LONDON
D.C. Bar No. 456284
**Davis Wright Tremaine LLP**
1919 Pennsylvania Ave. NW, Suite 800
Washington, D.C. 20006
Telephone: (202) 973-4200
Facsimile: (202) 973-4499
Email: bobcornrevere@dwt.com
         ronnielondon@dwt.com

LAWRENCE G. WALTERS
Florida Bar No.: 0776599
*Pro Hac Vice* Admission Pending
**Walters Law Group**
195 W. Pine Ave.
Longwood, FL 32750-4104
Telephone: (407) 975-9150
Facsimile: (408) 774-6151
Email: Larry@FirstAmendment.com
         Paralegal@FirstAmendment.com

 AARON MACKEY
 D.C. Bar No. 1017004
 DAVID GREENE
 (admitted in California)
 *Pro Hac Vice* Admission Pending
 CORYNNE MCSHERRY
 (admitted in California)
 **Electronic Frontier Foundation**
 815 Eddy Street
 San Francisco, CA 94109
 (415) 436-9333
 Email:  amackey@eff.org
          davidg@eff.org

 DAPHNE KELLER
 Cal. Bar No. 226614
 **Stanford Law School Center**
  **for Internet and Society**
 559 Nathan Abbott Way
 Stanford, CA 94305-8610
 (650) 723-1417
 Email:  daphnek@law.stanford.edu

 Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| WOODHULL FREEDOM FOUNDATION, HUMAN RIGHTS WATCH, ERIC KOSZYK, JESSE MALEY, a/k/a ALEX ANDREWS, and THE INTERNET ARCHIVE, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:18-cv-1552 |
| **v.** | ) ) ) | |
| THE UNITED STATES OF AMERICA and JEFFERSON B. SESSIONS, in his official capacity as ATTORNEY GENERAL OF THE UNITED STATES, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

    A.  Internet Regulation, the Courts and the First Amendment ................................. 2

    B.  FOSTA's Legislative History ............................................................................. 5

    C.  FOSTA's Specific Provisions ............................................................................. 8

    D.  FOSTA's Immediate Impact .............................................................................. 10

    E.  Impact on Plaintiffs ........................................................................................... 12

ARGUMENT ..................................................................................................................... 18

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BECAUSE FOSTA VIOLATES THE FIRST AMENDMENT AND DUE PROCESS, AND IMPOSES *EX POST FACTO* PENALTIES .......................................................................... 19

    A.  FOSTA Violates the First Amendment Because it is a Vague and Overly Broad Content-Based Regulation of Internet Speech .................................................. 19

        1.  FOSTA's Prohibitions are Unconstitutionally Overbroad ......................... 19

        2.  FOSTA Fails Strict Scrutiny .................................................................... 22

        3.  FOSTA's Prohibitions are Unconstitutionally Vague .............................. 28

        4.  FOSTA Lacks the Necessary Scienter to Satisfy First Amendment Requirements ......................................................................................... 31

    B.  FOSTA's Selective Modification of Section 230's Immunity for Online Intermediaries Violates the First Amendment and Promotes Widespread Censorship of Internet Speech ........................................................................... 33

    C.  FOSTA is an Unconstitutional *Ex Post Facto* Law ........................................ 37

II.   PLAINTIFFS AND ALL OTHER INTERNET PUBLISHERS AND USERS HAVE SUFFERED AND WILL CONTINUE TO SUFFER IRREPARABLE HARM ABSENT PRELIMINARY RELIEF ...................................................................... 39

III.  THE BALANCE OF EQUITIES FAVORS INJUNCTIVE RELIEF ..................... 42

IV.  PRELIMINARY RELIEF WOULD SERVE THE PUBLIC INTEREST ............. 44

CONCLUSION .................................................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*ACLU v. Mukasey*,
534 F.3d 181 (3d Cir. 2008) .................................................4

*ACLU v. Reno*,
929 F. Supp. 824 (E.D. Pa. 1996), *aff'd*, 521 U.S. 844 (1997) ...........................3, 29

*American Libraries Ass'n v. Pataki*,
969 F. Supp. 160 (S.D.N.Y. 1997) .................................................4

*Amusement Devices Ass'n v. Ohio*,
443 F. Supp. 1040 (S.D. Ohio 1977) .................................................29

*Armstrong v. D.C. Public Library*,
154 F. Supp. 2d 67 (D.D.C. 2001) .................................................28

*Ashcroft v. ACLU*,
542 U.S. 656 (2004) .................................................4, 25, 27

*Ashcroft v. Free Speech Coalition*,
535 U.S. 234 (2002) .................................................19, 25, 26

*Backpage.com, LLC v. Lynch*,
216 F. Supp. 3d 96 (D.D.C. 2016) .................................................27

*Backpage.com v. Cooper*,
939 F. Supp. 2d 805 (M.D. Tenn. 2013) .................................................22, 27, 32

*Backpage.com v. Dart*,
807 F.3d 229 (7th Cir. 2015) .................................................21, 27

*Backpage.com v. Hoffman*,
2013 WL 4502097 (D.N.J. Aug. 20, 2013) .................................................22

*Backpage.com v. McKenna*,
881 F. Supp. 2d 1262 (W.D. Wash. 2012) .................................................22

*Baggett v. Bullitt*,
377 U.S. 360 (1964) .................................................28, 30

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003) .................................................3, 4, 33, 34

*Bays v. City of Fairborn,*
    668 F.3d 814 (6th Cir. 2012) .......................................................................19, 39

*Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.,*
    482 U.S. 569 (1987)...........................................................................................28

*Beazell v. Ohio,*
    269 U.S. 167 (1925)........................................................................................8, 38

*Big Mama Rag, Inc. v. United States,*
    631 F.2d 1030 (D.C. Cir. 1980) ........................................................................28

*Brown v. Entm't Merchs. Ass'n,*
    564 U.S. 786 (2011)......................................................................................25, 28

*Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.,*
    519 F.3d 666 (7th Cir. 2008) .............................................................................34

*Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.,*
    447 U.S. 530 (1980)...........................................................................................23

*Cramp v. Board of Pub. Instruction,*
    368 U.S. 278 (1961)...........................................................................................31

*Cummings v. Missouri,*
    71 U.S. (4 Wall.) 277 (1867) ..........................................................................8, 38

*Dart v. Craigslist,*
    665 F. Supp. 2d 961 (N.D. Ill. 2009) .....................................................20, 22, 36

*Doe v. Backpage.com LLC,*
    104 F. Supp. 3d 149 (D. Mass. 2015), *aff'd*, 817 F.3d 12 (1st Cir. 2016),
    *cert. denied*, 137 S. Ct. 622 (2017) ............................................................. 21-22

*Doe v. GTE Corp.,*
    347 F.3d 655 (7th Cir. 2003) .............................................................................20

*Elonis v. United States,*
    135 S. Ct. 2001 (2015)........................................................................................32

*Elrod v. Burns,*
    427 U.S. 347 (1976).......................................................................................18, 39

*Fire Fighters Ass'n, D.C. v. Barry,*
    742 F. Supp. 1182 (D.D.C. 1990) ......................................................................28

*Google v. Hood,*
    822 F.3d 212 (5th Cir. 2016) ...........................................................................1, 34

*Google v. Hood,*
  96 F. Supp. 3d 584 (S.D. Miss. 2015), *vacated on other grounds,*
  822 F.3d 212 (5th Cir. 2016) ............................................................19, 44

*Gordon v. Holder,*
  721 F.3d 638 (D.C. Cir. 2013) ...........................................................44

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972)...........................................................................28, 31

*Griswold v. Connecticut,*
  381 U.S. 479 (1965)...........................................................................42

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010)...............................................................................24

*In re Aimster Copyright Litig.,*
  334 F.3d 643 (7th Cir. 2003) .............................................................21

*Jian Zhang v. Baidu.com Inc.,*
  10 F. Supp. 3d 433 (S.D.N.Y. 2014)..................................................34

*Jones v. Dirty World Entm't Recordings LLC,*
  755 F.3d 398 (6th Cir. 2014) .............................................................4, 36

*King v. Fed. Bureau of Prisons,*
  415 F.3d 634 (7th Cir. 2005) .............................................................42

*Kingsley Int'l Pictures Corp. v. Regents of Univ. of N.Y.,*
  360 U.S. 684 (1959)...........................................................................26

*Koger v. Dart,*
  114 F. Supp. 3d 572 (N.D. Ill. 2015) .................................................42

*La'Tiejira v. Facebook, Inc.,*
  272 F. Supp. 3d 981 (S.D. Tex. 2017) ...............................................34

*Landgraf v. USI Film Prods.,*
  511 U.S. 244 (1994)...........................................................................37

*Langdon v. Google, Inc.,*
  474 F. Supp. 2d 622 (D. Del. 2007)...................................................35

*M.A. v. Village Voice Media Holdings, LLC,*
  809 F. Supp. 2d 1041 (E.D. Mo. 2011)..............................................22

*Members of City Council v. Taxpayers for Vincent,*
  466 U.S. 789 (1984)...........................................................................20

*Meredith Corp. v. FCC*,
   809 F.2d 863 (D.C. Cir. 1987) ........................................................................... 39

*Mishkin v. New York*,
   383 U.S. 502 (1966) ................................................................................... 31, 33

*NAACP v. Button*,
   371 U.S. 415 (1963) ................................................................................... 20, 29

*Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*,
   274 F.3d 377 (6th Cir. 2001) ........................................................................... 44

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ......................................................................................... 26

*Ogden v. Sanders*,
   25 U.S. (12 Wheat.) 213 (1827) ....................................................................... 37

*Packingham v. North Carolina*,
   137 S. Ct. 1730 (2017) ........................................................................ 4, 5, 33, 41

*Pearson v. Shalala*,
   130 F. Supp. 2d 105 (D.D.C. 2001) ................................................................. 44

*PHE, Inc. v. U.S. Dep't of Justice*,
   743 F. Supp. 15 (D.D.C. 1990) ........................................................................ 44

*Pursuing America's Greatness v. FEC*,
   831 F.3d 500 (D.C. Cir. 2016) ....................................................... 18, 19, 24, 44

*Red Lion Broad. Co. v. FCC*,
   395 U.S. 367 (1967) ......................................................................................... 41

*Reed v. Town of Gilbert*,
   135 S. Ct. 2218 (2015) ......................................................................... 22, 23, 25

*Reno v. ACLU*,
   521 U.S. 844 (1997) ................................................................................. *passim*

*Fair Housing Council of San Fernando Valley v. Roommates.com*,
   521 F.3d 1157 (9th Cir. 2008) ................................................................... 22, 37

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995) ......................................................................................... 23

*Roth* v. *United States*,
   354 U.S. 476 (1957) ........................................................................................... 3

*Sable Commc'ns of Cal., Inc. v. FCC,*
  492 U.S. 115 (1989) ............................................................................................12

*Sanger v. Reno,*
  966 F. Supp. 151 (E.D.N.Y. 1997) ......................................................................38

*Search King, Inc. v. Google Tech., Inc.,*
  2003 WL 21464568 (W.D. Okla. 2003) ...............................................................35

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,*
  502 U.S. 105 (1991) ............................................................................................23

*Smith v. California,*
  361 U.S. 147 (1959) ............................................................................................28

*Smith v. Goguen,*
  415 U.S. 566 (1974) ............................................................................................29

*Smoking Everywhere, Inc. v. FDA,*
  680 F. Supp. 2d 62 (D.D.C. 2010) ......................................................................18

*Snyder v. Phelps,*
  580 F.3d 206 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011) ..................................26

*Speiser v. Randall,*
  357 U.S. 513 (1958) ............................................................................................33

*Thompson v. W. States Med. Ctr.,*
  535 U.S. 357 (2002) ............................................................................................20

*True the Vote, Inc. v. IRS,*
  831 F.3d 551 (D.C. Cir. 2016) ............................................................................23

*United States v. Miller,*
  379 F.2d 483 (7th Cir. 1967) ..............................................................................30

*United States v. Playboy Entm't Grp., Inc.,*
  529 U.S. 803 (2000)................................................................................23, 25, 27

*United States v. Rivera,*
  775 F.2d 1559 (11th Cir. 1985) ..........................................................................24

*United States v. Stevens,*
  559 U.S. 460 (2010)........................................................................................19, 22

*United States v. X-Citement Video, Inc.,*
  513 U.S. 64 (1994)...............................................................................................32

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*,
   478 F.3d 413 (1st Cir. 2007)...................................................................4, 33, 34, 35

*Video Software Dealers Ass'n v. Webster*,
   968 F.2d 684 (8th Cir. 1992) .............................................................................32

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
   425 U.S. 748 (1976)............................................................................................42

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)..........................................................................................18, 44

*Zango, Inc. v. Kaspersky Lab, Inc.*,
   568 F.3d 1169 (9th Cir. 2009) ...........................................................................34

*Zeran v. America Online, Inc.*,
   129 F.3d 327 (4th Cir. 1997) ...................................................................4, 34, 35

**State Cases**

*Barrett v. Rosenthal*,
   40 Cal. 4th 33 (2006) .........................................................................................34

*Cohen v. Bd. of Supervisors*,
   707 P.2d 840 (Cal. 1985) ...................................................................................22

*Delfino v. Agilent Techs., Inc.*
   145 Cal. App. 4th 790 (2006) ............................................................................34

**Constitutional Provisions**

U.S. Const.
   amend. I............................................................................................... *passim*
   amend. V ....................................................................................................2
   art. I, § 9....................................................................................................37
   art. I, § 9, cl. 3........................................................................................8, 38
   art. I, § 10..................................................................................................37
   art. VI, cl. 3 ...............................................................................................38

## Federal Statutes

18 U.S.C.

    § 1591.................................................................................... *passim*
    § 1591(a)(1) ..............................................................................27
    § 1591(a)(2) ..............................................................................27
    § 1591(e)(4) ..............................................................................10
    § 1595.............................................................................6, 9, 10, 35
    § 1595(d) .............................................................................10, 26
    § 2421A................................................................................. *passim*
    § 2421A(a) ...............................................................................9, 26
    § 2421A(b) ...............................................................................9, 26
    § 2421A(b)(2) .........................................................................29, 32
    § 2421A(c) ...............................................................................9, 26
    § 2421A(d) ...............................................................................9, 26

47 U.S.C.

    § 223.............................................................................................1
    § 230...................................................................................... *passim*
    § 230(c)(2) .........................................................................34, 35, 36
    § 230(e) ...................................................................................9, 37
    § 230(e)(5) ...........................................................................10, 26
    § 230(e)(5)(C) ..........................................................................24
    § 507..........................................................................................38

Public Law

    No. 96-132, 93 Stat. 1040 (1979) .........................................39
    No. 115-164, 132 Stat. 1253 (2018) ................................... *passim*

## Rules

Federal Rules of Civil Procedure 11(b)(2)................................39

## Legislative Material

163 Congressional Record

    H1248 (daily ed. Feb. 26, 2018) ............................................8
    H2629 (daily ed. Apr. 3, 2017)..............................................5
    S4670 (daily ed. Aug. 1, 2017)..............................................5

164 Congressional Record

    H1297 (daily ed. Feb. 27, 2018) ............................................8
    S1293 (daily ed. Feb. 28, 2018).............................................8
    S1849 (daily ed. Mar. 21, 2018) ............................................8
    S1869 (daily ed. Mar. 21, 2018) ............................................6

H.R. 1865, Allow States and Victims to Fight Online Sex Trafficking Act of
    2017, Pub. L. No. 115-164, 132 Stat. 1253 (2018)....................... *passim*

H.R. Rep. No. 115-572, pt. 1 (2018)........................................................................5, 7, 32

HOUSE OF REPRESENTATIVES JUDICIARY COMMITTEE, Goodlatte Floor Speech
    in Support of FOSTA (Feb. 27, 2018), *available at*
    https://judiciary.house.gov/press-release/69685/ ....................................................38

Internet Freedom and Family Empowerment Act, H.R. 1978, 104th Cong. (1995) ......................3

*Latest Developments in Combating Online Sex Trafficking: Hearing before*
    *the Subcomm. on Commc'ns and Tech. of the H. Comm. on Energy*
    *and Commerce*, 115th Cong. 4 (2017) (statement of Russ Winkler,
    Special Agent in Charge, Tennessee Bureau of Investigation),
    http://docs.house.gov/meetings/IF/IF16/20171130/106657/HHRG-115-IF16-
    Wstate-WinklerR-20171130-U41.pdf .............................................................7, 26

S. Rep. No. 115-199 (2018)........................................................................................35

Stop Enabling Sex Traffickers Act ...........................................................................5, 8

U.S. DEPT. OF JUSTICE OFFICE OF LEGISLATIVE AFFAIRS, *Memorandum to Hon.*
    *Robert Goodlatte, Chairman, U.S. House of Representatives Committee of*
    *the Judiciary* (Feb. 27, 2018)...............................................................................38

**Other Authorities**

About FOSTA, CRAIGSLIST, https://www.craigslist.org/about/FOSTA (last visited
    June 12, 2018).......................................................................................................11

*Black's Law Dictionary* (10th ed. 2014).....................................................................24

Eric Goldman, *'Worst of Both Worlds' FOSTA Signed Into Law, Completing*
    *Section 230's Evisceration*, Tech. & Mktg. Law Blog, April 11, 2018
    (https://blog.ericgoldman.org/archives/ 2018/04/worst-of-both-worlds-
    fosta-signed-into-law-completing-section-230s-evisceration.htm) ...........................................5

http://desireealliance.org/conference .........................................................................12

https://freedomnetworkusa.org/app/uploads/2017/10/FNUSAUrgesCautionCDAR
    eform.pdf...............................................................................................................7

*Oxford English Dictionary* (3d ed. 2007) ...................................................................24

"Women's Rights Organizations Call on Congress to Protect Sex Workers
    Rights in Fight to End Trafficking of Persons," https://iwhc.org/press-
    releases/congress-protect-sex-workers-rights-end-trafficking...........................................7

## INTRODUCTION

This is a constitutional challenge to the Allow States and Victims to Fight Online Sex Trafficking Act of 2017, Pub. L. No. 115-164, 132 Stat. 1253 (2018) ("FOSTA" or "the Act"), the furthest-reaching attempt to censor online speech since Congress first attempted to regulate the Internet through anti-indecency provisions in the Communications Decency Act of 1996, 47 U.S.C. § 223 ("CDA").  FOSTA targets online speech by (1) creating a new federal offense for anyone who "owns, manages, or operates an interactive computer service" with the intent to "promote" or "facilitate" prostitution, (2) vaguely expanding potential liability for federal sex trafficking offenses, and (3) diluting the CDA's only pro-free speech provision – Section 230 – by limiting federal immunity provided online platforms that host third party speech.  These new, entirely content-based prohibitions provide for harsh criminal penalties and heavy civil liability for online publishers based on expansive but undefined terms regarding "promotion" or "facilitation" of prostitution and/or "reckless disregard" of conduct that "contributes to sex trafficking."

Attempts to regulate the Internet are not new, nor is this the first time Congress has looked past "the importance of preserving free speech on the internet, even though [it] serves as a conduit for much that is distasteful or unlawful." *Google v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016).  But starting with the Supreme Court's landmark ruling in *Reno v. ACLU*, 521 U.S. 844 (1997), courts consistently have held the First Amendment prohibits content-based, overly broad, and vague regulations that threaten online speech.  FOSTA is the latest in this line of censorial efforts.  Both through direct restrictions and broad chilling effects on protected speech, FOSTA, like the CDA before, "threatens to torch a large segment of the Internet community." *Id.* at 882.

FOSTA casts into doubt the legality of constitutionally protected, commercial and non-commercial speech that "promotes," "assists" or "facilitates" sex work, including advocacy for decriminalization, the provision of health and safety resources to sex workers such as bad date

lists, and provision of other information that helps sex workers.  It has already had widespread effects across the Internet generally, and has limited speech by the Plaintiffs, which include organizations and individuals who engage in constitutionally protected online speech.  As a consequence, Plaintiffs seek to have the Act held unconstitutional under the First and Fifth Amendments both on its face and as applied.  While Plaintiffs strongly oppose all forms of coerced sexual activity and support appropriately targeted and effective measures to end sex trafficking, FOSTA will not reduce such practices, and only makes matters worse.

FOSTA erroneously conflates online communications relating to sex work with prostitution, and treats prostitution as synonymous with trafficking.  By employing expansive and undefined terms to regulate online speech, backed by threat of severe criminal penalties and massive civil liability, Congress adopted a measure that instantly cast a pall over any online communication with even remote connections to sexual relations.  FOSTA has impeded efforts to prevent trafficking and rescue victims, hindered harm-reduction activity, and made all forms of sex work more dangerous – all while undermining protection for free online expression, contrary to the near unanimity of judicial decisions over the past two decades.

To allow due consideration of their claims, while avoiding the harm to free speech that FOSTA has had and will continue to have, Plaintiffs ask that the Court preliminarily enjoin the government from enforcing it.  Plaintiffs therefore urge this Court to preserve the *status quo ante* because they are likely to prevail in having FOSTA declared unconstitutional and because the public interest supports barring enforcement of a counterproductive law.

## BACKGROUND

### A.    Internet Regulation, the Courts and the First Amendment

As the Supreme Court recognized, the Internet gives individuals the ability to access and share information as "diverse as human thought," on topics ranging from "the music of Wagner

to Balkan politics to AIDS prevention to the Chicago Bulls." *Reno*, 521 U.S. at 849-52.  The

first courts to consider the implications of this new medium quickly realized the Internet is "the

most participatory form of mass speech yet developed" that makes possible for the first time "a

never-ending worldwide conversation." *ACLU v. Reno*, 929 F. Supp. 824, 883 (E.D. Pa. 1996)

(Dalzel, J.), *aff'd*, 521 U.S. 844.  This naturally enabled people to communicate about sex, which

the Court has long acknowledged as "a great and mysterious motive force in human life" that

"indisputably [has] been a subject of absorbing interest … through the ages," as "one of the vital

problems of human interest and [] concern." *Roth* v. *United States,* 354 U.S. 476, 487 (1957).

The initial impulse of Congress in reaction to the emergence of the publicly available

Internet was to censor it.  Senator James Exon proposed the CDA to prohibit "indecent" speech

online as part of a comprehensive rewrite of the Communications Act.  At the time, Congress

believed it could freely regulate the Internet under relaxed First Amendment scrutiny just as it

regulates broadcasting, expression directed to minors, or certain "secondary effects." *Reno*, 521

U.S. at 867.  However, another provision of the CDA, Section 230, was added to Senator Exon's

proposal as something of a First Amendment "savings clause."  Internet Freedom and Family

Empowerment Act, H.R. 1978, 104th Cong. (1995).  It recognized that free expression on the

Internet would depend greatly on online publishers' ability to host third-party speech without

risking liability, and to make editorial judgments about expression they decided to permit. *See*,

*e.g.*, *Batzel v. Smith*, 333 F.3d 1018, 1027-29 (9th Cir. 2003).

The Supreme Court rejected not just the specific censorial provisions of the CDA but also

the very premise on which they were based, finding "our cases provide no basis for qualifying

the level of First Amendment scrutiny that should be applied to this medium." *Reno*, 521 U.S. at

870.  It raised alarms about any approach to Internet regulation that would cast doubt among

speakers about whether they might risk liability if they communicated about such things as birth control, homosexuality, sexually oriented topics, or prison rape (among many other matters).  *Id.* at 871.  Yet even after the Court invalidated the CDA's indecency regulations, Congress adopted and the government defended the Child Online Protection Act, ultimately to no avail.  *See Ashcroft v. ACLU*, 542 U.S. 656 (2004); *ACLU v. Mukasey*, 534 F.3d 181 (3d Cir. 2008).

Meanwhile, the CDA's speech-protective federal immunity provisions remained intact, providing essential support for online freedom of expression.  *E.g.*, *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 408-09 (6th Cir. 2014); *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418-19 (1st Cir. 2007); *Batzel*, 333 F.3d at 1027-29.  The twin pillars of online free expression – strict scrutiny of any regulation of online expression, coupled with freedom to transmit third-party speech without risk of civil or criminal sanctions – have helped maintain the Internet as "the premier technological innovation of the present age."  *American Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 161 (S.D.N.Y. 1997).  Without such protection, online communication would have been far less robust, diverse, and free.  *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997).

The need to protect the online ecosystem has become even more vital in the two decades since these initial decisions, as ways to access the Internet have multiplied and social media have become a part of daily life.  Yet precisely because the Internet is the most democratized forum for communication in human history, and facilitates speech both good and bad, efforts to impose various restrictions have not ceased.  As the Supreme Court observed just last year, the Internet has become an indispensable place to exchange ideas, because it "offers 'relatively unlimited, low-cost capacity for communication of all kinds.'"  *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735-36 (2017) (quoting *Reno*, 521 U.S. at 870).  Affirming the strong constitutional value

of that exchange, the Court urged "extreme caution before suggesting that the First Amendment provides scant protection for access to vast networks in that medium." *Id*. at 1736.

### B.    FOSTA's Legislative History

As enacted, FOSTA combined provisions of a bill passed by the House, the Allow States and Victims to Fight Online Sex Trafficking Act, and a bill the Senate passed, the Stop Enabling Sex Traffickers Act ("SESTA"), to create what experts have called "the worst of both worlds."[1] Through various combinations, amendments, and reconciliations, FOSTA ultimately erroneously conflated a vast range of sex work with illegal sex trafficking, by widening the scope of the law to include websites related to sex work.

The first step toward this outcome was Representative Ann Wagner's April 3, 2017, introduction of FOSTA, H.R. 1865, with a stated purpose of "clarify[ing] that Section 230 … does not prohibit the enforcement … of Federal and State criminal and civil law relating to sexual exploitation of children or sex trafficking[.]"  163 Cong. Rec. H2629 (daily ed. Apr. 3, 2017).  As later explained in the House Report on the bill, it was "designed to combat online sex trafficking by providing new tools to law enforcement through a new federal criminal statute and by making it easier for states to prosecute criminal actor websites by amending section 230."  H.R. Rep. No. 115-572, pt. 1, at 3 (2018).  However, the bill also proposed to amend 18 U.S.C. § 1591 to define "participation in a venture" relating to trafficking, and to impose liability on interactive computer services in connection with "publish[ing] information" in furtherance of trafficking offenses.

On August 1, 2017, Senator Rob Portman introduced S.1693, the first version of SESTA, the purpose of which was said to be the same as FOSTA.  *See* 163 Cong. Rec. S4670-71 (daily

---

[1]   Eric Goldman, *'Worst of Both Worlds' FOSTA Signed Into Law, Completing Section 230's Evisceration*, Tech. & Mktg. Law Blog, April 11, 2018 (https://blog.ericgoldman.org/archives/ 2018/04/worst-of-both-worlds-fosta-signed-into-law-completing-section-230s-evisceration.htm).

ed. Aug. 1, 2017).  It proposed amending CDA Section 230 to eliminate immunity for "any State criminal prosecution or civil enforcement action targeting conduct" that violates federal criminal law prohibiting certain forms of sex trafficking, and to remove immunity for federal civil suits by victims of sex trafficking under 18 U.S.C. § 1595.  *Id*.  It also proposed its own definition of "participation in a venture," to make knowingly "assist[ing], support[ing], or facilitat[ing]" sex trafficking a violation of federal law.  *Id*.

As Congress weighed the legislation, experts warned it would broadly censor online speech, fail to reduce trafficking, and make sex work more dangerous.  Senator Ron Wyden warned that the bill "punches a hole in the legal framework of the open internet."  164 Cong. Rec. S1869 (daily ed. Mar. 21, 2018).  Groups as diverse as the ACLU and the Cato Institute opposed the measure.  Cato cautioned that "[a] combined FOSTA/SESTA would benefit established social media platforms and trial lawyers at the expense of an open internet while doing little to prevent sex trafficking."  *Id*. S1867.  The ACLU predicted "the bill's language will encompass the actions of sex workers who have no connection to trafficking whatsoever …, including effective harm reduction and anti-violence tactics."  *Id*.

Congress also was warned that despite its stated intention to assist law enforcement and anti-trafficking efforts, the proposed law would actually hinder such efforts, and pose grave risks to sex workers.  The Freedom Network, an anti-trafficking organization, urged caution in making changes to Section 230 immunity, explaining that:

> It is important to note that responsible website administration can make traf-
> ficking more visible - - which can lead to increased identification.  There are
> many cases of victims being identified online - and little doubt that without this
> platform, they would have not been identified.  Internet sites provide a digital
> footprint that law enforcement can use to investigate trafficking into the sex
> trade, and to locate trafficking victims.  When websites are shut down, the sex
> trade is pushed underground and sex trafficking victims are forced into even
> more dangerous circumstances.  Street-based sex workers report significantly

> higher levels of victimization, including physical and sexual violence. This
> means that trafficking victims face even more violence, are less likely to be
> identified, with less evidence of their victimization.

https://freedomnetworkusa.org/app/uploads/2017/10/FNUSAUrgesCautionCDAReform.pdf.

Russ Winkler, a Special Agent with the Tennessee Bureau of Investigation who oversees traf-

ficking investigations, explained the investigative value of above-ground online advertising sites,

and urged Congress "to consider this as yet another example of the need for legal structure that

ensures that law enforcement can access the digital evidence we need to keep the public safe."[2]

A coalition of women's rights organizations similarly cautioned Congress that the law would

harm rather than help sex workers:

> By removing online platforms for sex workers, the legislation eliminates an
> important tool to screen clients and negotiate safe working conditions,
> exposing sex workers to violence and putting their lives at risk. The legislation
> not only harms sex workers, it will also undermine the US government's own
> goal of ending trafficking.

"Women's Rights Organizations Call on Congress to Protect Sex Workers Rights in Fight to End

Trafficking of Persons," https://iwhc.org/press-releases/congress-protect-sex-workers-rights-end-

trafficking.

On February 20, 2018, the House Judiciary Committee reported out FOSTA with an

amendment that expanded it by adding a new provision to the federal criminal code, 18 U.S.C.

§ 2421A, governing interactive computer services. It sought to prohibit reckless disregard of

trafficking, and promotion or facilitation of prostitution. The provision reflected Congress's be-

lief that "[p]rostitution and sex trafficking are inextricably linked." H.R. Rep. No. 115-572, pt. 1

---

[2]   *Latest Developments in Combating Online Sex Trafficking: Hearing before the Subcomm.
on Commc'ns and Tech. of the H. Comm. on Energy and Commerce*, 115th Cong. 4 (2017)
(statement of Russ Winkler, Special Agent in Charge, Tennessee Bureau of Investigation) at p.4.
http://docs.house.gov/meetings/IF/IF16/20171130/106657/HHRG-115-IF16-Wstate-WinklerR-
20171130-U41.pdf

at 5.  Less than a week later, the House Committee on Rules approved FOSTA with an amendment by Representative Walters to add SESTA, turning H.R. 1865 into a combined FOSTA-SESTA bill.  163 Cong. Rec. H1248 (daily ed. Feb. 26, 2018).  The House then passed H.R. 1865, and referred it to the Senate the next day, 164 Cong. Rec. S1293 (daily ed. Feb. 28, 2018).

As the combined H.R. 1865 was proceeding toward enactment, the Department of Justice ("DOJ") wrote one of the bill's sponsors, Representative Robert Goodlatte, to voice serious concerns.  *See* 164 Cong. Rec. H1297 (daily ed. Feb. 27, 2018).  DOJ wrote that "Section 2421A as originally drafted is broader than necessary because it would extend to situations where there is a minimal federal interest, such as to instances [where] an individual uses a cell phone to manage local commercial sex transactions involving consenting adults."  *Id.*  DOJ also criticized the changes to Section 1591 as "unnecessary," and shared a "serious constitutional concern" with the retroactive removal of Section 230 immunity.  *Id.*  DOJ wrote that "[i]nsofar as this [] would 'impose[] a punishment for an act which was not punishable at the time it was committed' or 'impose[] additional punishment to that then prescribed,' it would violate the Constitution's Ex post facto Clause."  *Id.* (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325-26 (1867), and citing *Beazell v. Ohio*, 269 U.S. 167, 169-70 (1925); U.S. Const. art. I, § 9, cl. 3).

Despite this warning, the House made no changes to the bill's revisions to Section 1591 or to its retroactivity for the new carve-out from Section 230 immunity.  On March 21, 2018, the Senate passed the legislation without amendment.  164 Cong. Rec. S1849 (daily ed. Mar. 21, 2018).  The President signed H.R. 1865 into law on April 11, 2018, and FOSTA took effect.

### C.     FOSTA's Specific Provisions

As enacted, FOSTA effects three major changes in the law:  (1) Section 3 creates a new federal crime and civil claim, codified at 18 U.S.C. § 2421A, prohibiting use or attempted use of any facility of interstate commerce, including interactive computer services, to promote or facili-

tate prostitution; (2) Section 4 amends CDA Section 230 to allow state authorities to prosecute interactive computer services if the underlying conduct would violate 18 U.S.C. § 2421A or § 1591, and to permit civil causes of action based on violations of Section 1591; and (3) Section 5 expands Section 1591's prohibition on "participation in a venture" involving sex trafficking to include any action "knowingly assisting, supporting, or facilitating" a violation thereof.

Section 2421A makes it a felony for anyone to own, manage, or operate an interactive computer service – as defined in Section 230 – using any facility or means of interstate commerce "with the intent to promote or facilitate the prostitution of another person."  18 U.S.C. § 2421A(a).  It also creates an "aggravated violation" when the underlying conduct "promotes or facilitates the prostitution of 5 or more persons" or one "acts in reckless disregard" of the fact that his conduct "contributed to sex trafficking."  Id. § 2421A(b).[3]  Anyone convicted of violating Section 2421A(a) can be fined, imprisoned for up to 10 years, or both; for "aggravated violations" under Section 2421A(b) imprisonment may be for up to 25 years. Id. § 2421A(a)-(b). Operators of interactive computer services can also face civil suits for violations of 2421A(b). Id. § 2421A(c).  The law does not define what it means to "promote" or "facilitate" prostitution, nor even what constitutes "prostitution," which is undefined in federal law; nor are "promote," "facilitate," or "contribute to sex trafficking" defined for purposes of Section 2421A(b).

As to preexisting CDA immunity from civil claims and from state law, FOSTA amended Section 230(e) to eliminate immunity for:  "(A) any claim in a civil action [] under section 1595 of title 18 … if the conduct underlying the claim constitutes a violation of section 1591 … ;" "(B) any charge in a criminal prosecution [] under State law if the conduct underlying … would constitute a violation of section 1591 … ;" or "(C) any charge in a criminal prosecution [] under

---

[3]  Sections 2421A(c) and (d) allow for, respectively, civil recovery damages and attorneys' fees, and mandatory restitution for victims of the crime.

State law if the conduct underlying … would constitute a violation of section 2421A." *See* 47 U.S.C. § 230(e)(5).  The amendments to Section 230, like all of FOSTA, became effective upon the date of enactment.  However, these changes to the CDA's statutory immunities are *retroactive* in that they apply "regardless of whether the conduct alleged occurred, or is alleged to have occurred, before, on, or after … enactment." *See* FOSTA, Pub. L. No. 115-164, § 4(b).

FOSTA also expands the federal criminal trafficking law in 18 U.S.C. § 1591 by newly defining "participation in a venture" (in the prohibition in Section 1591(a)(2) against benefitting financially or receiving anything of value from sex trafficking) to mean "knowingly assisting or supporting, or facilitating a violation of" the sex trafficking law.  *See* 18 U.S.C. § 1591(e)(4).[4] The law does not specify what *mens rea* "participation in a venture" requires.  It does not, however, appear to require that a participant realize, or even suspect, that a crime has occurred or will occur.  Violations of Section 1591 are punishable by mandatory minimum sentences of ten or fifteen years (depending on the victim's age and use of coercion), and fines of $250,000 for individuals, $500,000 for organizations.  Additionally, FOSTA amends Section 1595 to provide that state attorneys general may bring civil actions *parens patriae* if there is reason to believe "an interest of the residents of that State has been or is threatened or adversely affected by any person who violates section 1591." *See* 18 U.S.C. § 1595(d).

### D.  FOSTA's Immediate Impact

Creation of new federal offenses for "promotion or facilitating prostitution" and "reckless disregard of a contribution to sex trafficking" with broad, undefined terms, expansion of federal sex trafficking law via a similarly unclear "participation in a venture" definition, and related retrenchments of Section 230 immunity had precisely the censorial effect predicted during consi-

---

[4]    As noted, the newly expanded "participation in a venture" offense no longer falls within the immunity for civil claims and state prosecution provided by Section 230.  *See supra* 6, 9.

deration of FOSTA.  Numerous online service providers that enable interpersonal contact by users – including many lacking a connection to sexual content – immediately removed content, eliminated entire sections of websites, or were shuttered altogether out of fear of state or federal prosecution, or ruinous civil liability.  *See* Declaration of Kate D'Adamo ¶¶ 9-13 ("D'Adamo Decl.").  These include websites that host personal ads, facilitate dating, or are community forums devoted to lawful adult sexual relationships, as well as online platforms that hosted speech about non-sexual massage therapy and other non-sexual services.  *Id.* ¶ 13.  Some online service providers took these actions simply because they could not afford to monitor the activities of third parties on their sites as the new law effectively requires.

Just two days after the Senate passed H.R. 1865, online classified ad service Craigslist eliminated all personals ads, including non-sexual categories such as "Missed Connections" and "Strictly Platonic."  It released a statement explaining it censored these sections due to FOSTA: "Any tool or service can be misused.  We can't take such risk without jeopardizing all our other services, so we are regretfully taking [the] personals offline."[5]  D'Adamo Decl. ¶ 10.  Reddit, a site where users post content, including news articles, photos or links, and participate in comment threads discussing the posts, began removing "subreddits" relating to sex.  *Id.* ¶ 11.  It also warned the moderator of the r/sexworkers subreddit, a "community forum for sex workers, clients, and even those unaffiliated with the industry to … ask questions and share resources," that the forum could be shut down if administrators felt it infringed Reddit's post-FOSTA policy.  *Id.*  Google changed enforcement of its Google Play policy to forbid publishing of "sexually explicit or pornographic images or videos," *id.* ¶ 13, even though any "[s]exual expression which

---

[5]  *See* About  FOSTA,  Craigslist,  https://www.craigslist.org/about/FOSTA  (last  visited June 12, 2018).  Users now receive "404 Errors" if they try to access URLs where Craigslist's personal formerly appeared.

is indecent but not obscene is protected by the First Amendment," and cannot be criminalized under FOSTA.  *See Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989).

In the same vein, the Desiree Alliance, a national coalition of current and former sex workers, health professionals, social scientists, sex educators, and their supporting networks, cancelled its July 2019 conference, scuttling what would have been the largest U.S. gathering to address human, labor, and civil rights for sex workers.  In an online post, its Director announced that because of FOSTA, "our leadership made the decision that we cannot put our organization and our attendees at risk."  *See* http://desireealliance.org/conference.

Websites adjacent to sex-related services, even if not directly connected to them, also were affected.  VerifyHim.com, a tool that helped sex workers avoid abusive clients, announced it would "change the direction of the site.'"  D'Adamo Decl. ¶ 12.  The "adult-ad forum" CityVibe.com disappeared two days after the President signed FOSTA.  *Id*. ¶ 13.  And TheEro-ticReview.com, a site where users post reviews about services of adult entertainers and escorts, blocked all U.S. users given potential FOSTA enforcement.  *Id*.  Similar impacts occurred at adult websites www.myscarlettbook.com, www.escortdesign.com, and www.getluckyhere.com, among others.  *Id*.

### E.     Impact on Plaintiffs

Plaintiffs have likewise been forced to refrain from speaking or had their ability to speak cast into great uncertainty by FOSTA's enactment.  Woodhull, a tax-exempt education, advocacy and lobbying organization, is the only national human rights group working full-time toward affirming and protecting the fundamental human right to sexual freedom.  Declaration of Ricci Levy ("Levy Decl.") ¶¶ 2-3.  Its mission focuses on supporting the health, safety, and protection of those under the broad umbrella of "sex workers," including adult film performers, live web-cam models, sexual wellness instructors, escorts, and prostitutes.  *Id*. ¶ 5.  Woodhull strongly

opposes sex trafficking or sexual assault in any form, while supporting the right to engage in consensual sexual activity, including through advocacy and other efforts at its website. *Id.*

As Woodhull's pursuit of its mission involves using the Internet and other means of inter-state commerce, immediately in the wake of FOSTA it censored its publication of information on its site that could assist sex workers negatively impacted by the law. *Id.* ¶¶ 31-32. It also was inhibited from posting other resources for sex workers on its site, from voicing on its blog and in social media opposition to FOSTA's enforcement against marginalized sex workers, and from allowing third parties to post similar material on Woodhull's *Sex and Politics* blog. *Id.* ¶ 28.

FOSTA also has affected speech associated with Woodhull's signature event, its annual multi-day Sexual Freedom Summit, scheduled this year for August 2-5 in Alexandria, Virginia, to bring together hundreds of educators, therapists, legal and medical professionals, and leaders of advocacy groups to strategize, share information, and work collaboratively to protect members of their diverse communities. *Id.* ¶ 16. The Summit has long consisted of various workshops organized into tracks focused on different aspects of sexual freedom, which in recent years has included a "sex worker" track with sessions, among others, devoted to, *e.g.*, harm reduction, disability, age, health, and personal safety. *Id.* ¶ 17. Woodhull utilizes a wide variety of inter-active computer services to organize, facilitate, and promote the Summit. *Id.* ¶¶ 10-15. This includes online databases and cloud storage for planning and scheduling, emailing participants and other members of the Summit constituency, and promoting workshops on the Summit website and on social media such as Facebook and Twitter, all of which historically has featured biographies and contact information for presenters. *Id.* ¶¶ 10, 23, 24. Woodhull also intends to livestream the sex work track on Facebook Live, and live tweet the event on Twitter, so that those who cannot attend can benefit from the information and commentary. *Id.* ¶¶ 25-26.

But this year, with enactment of FOSTA, Woodhull became concerned over promotion of the Summit's sex worker track, and publication of presenters' contact information, and thus in April 2018 ceased all online promotion of the sex work track.  *Id*. ¶¶ 33-34.  Given Woodhull's mission, this quickly led to social media backlash and threats to boycott the Summit.  *Id*. ¶ 35.  In June, Woodhull decided to publish and promote information about the sex worker track online after all, including presenters' contact and biographical information, and to promote workshops on Facebook and Twitter, despite uncertainty whether this risks violating FOSTA.  *Id.* at 36. Even so, although it considered offering the Desiree Alliance the opportunity to conduct its cancelled July 2019 institute during the 2018 Summit, Woodhull concluded it would be too risky under FOSTA to promote the institute in conjunction with the Summit.  *Id.* ¶ 40.  And Woodhull remains uncertain whether it would be committing a crime or exposing itself to civil liability to livestream and live tweet the sex work track.

Plaintiff Human Rights Watch, one of the major international human rights monitoring organizations, sees its mission as exposing violations of international human rights law to public scrutiny around the world and generating momentum for change.  Among those violations are exploitation and violence directed at women and girls, including those who are sex workers. Declaration of Dinah PoKempner ("PoKempner Decl.") ¶ 3.  Every year, HRW produces and publishes many hundreds of reports, press releases, videos, podcasts and other online documents on its website and social media accounts.  Some of these include research and advocacy on behalf of the rights of sex workers, including our advocacy that sex work be decriminalized.[6]

---

[6]   For example, in 2010, HRW reported on the unlawful arrests and detention of sex workers in Cambodia; in 2012, it reported on police searches of women for condoms as evidence of prostitution in four US cities; in 2013, it documented torture, beatings and other assaults by police officials against sex workers, and similar abuses against sex workers in Tanzania; and in

Human Rights Watch's policy, adopted in 2013, opposes criminalization of consensual adult sex work and states that criminalization of voluntary, consensual sexual relations among adults is incompatible with respect for a number of internationally recognized human rights, including the rights to personal autonomy and privacy.  The policy further states that "[f]orced prostitution and trafficking in human beings are among the most serious violations of human rights" and that "[a]ll states have an obligation to take necessary measures to prevent and combat such criminal activities."  However, HRW believes "those engaged in sex work are more likely to be capable of seeking protection from the law if they and their work are not treated as criminal" and it advocates accordingly.  *Id*. ¶¶ 6-7.

Despite these clear distinctions in its policy, HRW is concerned that its global advocacy against criminalization of sex work and arrest of sex workers could be seen by U.S. litigants as "facilitating" "prostitution" or in some way assisting sex trafficking, thus violating FOSTA. Moreover, because HRW relies heavily on individuals spreading its reporting and advocacy through social media, it is concerned that social media platforms and websites that host, disseminate, or allow users to spread its reports and advocacy materials may be inhibited from doing so due to the substantial additional penalties of Section 2421A for "reckless disregard" of a connection to sex trafficking activities.  *Id*. ¶¶ 8-9.

Plaintiff Eric Koszyk, a licensed massage therapist living in Portland, Oregon, and sole proprietor of Soothing Spirit Massage – a business he has run for over a decade – has also felt the effects of FOSTA.  Mr. Koszyk had used the online classified ad platform Craigslist.org, the largest such U.S. site, as the primary way to find clients for Soothing Spirit, with approximately 90 percent of its clientele coming through Craigslist ads.  Declaration of Eric Koszyk ("Koszyk

---

2014, it advocated against a Canadian anti-prostitution bill.  PoKempner Decl. ¶ 5.  HRW has also documented abuses against sex workers in Ukraine, Greece, Lebanon and South Africa.  *Id*.

Decl.") ¶ 6.  The ads typically posted in the website's Therapeutic Services section, specified Mr. Koszyk's gender and that his massage therapy is professional, licensed, and therapeutic, and have largely remained unchanged during the entire time Mr. Koszyk used Craigslist.  *Id.* ¶ 7.

After FOSTA was signed into law on April 11, 2018, Mr. Koszyk discovered Craigslist had removed his most recent ad for Soothing Spirit, and learned it had shut down its Therapeutic Services section in response to FOSTA's passage.  *Id.* ¶¶ 21-23.  Though Mr. Koszyk tried to re-post the same long-running ad in Craigslist's Skilled Services section, the site blocked the posting, and Mr. Koszyk has since been unable to post on *any* part of Craigslist, and thus since April 11, 2018, has been unable to advertise his therapeutic massage service.  *Id.* ¶¶ 23-24.

FOSTA also has cast great doubt on the legality and actionability of the advocacy work by Plaintiff Jesse Maley, a long-time advocate for sex worker rights (under the name "Alex Andrews"), and co-founder and organizer of both a number of advocacy groups for sex worker health, safety, and human rights, and of the website Rate That Rescue (www.ratethatrescue.org), a free sex worker-led, community effort to share information.  Declaration of Jesse Maley ("Maley Decl.") ¶¶ 1-10, 12-13.  Rate That Rescue is a ratings and review site created in response to the rapid growth of organizations that claim to assist or rescue sex workers, because some such groups offer services and support that may not match the needs of sex workers who do not view themselves as victims.  *Id.* ¶¶ 14-16.  Rate That Rescue also has expanded to share information about all types of entities that provide services sex workers use – be they public, private, non-profit, or commercial – including those that do not focus on sex workers but have products or services they use, like Twitter, Wix, or PayPal.  *Id.* ¶¶ 18-23.

As the Rate That Rescue website hosts content created by both organizations and the sex worker community, it relied heavily on CDA immunity under Section 230, especially insofar as

users can post anonymously.  *Id.* ¶¶ 19-21, 24-25.  Without Section 230's protections, Rate That Rescue will be unable to function and faces potentially ruinous liability for the content of users' speech, as the site produces no revenue, is volunteer-operated, and cannot actively or comprehensively review, edit, or moderate user-generated content.  *Id.* ¶¶ 27-29.  There is also concern that Rate That Rescue could face claims of direct liability under FOSTA's new Section 2421A ban on owning, managing, or operating a website with the intent to promote or facilitate prostitution, especially given that listing organizations that provide free services to sex workers – including healthcare, housing, and childcare – could be seen as helping or assisting them.  *Id.* ¶¶ 30-31.  The fact that Rate That Rescue was established by sex workers and their advocates to improve their lives, health, safety, and wellbeing raises the same concerns.  *Id.*  Additionally, FOSTA has delayed Ms. Maley's decision about whether to purchase an in-development smartphone application and website designed to increase sex worker safety by allowing them to report violence, harassment and other harmful behavior, and by maintaining a database of reports so other sex workers could avoid violence and bad actors.  *Id.* ¶¶ 32-39.

Plaintiff The Internet Archive ("the Archive") is a 501(c)(3) organization located in San Francisco, California, that works to prevent the Internet and other "born-digital" materials from disappearing into the past, by offering permanent access for researchers, historians, scholars, people with disabilities, and the general public to historical collections that exist in digital format.  The vast majority of the material in the Archive's collection is authored by third parties and includes over 330 billion web pages spanning 1996 to the present, over 17 million texts (including over 2 million scanned public-domain works), 5 million audio files, and 4 million video files.  Declaration of Brewster Kahle ("Kahle Decl.") ¶¶ 2, 4, 5, 8, 12.  The Archive "crawls" and archives about 80 million web pages per day, and over 20,000 items are added to the collection

by third parties daily.  Files are downloaded by tens of millions of users each month.  *Id.* ¶¶ 7, 12, 13.  The Archive does at times remove content, but has no practical ability to evaluate the legality of any significant portion of the third-party content it archives and makes available.  The Archive relies upon immunity granted by 47 U.S.C. § 230 for third-party content.  *Id.* ¶¶ 14-15.

The Archive is concerned the changes to 18 U.S.C. §1591 and § 2421A will subject it to federal criminal, state criminal, and civil liability.  This is because some third-party content the Archive hosts, such as particular websites, information about books, and books themselves, may be construed as promoting or facilitating prostitution, or assisting, supporting, or facilitating sex trafficking.  The Archive also fears that after FOSTA it can no longer rely on Section 230 to bar liability for content created by third parties and hosted by the Archive.  *Id.* ¶¶ 21-22.

## ARGUMENT

The Court should grant preliminary injunctive relief in this case "to maintain the status quo pending a final determination of the merits" of Plaintiffs' constitutional challenge to FOSTA, *Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 78 (D.D.C. 2010), because "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  As demonstrated below, Plaintiffs are likely to succeed on the merits of their challenge to FOSTA, irreparable harm is likely absent preliminary relief, the equities balance in their favor, and preliminary relief accords with the public interest.  *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

FOSTA creates immediate threats of criminal prosecution and civil liability and violates the constitutional rights to publish, post to, and access websites for Plaintiffs, other websites, and all Internet users and service providers.  Because FOSTA changes existing law and creates new criminal penalties in ways that violate well-established First Amendment principles, and stands

as an unconstitutional *ex post facto* law, Plaintiffs are likely to prevail on the merits, and have

shown irreparable harm.  *See, e.g.*, *Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012)

(when First Amendment rights are implicated, preliminary injunction factors essentially col-

lapse).  The government will experience minimal harm, or none at all, from an order preserving

the *status quo* of laws that took effect only recently, particularly given preexisting criminal laws

that remain in effect.  If anything, in view of the harm resulting from FOSTA's hindrance of sex

trafficking prevention efforts, and harms being suffered by sex workers, a preliminary injunction

would, in fact, *serve* that particular public interest as well.  And the public interest also will be

served, as always, by safeguarding constitutional rights and preserving laws that have fostered a

free and open internet.  *See Pursuing America's Greatness*, 831 F.3d at 511-12; *Google v. Hood*,

96 F. Supp. 3d 584, 601 (S.D. Miss. 2015), *vacated on other grounds*, 822 F.3d 212.

## I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BECAUSE FOSTA VIOLATES THE FIRST AMENDMENT AND DUE PROCESS, AND IMPOSES *EX POST FACTO* PENALTIES

### A.     FOSTA Violates the First Amendment Because it is a Vague and Overly Broad Content-Based Regulation of Internet Speech

#### 1.     FOSTA's Prohibitions are Unconstitutionally Overbroad

The Constitution "gives significant protection from overbroad laws that chill speech

within the First Amendment's vast and privileged sphere."  *Ashcroft v. Free Speech Coalition*,

535 U.S. 234, 244 (2002).  A law thus "may be invalidated as overbroad if 'a substantial number

of its applications are unconstitutional, judged in relation to the statute's plainly legitimate

sweep.'"  *United States v. Stevens*, 559 U.S. 460, 473 (2010).  *See Free Speech Coalition*, 535

U.S. at 244 (a law is "unconstitutional on its face if it prohibits a substantial amount of protected

expression").  Likewise, a law that targets speech is facially unconstitutional if there is a "likeli-

hood that the statute's very existence will inhibit free expression" by "inhibiting the speech of

third parties who are not before the Court." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 799 (1984).   "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).   For that reason, "if the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech, [it] must do so." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 371 (2002).

There can be no doubt FOSTA "prohibits a substantial amount of protected expression." It creates a new federal crime targeting anyone who "owns, manages, or operates an interactive computer service" with the intent to "promote" or "facilitate" prostitution or who recklessly disregard that they are "contributing to sex trafficking" and it authorizes state prosecutions and civil actions for such activity.   The law provides no definitions, nor does it suggest discernable limits for what might constitute promotion or facilitation of prostitution or trafficking.   By asserting that sex trafficking and prostitution are "inextricably linked," Congress indicated its intent to combat sex trafficking by imposing liability on a broad range of non-trafficking speech, thus threatening sex worker advocates with potential liability for trafficking.

FOSTA's new restrictions on speech and its changes to Section 230 immunity for hosting third-party speech are overly broad.   The U.S. District Court for the Northern District of Illinois explained that "'[f]acilitating' and 'assisting' encompass a broader range of conduct, so broad in fact that they include … intermediaries like phone companies, ISPs, and computer manufac-turers." *Dart v. Craigslist*, 665 F. Supp. 2d 961, 967 (N.D. Ill. 2009).   To suggest that providing a platform for speech of someone who might commit illegal acts "promotes" or "facilitates" those acts "does not satisfy the ordinary understanding of culpable assistance to a wrongdoer." *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003) ("Just as the telephone company is not

liable … for [video]tapes or narcotics sold by phone, … a web host cannot be classified as an aider and abettor of criminal activities conducted through access to the Internet."). *See also In re Aimster Copyright Litig.*, 334 F.3d 643, 651 (7th Cir. 2003) ("A retailer of slinky dresses is not guilty of aiding and abetting [] even if he knows that some of his customers are prostitutes ….").

Under FOSTA's plain terms, anything on an online platform, commercial or non-commercial alike, that can be said to "promote" or "facilitate" prostitution or trafficking is at risk of criminal prosecution or ruinous civil liability.  Websites that support sex workers by providing health-related information or safety tips could be liable for promoting or facilitating prostitution, *see* Maley Decl. ¶¶ 30-31, while those that make prostitution easier – *i.e.*, "facilitate" it – by advocating for decriminalization are now uncertain of their own legality.  PoKempner Decl. ¶¶ 8-9.  Merely indicating online without negativity that a person is a sex worker – thus "promoting the[ir] prostitution" – could trigger similar ruinous liability.  Additionally, websites that enable interpersonal or intimate connections, such as "personals" or "dating" information, face obvious risks.  That is why an unprecedented array of sites closed down or severely restricted access to constitutionally protected material immediately after FOSTA passed.  D'Adamo Decl. ¶¶ 10-13.

FOSTA is also unconstitutionally overbroad because it intends to rehabilitate claims filed to suppress constitutionally protected speech, and its terms chill that expression.  Those who previously brought actions to close down online classified ad services, but were blocked by Section 230, advocated for FOSTA based on claims that ad sections for "adult" services or "escorts" were synonymous with prostitution.  *See supra* 7-8.  Yet such arguments have been rejected as unconstitutional by every court that considered them.[7]  FOSTA seeks to overturn this settled law.

---

[7]  *See, e.g., Backpage.com v. Dart*, 807 F.3d 229, 234 (7th Cir. 2015) ("[N]ot all advertisements for sex are advertisements for illegal sex."); *Doe v. Backpage.com LLC*, 104 F. Supp. 3d 149, 156-57 (D. Mass. 2015), *aff'd*, 817 F.3d 12 (1st Cir. 2016) ("The existence of an escorts

The result is widespread confusion about what online speech is safe from prosecution or civil liability.  A similar uncertainty underlay the Supreme Court's concern about the CDA's indecency prohibition.  It asked: "Could a speaker confidently assume that a serious discussion about birth control [], homosexuality, the First Amendment issues raised by the Appendix to our *Pacifica* opinion, or … prison rape would not violate the CDA?"  *Reno*, 521 U.S. at 871.  The answer, of course, was "no."  But FOSTA is even worse because it empowers 50 state attorneys general, local prosecutors, and enterprising plaintiffs' lawyers across America to concoct arguments for what might constitute promoting of facilitating prostitution or trafficking.[8]

### 2.    FOSTA Fails Strict Scrutiny

Strict scrutiny applies to FOSTA because it imposes content-based restrictions on speech. As a general mater, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Stevens*, 559 U.S. at 468.  "[R]egulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  *Reed v. Town of Gilbert*, 135 S. Ct. 2218,

---

section in a classified ad service, whatever its social merits, is not illegal."), *cert. denied*, 137 S. Ct. 622 (2017); *Backpage.com v. McKenna*, 881 F. Supp. 2d 1262, 1282 (W.D. Wash. 2012) (escort ads have long been permitted and escort services are licensed and regulated in many states); *Backpage.com v. Cooper*, 939 F. Supp. 2d 805, 833-34 (M.D. Tenn. 2013) (ads on Backpage.com are protected speech under the First Amendment); *Backpage.com v. Hoffman*, 2013 WL 4502097, at *9-11 (D.N.J. Aug. 20, 2013) (rejecting argument that escort ads on the website are unprotected speech); *M.A. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1049-50 (E.D. Mo. 2011).  *See also Craigslist*, 665 F. Supp. 2d at 968 ("We disagree … that the 'adult services' section is a special case.  The phrase 'adult,' even in conjunction with 'services,' is not unlawful in itself nor does it necessarily call for unlawful content."); *Cohen v. Bd. of Supervisors*, 707 P.2d 840, 852 (Cal. 1985) ("An escort service may very well involve lawful activities relating to sex.") (internal quotation marks omitted).

[8]   *See Fair Housing Council of San Fernando Valley v. Roommates.com*, 521 F.3d 1157, 1174 (9th Cir. 2008) ("there will always be close cases where a clever lawyer could argue that *something* the website operator did encouraged the illegality" and websites will be faced with "death by ten thousand duck-bites, fighting off claims that they promoted or encouraged – or at least tacitly assented to – the illegality of third parties").

2227 (2015).  *See Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 530, 537 (1980) ("The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.").  "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose.  Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny."  *Reed*, 135 S. Ct. at 2227.

FOSTA creates new criminal provisions in 18 U.S.C. § 2421A that apply to any online publisher who intends to "promote" or "facilitate" the prostitution of another or acts in "reckless disregard" that their actions "contributed to sex trafficking."  Section 2421A thus targets speech based on its "message" and "function" – the promotion or facilitation of prostitution.  *Reed*, 135 S. Ct. at 2227.  *See also Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (statute restricting speech about crime is content-based).  Section 2421A "focuses *only* on the content of the speech ….  This is the essence of content-based regulation." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 811-12 (2000).

Section 2421A not only imposes content-based restrictions, but also allows the government to discriminate against certain viewpoints, which is an even more "blatant" and "egregious form of content discrimination."  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *True the Vote, Inc. v. IRS*, 831 F.3d 551, 560 (D.C. Cir. 2016).  By criminalizing speech that promotes or facilitates prostitution, the law's sweep includes speech by Plaintiffs such as harm-reduction education aimed at sex workers, and advocacy intended to bring about decriminalization of sex work. Maley Decl. ¶¶ 27-31; Declaration of Dr. Alexandra Lutnick ("Lutnick Decl.") ¶ 20.  Speech condemning prostitution faces no such prohibition.  The statute

does not define "promote" and "facilitate," but by their plain meanings, these terms encompass advocacy and education that has the effect of furthering prostitution.[9]  *See also United States v. Rivera*, 775 F.2d 1559, 1562 (11th Cir. 1985) (defining "facilitate" as "to make easier or less difficult"); *cf. Holder v. Humanitarian Law Project*, 561 U.S. 1, 7 (2010) (statute prohibiting "material support" of terrorist organizations meant "any contribution" that "facilitate[d]" their criminal conduct); *id.* at 36 (statute applied even where providers of support meant to "*promote* only the groups' nonviolent ends") (emphasis added).

For similar reasons, the exception added by FOSTA to 47 U.S.C. § 230(e)(5)(C) is also content-based.  Together, subsections 230(c)(1) and (e)(3) provide broad immunity to providers of interactive computer services who host speech by others that violates state law.  *See id.* § 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.").  Subsection (e)(5)(C) selectively cuts back this protection based entirely on the content of speech, exposing platforms to prosecution under state laws "if the conduct underlying the charge would constitute a violation" of 18 U.S.C. § 2421A and "prostitution is illegal in the jurisdiction where the defendant's promotion or facilitation of prostitution was targeted."  The law is content-based because it discriminates against platforms based on the content of the speech they host, providing protection for hosting any and all speech that may be illegal under state law *except* speech that "facilitates" prostitution.

Because FOSTA imposes content-based restrictions on speech, it is subject to strict scrutiny, "regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech."  *Pursuing America's Greatness*,

---

[9]  According to the Oxford English Dictionary, "promote" means "to advance or actively support (a process, cause, result, etc.)," *Oxford English Dictionary* (3d ed. 2007), while Black's Law Dictionary defines "to facilitate" as "to make the occurrence of (something) less difficult." *Black's Law Dictionary* (10th ed. 2014).

831 F.3d at 509 (quoting *Reed*, 135 S. Ct. at 2228).   Such content-based restrictions of speech, "enforced by severe criminal penalties, have the constant potential to be a repressive force in the lives and thoughts of a free people." *Ashcroft v. ACLU*, 542 U.S. at 660.   *See also Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011) ("It is rare that a regulation restricting speech because of its content will ever be permissible.").   The First Amendment "demands" that such restrictions "be presumed invalid, and that the Government bear the burden of showing their constitutionality." *Ashcroft*, 542 U.S. at 660 (citations omitted).

To satisfy strict scrutiny, the government must prove the law is "narrowly tailored to promote a compelling Government interest," and that no "less restrictive alternative would serve the [its] purpose." *Playboy*, 529 U.S. at 813; *Brown*, 564 U.S. at 799.   This means it may limit speech "no further than necessary to achieve the goal," to "ensure that legitimate speech is not chilled or punished." *Ashcroft*, 542 U.S. at 666.   Any speech restriction must directly advance the government interest and be neither overinclusive nor underinclusive, and there can be no less speech-restrictive alternatives to serve the government interest.   *Reno*, 521 U.S. at 874.

The government's burden is particularly heavy in this case where Congress adopted "nuclear option"-level penalties to ensure compliance.   *See Free Speech Coalition*, 535 U.S. at 244 ("a law imposing criminal penalties on protected speech is a stark example of speech suppression" and "a textbook example of why we permit facial challenges to statutes that burden expression").   In *Reno*, the Supreme Court noted that violations of the CDA could be punished by up to two years in prison and concluded "the severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *Reno*, 521 U.S. at 872.   But where the threat of such sanctions under the CDA were undeniably chilling, FOSTA imposes a deep freeze:  Violations of Section 2421A are subject to

10 years in prison, while aggravated violations carry a sentence of up to 25 years.  18 U.S.C. § 2421A(a)-(b).  While the CDA raised possible enforcement by federal prosecutors, FOSTA authorizes criminal enforcement by federal authorities, 50 state attorneys general, *and* hundreds of local prosecutors.  18 U.S.C. § 2421A(a); 47 U.S.C. § 230(e)(5); 18 U.S.C. § 1595(d).[10]

Here, FOSTA fails strict scrutiny because the law does not directly advance the government's objective.  If anything, the law has made it more difficult, as Congress was warned, for law enforcement to investigate trafficking.  *See* Winkler Statement, *Latest Developments in Combating Online Sex Trafficking*, *supra* note 2, at p.4; Declaration of Professor Alexandra Frell Levy ("Professor Levy Decl.") ¶¶ 7-9; Declaration of Dr. Kimberly Mehlman-Orozco ("Mehlman-Orozco Decl.") ¶¶ 247-29, 31; Lutnick Decl. ¶¶ 17-19.  It has also hindered operations of anti-trafficking organizations.  Lutnick Decl. ¶ 21; Freedom Network Statement, *supra* 6-7.

Further, the government cannot meet the heavy burden to demonstrate that FOSTA is narrowly tailored.  First, it is overinclusive because it restricts more speech than necessary to further the government's interest.  Even granting that there is a compelling interest in preventing sex trafficking, "[t]he prospect of crime … by itself does not justify laws suppressing protected speech."  *Free Speech Coalition*, 535 U.S. at 244-45; *see also Kingsley Int'l Pictures Corp. v. Regents of Univ. of N.Y.*, 360 U.S. 684, 689 (1959).  Section 2421A reaches beyond prostitution and sex trafficking, criminalizing speech intended to promote sex workers' rights and safety, including advocacy and education that may "facilitate" prostitution.  Congress' belief that such speech about sex work contributes to sex trafficking is not supported by evidence.

---

[10]   In addition, FOSTA authorizes civil damages, strips away existing statutory immunities from civil liability in state and federal courts, and imposes mandatory restitution "in addition to any other civil or criminal penalties."  18 U.S.C. § 2421A(c)-(d); 47 U.S.C. § 230(e)(5).  As with criminal penalties, the prospect of significant civil liability based on the exercise of free speech is circumscribed by the First Amendment.  *Snyder v. Phelps*, 580 F.3d 206, 217-18 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011); *New York Times Co. v. Sullivan*, 376 U.S. 254, 264-65 (1964).

Just as "the Government may not reduce the adult population to only what is fit for children," *Reno*, 521 U.S. at 875, neither may it limit how Americans may discuss issues that may include illegal behavior.  FOSTA's chilling effects go even further.  It has adversely affected online platforms that host classified ads (whether or not sexually-oriented), even though it cannot be presumed speech about sex is necessarily illegal or unprotected by the First Amendment.  *Backpage.com, LLC v. Dart*, 807 F.3d at 234 ("not all advertisements for sex are advertisements for illegal sex").  This is the very definition of a chilling effect.  Given this broad impact, the government cannot meet its "heavy burden" under strict scrutiny, *Reno*, 521 U.S. at 879, unless it can show that FOSTA restricts speech "no further than necessary." *Ashcroft*, 542 U.S. at 666.  Here, however, the law's vague and expansive terms, combined with its watered-down scienter requirements and draconian penalties show that Congress used "a butcher knife on a problem that requires a scalpel to fix." *Cooper*, 939 F. Supp. 2d at 813.

Second, there are less speech-restrictive alternatives that would effectively further the government's stated interest in eliminating sex trafficking.  "When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that [it] will be ineffective to achieve its goals." *Playboy*, 529 U.S. at 816.  Indeed, some of these alternatives already exist in federal law; prior to FOSTA's enactment, it was already a crime to "advertise[]" sex trafficking (on the Internet or elsewhere) and to "benefit[] financially" from a venture involving such ads.  18 U.S.C. § 1591(a)(1), (2).  Such laws, subject to First Amendment limits and when enforced pursuant to constitutionally required *mens rea* requirements, constitute less restrictive ways to address the government's interest. *Backpage.com, LLC v. Lynch*, 216 F. Supp. 3d 96, 108-09 (D.D.C. 2016); *Playboy*, 529 U.S. at 816-26.

### 3.     FOSTA's Prohibitions are Unconstitutionally Vague

Not only is FOSTA overly broad, its restrictions on speech also are unconstitutionally vague.[11]   As a general proposition, vague laws offend due process because they fail to give people of ordinary intelligence fair warning of what conduct is prohibited, allow arbitrary and discriminatory enforcement, and delegate basic policy matters to policemen, judges and juries for resolution on an ad hoc and subjective basis. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).   Statutory vagueness takes on added significance beyond normal due process concerns where the government seeks to regulate speech.   Vague statutes that affect "sensitive areas of basic First Amendment freedoms" are unconstitutional because they "inevitably lead citizens to 'steer far wider of the unlawful zone' … than if the boundaries of the forbidden areas were clearly marked." *Id*. at 108 (quoting *Baggett*, 377 U.S. at 372).   As a result, "this Circuit has ruled that officials must have 'explicit guidelines in order to avoid arbitrary and discriminatory enforcement.'" *Armstrong v. D.C. Public Library*, 154 F. Supp. 2d 67, 81 (D.D.C. 2001) (quoting *Big Mama Rag, Inc. v. United States*, 631 F.2d 1030, 1035 (D.C. Cir. 1980)).   If a law "lacks terms which can be defined objectively, a court will strike it down for vagueness." *Id.* at 77 (quoting *Fire Fighters Ass'n, D.C. v. Barry*, 742 F. Supp. 1182, 1196 (D.D.C. 1990)).

A vague law that regulates expression "'raises special First Amendment concerns because of its obvious chilling effect on free speech.'" *Brown*, 564 U.S. at 807 (quoting *Reno*, 521 U.S. at 871-72).   *See also Smith v. Goguen*, 415 U.S. 566, 573 (1974) ("Where a statute's literal

---

[11]   Questions involving overbreadth and vagueness in laws that regulate speech necessarily are related.   However, a restriction can be unconstitutionally overbroad without being vague. *E.g.*, *Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 570, 577 (1987) (resolution banning all "First Amendment activities" at Los Angeles International Airport is overbroad).   At the same time, vague restrictions on speech are inherently overbroad, because a nebulous law really imposes "no rule or standard at all." *Baggett v. Bullitt*, 377 U.S. 360, 365 (1964).   *Reno*, 521 U.S. at 864 (vagueness is relevant to the First Amendment overbreadth inquiry).

scope … is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts."). And where penal statutes are involved, "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP*, 371 U.S. at 438. Finally, for reasons already discussed, the "unique nature of the [Internet] cannot be overemphasized in discussing and determining the vagueness issue." *Reno*, 929 F. Supp. at 865 n.9.

FOSTA falls far short of this constitutional standard. It imposes criminal penalties based entirely on speaking or publishing online with "intent" to "promote" or "facilitate" the prohibited offenses but does not define those terms.[12] The Act creates further ambiguity by increasing punishment for those who act "in reckless disregard … that … conduct contributed to sex trafficking," without defining how one "contributes to sex trafficking." 18 U.S.C. § 2421A(b)(2). The vagueness of "contributed to sex trafficking" is compounded by Congress's belief that sex trafficking and consensual sex work are "inherently linked," thus raising the probability that it considers anything that "contributes to" sex work, whatever that means, to also "inherently" "contribute to sex trafficking." Even under normal due process standards, an intent to "facilitate" criminal activity can be constitutionally vague.[13] But the Supreme Court has held this requirement takes on even greater urgency in the First Amendment context.

---

[12] FOSTA's inclusion of an "intent" standard does nothing to cure the law's vagueness where the operative terms "promote" or "facilitate" are ambiguous and undefined. *Amusement Devices Ass'n v. Ohio*, 443 F. Supp. 1040, 1051 (S.D. Ohio 1977) ("[T]he Supreme Court has never to our knowledge held that the imposition of a scienter element upon a statute necessarily renders the statute's prohibitions sufficiently precise to withstand a vagueness challenge."). In any event, the law's scienter elements are defective, as explained *infra* § I.A.4.

[13] *E.g.*, *Amusement Devices Ass'n*, 443 F. Supp. at 1051 (invalidating state law prohibiting provision of legal services to criminal syndicate with a purpose of "establishing or maintaining" the syndicate or "facilitating any of its activities" because the language "fails to specify with reasonable clarity which kind or kinds of conduct it prohibits").

The operative terms of FOSTA impose a far more amorphous burden on protected speech by prohibiting any communication that may be said to "promote" or "facilitate" prostitution or trafficking than the undefined terms the Supreme Court held unconstitutionally vague in *Reno*: "obscene or indecent" and "patently offensive." *Reno*, 521 U.S. at 858-59, 871-79. Not only does FOSTA fail to define the key terms "promote" or "facilitate," other federal statutes with those terms have been interpreted fairly boundlessly, with facilitate, for example, meaning simply "to make easy or less difficult." *E.g.*, *United States v. Miller*, 379 F.2d 483, 485-86 (7th Cir. 1967) (interpreting provisions of Travel Act). Under these vague parameters, any online speech that might be considered encouraging to sex workers, or that provides services or seeks to minimize harm in a way that encourages, or makes sex work easier and safer for sex workers, could be swept up in prosecutions or civil claims. Or, as the Court put it in *Reno*, no one could say with confidence that such speech would not be subject to legal sanctions. 521 U.S. at 871.

The same dynamic is at work here. As the Court observed in *Baggett*, "the susceptibility of the statutory language to require the foreswearing of an undefined variety of 'guiltless knowing behavior'" makes a law unconstitutionally vague. *Id.* at 366-68 (striking down a statute requiring teachers to sign oaths affirming they did not "advise, teach, abet, or advocate" overthrow of government). *Compare Reno*, 521 U.S. at 871 ("Could a speaker confidently assume that a serious discussion about birth control [], homosexuality, the First Amendment issues raised by the Appendix to our *Pacifica* opinion, or … prison rape would not violate the CDA?"), with *Baggett*, 377 U.S. at 368 ("Does the statute reach endorsement or support for Communist candidates for office? Does it reach a lawyer who represents the Communist Party or its members or a journalist who defends [the] constitutional rights of the Communist Party or its members or

anyone who supports any cause which is likewise supported by Communists or the Communist Party?").[14]

It would ignore reality – as well as the history of Internet censorship – to disregard how FOSTA's vague mandate will be used by prosecutors and private litigants in all 50 states to censor speech and threaten lifestyle choices with which they disagree.  FOSTA provides them a perfect tool for driving material they dislike from the Internet, even though it is constitutionally protected.  Given the massive criminal penalties and onerous potential civil liability, online plat-forms large and small will have no choice but to "steer far wider of the unlawful zone."  *Gray-ned*, 408 U.S. at 109.  Indeed, they have already done so on a massive scale.  *See supra* 11-12.

### 4.     FOSTA Lacks the Necessary Scienter to Satisfy First Amendment Requirements

FOSTA is also unconstitutional because it does not include the requisite standard of *mens rea*.  The Supreme Court has long held the First Amendment bars the State from imposing liability for distributing expressive materials without proof of scienter.  In *Smith v. California*, 361 U.S. 147 (1959), for example, the Court struck down a Los Angeles ordinance making it a crime for booksellers to possess obscene books.  Even though the First Amendment does not protect obscene speech, the Court held a bookseller could not be liable without proof of know-ledge of the contents of a given book.  *Id.* at 153-54 ("It would be altogether unreasonable to demand so near an approach to omniscience.  And the bookseller's burden would become the public's burden").  *See also Mishkin v. New York*, 383 U.S. 502, 511 (1966) ("The Constitution requires proof of scienter to avoid the hazard of self-censorship of constitutionally protected

---

[14]   *See also Cramp v. Board of Pub. Instruction*, 368 U.S. 278, 281 (1961) (invalidating Florida law that required public employees to swear they never lent "aid, support, advice, counsel or influence to the Communist Party").

material ....").[15]   The First Amendment burden imposed by self-censorship is magnified online, because "websites … will bear an impossible burden to review all of their millions of postings or, more likely, shut down their adult services entirely."  *Cooper*, 939 F. Supp. 2d at 830.

FOSTA amended Section 1591 to provide that violation of the law requires only "participation in a venture" that includes "knowingly assisting, supporting, or facilitating" prostitution or trafficking, but left undefined what constitutes "assisting, supporting, or facilitating" such activities.  *See Cooper*, 939 F. Supp. 2d at 830 (broad and undefined terms undermine scienter requirements).  FOSTA's "aggravated" offense in Section 2421A further dispenses of scienter by imposing liability based on "reckless disregard" of the fact that conduct "contributed to sex trafficking."  18 U.S.C. § 2421A(b)(2).  This provision strips away the requirement of specific knowledge mandated by the Constitution in favor of an amorphous standard that imposes massive liability based on generalized knowledge that online speech may be construed to "promote or facilitate" prostitution or to "contribute to sex trafficking."  *See Elonis*, 135 S. Ct. at 2009 (holding defendant "must know the facts that make his conduct fit the definition of the offense, even if he does not know that those facts give rise to a crime").

The House Report on the legislation explained that the purpose of this change was to create a workaround to the specific knowledge requirement for advertising in the prior version of Section 1591.  It noted Section 1591's previous knowledge requirement was difficult to prove because "online advertisements rarely, if ever, indicate that sex trafficking is involved."  H.R. Rep. No. 115-572, pt. 1, at 5.  The Report added that "federal prosecutors usually cannot

---

[15]   *See also United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994) ("[A] statute completely bereft of a scienter requirement as to the age of the performers would raise serious constitutional doubts."); *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690 (8th Cir. 1992) ("Statutes that impose criminal responsibility for dissemination of unprotected speech must contain a knowledge requirement."); *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) ("[W]rongdoing must be conscious to be criminal.").

demonstrate beyond a reasonable doubt that the website operators knew the advertisements involved sex trafficking." FOSTA therefore adopted a generalized knowledge standard, contrary to constitutional requirements.

The predictable result of this legislation has been "self-censorship of constitutionally protected material" on a massive scale, *Mishkin*, 383 U.S. at 511, such as where Craigslist eliminated its entire personals section. *See supra* 11, 16. Such mainstream, general-purpose websites are of the sort that the Supreme Court called "indispensable" in *Packingham*. 137 S. Ct. at 1735-36. And that is without even consideration of online services like those of the Plaintiffs, which merely *talk about* sex work and related topics (or, in the case of Mr. Koszyk, does not involve such subject matter at all) yet have restricted themselves in an effort to "steer far wide[] of the unlawful zone." *Speiser v. Randall*, 357 U.S. 513, 526 (1958).

### B.     FOSTA's Selective Modification of Section 230's Immunity for Online Intermediaries Violates the First Amendment and Promotes Widespread Censorship of Internet Speech

Section 230 of the CDA was based on understanding that the Internet would be crippled if online providers could be held liable for third-party content, "given the volume of material communicated …, the difficulty of separating lawful from unlawful speech, and the relative lack of incentives to protect lawful speech." *Lycos*, 478 F.3d at 418-19. At the same time, Congress recognized that "Internet service providers are likely to abandon efforts to self-regulate content posted on their site[s]" if "efforts to review and omit third-party … inappropriate material make a computer service provider … liable for posted speech." *Batzel*, 333 F.3d at 1029. To serve these twin goals, Congress adopted two different immunity provisions: Section 230(c)(1), which bars imposing liability on service providers for alleged harms arising from content posted by third parties, and Section 230(c)(2) which shields service providers from liability for good faith efforts to restrict access to material they consider "obscene, lewd, lascivious, filthy, excessively

violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected."[16]  Together, the two immunity provisions reinforce important First Amendment protections.  However, by limiting the scope of Section 230(c)(1) and preserving only the immunity of (c)(2) based on *blocking or removing* posted content, FOSTA transforms Section 230 into an engine of censorship in violation of the First Amendment.

Section 230 was adopted to promote free expression online, to free intermediaries from threats of liability for hosting third-party speech, and to encourage websites to make editorial judgments without risking liability.  *See, e.g.*, *Batzel*, 333 F.3d at 1027-29 (Section 230 was added to the CDA "to further First Amendment and e-commerce interests on the Internet while also promoting the protection of minors"); *Barrett v. Rosenthal*, 40 Cal. 4th 33, 56 (2006) (Section 230 reflects "legislative commitment to the value of maintaining a free market for online expression").[17]  It flows from recognition that online platforms have a constitutional right to make editorial choices,[18] as well as from the understanding that Internet speech will be

---

[16]  Section 230(c)(1) protects free speech online by allowing intermediaries to post third-party content without the threat of unlimited liability from state prosecutors or civil litigants who claim to be harmed by the postings.  Section 230(c)(2), on the other hand, protects against liability *from third parties* when editorial policies are enforced that prevent certain materials from posting.  *See Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1174-75 (9th Cir. 2009) (explaining different purposes of respective Section 230 immunities); *Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 670-71 (7th Cir. 2008) (Section 230(c)(1)'s immunity is "general," while (c)(2) ensures providers who filter offensive material are "'not liable *to the censored customer*'") (emphasis added).

[17]  *See also Google v. Hood*, 822 F.3d at 220 ("First Amendment values … drive the CDA"); *Zeran*, 129 F.3d at 330; *Lycos*, 478 F.3d at 418-19; *Delfino v. Agilent Techs., Inc.* 145 Cal. App. 4th 790, 802-03 (2006) (Section 230 was intended to "avoid the chilling effect upon Internet free speech" that would arise from imposing liability on intermediaries).

[18]  *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 991-22 (S.D. Tex. 2017) ("online publishers have a First Amendment right to distribute others' speech and exercise editorial control on their platforms"); *Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 438-39 (S.D.N.Y. 2014) (when online platforms "select and arrange others' materials, and add the all-important ordering that causes some materials to be displayed first and others last, they are

broadly stifled if platforms are held liable for speech posted by third parties.  *Lycos*, 478 F.3d at 418-19; *Zeran*, 129 F.3d at 331.

FOSTA ignores the First Amendment basis for Section 230 immunity and seeks to limit selectively the scope of Section 230 immunity for third-party postings that relate to prostitution and sex trafficking.  It amends Section 230(c)(1), which previously provided that online inter-mediaries are not to be treated as the publisher or speaker of third-party speech, so that it no longer bars civil claims under 18 U.S.C. § 1595, or state criminal charges where the underlying conduct would violate 18 U.S.C. § 1591, or the parallel 18 U.S.C. § 2421A in jurisdictions where prostitution is illegal.  At the same time, it does not affect immunity under Section 230(c)(2), which immunizes actions taken to *restrict* speech in various categories "whether or not protected by the First Amendment," so long as it is done in "good faith."  Thus, as reformulated, Section 230(c)(2) now provides a powerful incentive for online platforms to over-censor speech to qualify for immunity, and to do so under a nebulous and undefined "good faith" standard.[19]

---

engaging in fully protected First Amendment expression—'[t]he presentation of an edited compilation of speech generated by other persons"); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 629-30 (D. Del. 2007) (First Amendment protects decisions about placement, ranking, or rejection of online advertisements); *Search King, Inc. v. Google Tech., Inc.*, 2003 WL 21464568, at *4 (W.D. Okla. 2003) ("Google's PageRanks are entitled to 'full constitutional protection.'") (citation omitted).

[19]   The Senate Report on SESTA confused the immunities provided by Section 230(c)(1) versus 230(c)(2) in suggesting interactive computer service providers "would not have their good faith efforts to restrict access to objectionable content used against them" because the legislation "would not abrogate section 230(c)(2)(A)."  S. Rep. No. 115-199, at 4 (2018).  This congres-sional action misstates the purpose of Section 230(c)(2), which was enacted to protect inter-mediaries against claims made *by their customers* who might object to deletions to posted material or other editorial choices made by the service provider.  *See supra* 33-34 & n.16.  As now reinterpreted by Congress, Section 230(c)(1) immunity from prosecution or for claims brought by those claiming harm from third-party posts in the prescribed content categories would depend on the "good faith" limitation in Section 230(c)(2), which authorizes deleting content "whether or not [such speech is] protected by the First Amendment."  47 U.S.C. § 230(c)(2).

Because this change will be effectuated through potential state prosecutions and civil lawsuits, websites have been, and will continue to be, forced to err on the side of excessive censorship.  Moreover, the new provisions provide a mechanism for exercise of a heckler's veto, whereby any person can claim a website contains illegal content, thus triggering that site's "knowledge" – and forcing sites to choose between investigating each claim or simply taking the challenged content down.

Based on past experience, this is exactly what will happen:  those seeking to impose liability under Sections 1591 or 1595 (and, by logical extension, under the new federal crime under Section 2421A), will argue that any website that allows postings regarding "escorts" or "adult services" (or anything else promoting human interaction, such as "dating" or "personals") promotes or facilitates prostitution or trafficking.  *E.g.*, *Craigslist*, 665 F. Supp. 2d at 962.  *See also* Koszyk Decl. ¶¶ 21-24 (describing Craigslist's closure of its Therapeutic Services section after FOSTA's passage).  The fact that such speech is constitutionally protected will no longer matter, and online platforms will have no option but to err on the side of censorship.

Section 230 previously barred liability based on bare allegations that a website "encouraged" unlawful content in some way based on the understanding that such a basis for liability effectively eclipses the immunity Congress sought to provide.  *E.g.*, *Jones*, 755 F.3d at 408-09. Under FOSTA, it is not necessary to allege a website encouraged the posting of material in violation of its provisions, but only that the operator "promoted" or "*facilitated*" prostitution, or disregarded that postings "*contributed to* sex trafficking," which could encompass a wide range of behavior.  As the Ninth Circuit concluded, under Section 230 prior to FOSTA, such cases "must be resolved in favor of immunity, lest we cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or

encouraged – or at least tacitly assented to – the illegality of third parties." *Roommates.com*, 521 F.3d at 1174.   But after FOSTA, websites (and especially those without substantial legal resources) face just that kind of death.   Lutnick Decl. ¶ 12.   The only rational response is to broadly censor constitutionally protected material and to immediately take down material subject to a complaint – which is exactly what has occurred.

### C.      FOSTA is an Unconstitutional *Ex Post Facto* Law

On its face, FOSTA violates the Constitution's command that "[n]o … *ex post facto* Law shall be passed."   U.S. Const. art. I, § 9.   *See also* U.S. Const. art. I, § 10 (barring states from adopting *ex post facto* laws).   "[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic."   *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994).[20]   The Supreme Court has thus long recognized retroactive legislation as "oppressive, unjust, and tyrannical," and therefore "condemned by the universal sentence of civilized man."   *Ogden v. Sanders*, 25 U.S. (12 Wheat.) 213, 266 (1827).

FOSTA is an *ex post facto* law because its effective date enables enforcement "regardless of whether the conduct alleged occurred, or is alleged to have occurred, before, on, or after such date of enactment."   FOSTA § 4(b).   This provision implements changes to 47 U.S.C. § 230(e), which authorizes (1) civil claims that are predicated on violations of criminal law in 18 U.S.C. § 1591; (2) criminal prosecutions under state law where the underlying conduct violates Section 1591; and (3) criminal prosecutions under state law where the underlying conduct violates newly adopted prohibitions in 18 U.S.C. § 2421A.

---

[20]   The Constitution's Framers were keenly aware of the dangers posed by such laws.   *See* The Federalist No. 44 (James Madison) ("ex-post-facto laws … are contrary to the first principles of the social compact, and to every principle of sound legislation"); The Federalist No. 84 (Alexander Hamilton) ("the prohibition of ex-post-facto laws … are perhaps greater securities to liberty and republicanism" than any other constitutional principles).

Congress was clearly aware of this constitutional concern, yet the provision passed both houses of Congress and was signed into law without change. As noted, DOJ warned Congress about this defect prior to FOSTA's passage. Citing the proposed effective date, DOJ notified the Chairman of the House Judiciary Committee that the Department "objects to this provision because it is unconstitutional." U.S. DEPT. OF JUSTICE OFFICE OF LEGISLATIVE AFFAIRS, *Memorandum to Hon. Robert Goodlatte, Chairman, U.S. House of Representatives Committee of the Judiciary* (Feb. 27, 2018). The Memorandum explained that "Insofar as this will "impose[] a punishment for an act which was not punishable at the time it was committed" or "impose[] additional punishment to that then prescribed" it would violate the Constitution's *Ex post facto* Clause. *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325-26 (1867); *see Beazell v. Ohio*, 269 U.S. 167, 169-70 (1925); U.S. Const. art. I, § 9, cl. 3.

As both DOJ and *Congress* understood,[21] this provision is unconstitutional. For present purposes, however, the question is whether the government will defend this provision or agree it must be enjoined.[22] "Federal officials are not only bound by the Constitution, they must also take a specific oath to support and defend it. U.S. Const. art. VI, cl. 3. To enforce a … policy that the [government] itself believes is unconstitutional may well constitute a violation of that

---

[21] Representative Goodlatte acknowledged the law's constitutional problems in a floor speech shortly before the legislation passed the House. HOUSE OF REPRESENTATIVES JUDICIARY COMMITTEE, Goodlatte Floor Speech in Support of FOSTA (Feb. 27, 2018), *available at* https://judiciary.house.gov/press-release/69685/ (noting that retroactive application of FOSTA "could subject this legislation to a constitutional challenge under the *Ex Post Facto* Clause"). Chairman Goodlatte said that he hoped the problem could be fixed and promised to propose an amendment to do so. However, no such amendment was forthcoming and the bill was passed with the constitutional flaws intact.

[22] DOJ faced a similar issue with the CDA, which originally contained a section prohibiting the transmission of information "intended for producing abortion." *See Sanger v. Reno*, 966 F. Supp. 151, 157-58 (E.D.N.Y. 1997) (discussing the Hyde Amendment, codified as CDA § 507). Upon passage, the Attorney General wrote to Congress explaining that § 507 violated the First Amendment and that DOJ would decline to enforce it. *Id*. at 158.

oath." *Meredith Corp. v. FCC*, 809 F.2d 863, 874 (D.C. Cir. 1987).[23]  In light of DOJ's position

on FOSTA's *ex post facto* provisions, it cannot defend the provision.[24]

## II.   PLAINTIFFS AND ALL OTHER INTERNET PUBLISHERS AND USERS HAVE SUFFERED AND WILL CONTINUE TO SUFFER IRREPARABLE HARM ABSENT PRELIMINARY RELIEF

Because Plaintiffs are likely to succeed on the merits of their challenges to FOSTA, and

in particular that it violates the First Amendment, they also have shown likelihood of irreparable

harm.  The Supreme Court has repeatedly held that "[t]he loss of First Amendment freedoms, for

even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at

373.  *See also supra* 19 (citing *Bays*, 668 F.3d at 819, regarding how preliminary injunction

factors essentially collapse when First Amendment rights are implicated).  Here, the Plaintiffs

have already had their protected speech curtailed due to FOSTA's chilling effect, and the need to

self-censor, causing further loss of First Amendment rights, will only continue.  The same is true

for other websites, and the members of the public who use them.

FOSTA's enactment is substantially inhibiting Woodhull's mission to advocate for harm-

reduction, and for the health and safety of sex workers, by forcing it to curtail its use of online

resources.  Levy Decl. ¶ 28.  Woodhull has already censored publication of information on its

website that could assist sex workers negatively impacted by FOSTA, and was inhibited from

posting other resources for sex workers, from expressing opposition to FOSTA, and from allow-

ing third parties to make similar posts to Woodhull's *Sex and Politics* blog.  *Id*.  It also held back

---

[23]   Even if violation of the oath did not present a constitutional problem, taking a position in court that contradicts DOJ's representations to Congress at least raises a question whether pleadings signed by government lawyers "are warranted by existing law."  Fed. R. Civ. P. 11(b)(2).

[24]   The Attorney General is obligated to notify Congress whenever the Justice Department establishes a policy of declining to enforce or defend a given law passed by Congress based on the Department's conclusion that the act is unconstitutional.  Pub. L. No. 96-132, § 21(a)(2), 93 Stat. 1040, 1049 (1979).

from promoting portions of its 2018 Summit dedicated to sex workers – even though the material is educational and informational, and participants include advocates, educators, therapists and legal and medical professionals – from the time of FOSTA's enactment until such time that Woodhull was so whipsawed by its constituents' reactions that it had to bear the risk FOSTA presented and promote the Summit's sex work track. *Id.* ¶¶ 32-36. This decision prevented Woodhull from fully publicizing and promoting its Summit activities, and singled out sex worker content for disparate treatment. *Id.* ¶ 34. Despite its nervous self-reversal on promoting the Summit, Woodhull still felt unable to offer a platform there to the Desiree Alliance's conference, and Woodhull remains hesitant to continue former efforts to promote sex worker education and harm-reduction on its website. *Id.* ¶ 40. And Woodhull does not know whether it will commit a federal crime if it livestreams or live tweets the sex work track as it hopes to do. *Id.* ¶ 38.

HRW is uncertain whether its global advocacy against criminalization of sex work and arrest of sex workers could be seen by U.S. litigants as "facilitating" "prostitution" or in some way assisting sex trafficking, thus violating FOSTA. Also, HRW relies heavily on individuals disseminating its content through social media, and is concerned that social media platforms and websites that host, disseminate, or allow users to spread its reports and advocacy materials may be inhibited from doing so, on the basis of the substantial additional penalties of Section 2421A for "reckless[] indifferen[ce]" to sex trafficking activities. PoKempner Decl. ¶¶ 8-9.

Alex Andrews' Rate That Rescue website continues to operate under the uncertainty that retrenched Section 230 immunity presents given its inability to moderate the third-party content at its site. The very fact that Rate That Rescue was established by sex workers and advocates for them to improve their lives, health, safety, and wellbeing creates existential doubts given the speech FOSTA criminalizes. Maley Decl. ¶¶ 27-31. The new law is also impeding progress on

an in-development smartphone app and website, the *raison d'être* of which is intended to be the communication of safety information critical to protecting sex workers.  *Id*. ¶¶ 32-39.

Eric Koszyk, meanwhile, he has lost all access to Craigslist, the one national, well-known online platform for promotion of his licensed, therapeutic massage business – which comprises exclusively protected speech.  Koszyk Decl. ¶¶ 21-24.  As Mr. Koszyk attests, he is unaware of any other website that will allow him to post similar ads and reach a similar sized audience as Craigslist.  *Id*. ¶ 25.  FOSTA has prevented him from being able to post ads on Craigslist for months, with no end in sight absent a preliminary injunction.

And Mr. Koszyk's circumstance highlights the irreparable harm of lost First Amendment rights by others not presently before the Court.  *See* Lutnick Decl. ¶¶ 12-16.  Some of these are connected to Plaintiffs, such as the speaker scheduled for Woodhull's Summit who pulled out after FOSTA silenced the organization's promotion of workshops in the sex worker track, or the Desiree Alliance, which given Woodhull's inability to step in, was forced to cancel what would have been the largest U.S. gathering to address human, labor, and civil rights for sex workers. The removal of content, shuttering of services, and changes in policies outlined above by numerous online services further evidences the incursion on First Amendment rights FOSTA imposes.

This is especially true of websites and interactive computer services that enable interpersonal contact by users such as those for personal ads, dating services, and similar platforms that facilitate the "unlimited … communication of all kinds" that the Supreme Court deemed so vital.  *Packingham*, 137 S. Ct. at 1735-36 (citation omitted); Lutnick Decl. ¶¶ 12-16.  This intrusion on the types of speech that online intermediaries facilitate, and that mark the Internet as a unique mass medium, trenches deeply on "the right of the public to … social, political, esthetic, moral, and other ideas and experiences," *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1967),

and the right more generally of willing listeners to receive information from willing speakers. *E.g.*, *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976).

The Internet Archive is concerned its practice of hosting third-party content, such as archives of particular websites, information about books, and the books themselves, could be construed as promoting or facilitating prostitution, or assisting, supporting, or facilitating sex trafficking. The Archive also fears it can no longer rely on Section 230 to bar liability for third-party content hosted by the Archive, on account of FOSTA. Kahle Decl. ¶¶ 21-22.

This, of course, affects not just the First Amendment interests of online platforms that host speech, but those of the millions of individuals who use them to access that information, as "[f]reedom of speech is not merely freedom to speak; it is also freedom to read." *Koger v. Dart*, 114 F. Supp. 3d 572, 578 (N.D. Ill. 2015) (quoting *King v. Fed. Bureau of Prisons*, 415 F.3d 634, 638 (7th Cir. 2005)). And it all, of course, reflects the specter of criminal and civil exposure under FOSTA's addition of Section 2421A as a new criminal offense and its amendments to Section 1591 and to the scope of Section 230 immunity. If the Supreme Court agreed in *Reno* that a threat of two years in prison under the CDA justified the district court's entry of a preliminary injunction, *see* 521 U.S. at 862, 885; *see also id*. at 872, the prospect of ten years in prison, ratcheting up to as many as 25 under FOSTA, certainly warrants preliminary injunctive relief. All of the above incursions on Plaintiffs' rights to free expression, and the self-censoring conduct of non-parties, constitute irreparable harm that compels preliminary injunctive relief.

## III.    THE BALANCE OF EQUITIES FAVORS INJUNCTIVE RELIEF

Any harm the government might cite from grant of a preliminary injunction pales compared to the loss of First Amendment freedoms Plaintiffs have shown. As a threshold matter, all of the laws that already criminalize the conduct of traffickers will continue to apply. Further,

although FOSTA is premised on preventing sex trafficking and helping ameliorate harm that may be involved in sex work, it is having a decidedly opposite impact.  Organizations like Woodhull, Desiree Alliance, and their cohorts, and websites like Rate That Rescue, seek to provide information, education, and strategies geared to the safety and well-being of their constituencies.  Yet FOSTA has forced them to curtail those efforts.  The same is true of online services and forums such as Reddit or VerifyHim.com, which have limited or eliminated opportunities for users to communicate in these areas.  *See* D'Adamo Decl. ¶¶ 10-13 (documenting actions by websites in response to FOSTA); Professor Levy Decl. ¶¶ 6-9 (discussing how shuttering online platforms will inhibit detection of sex trafficking); Lutnick Decl. ¶¶ 20-21.

Moreover, by eliminating online forums for sex workers, FOSTA is having a devastating impact of sex workers' health and safety.  Sex workers have lost the ability to screen clients, protect their identities, and arrange safe meeting places.  FOSTA also is driving sex workers back to street-based work and pimps, which is far more dangerous.  Street-based sex workers are far more likely to experience violence or exploitation.  Street-based sex work also increases marginalization and isolation, which in turn increases violence, and diminishes a sex worker's ability to seek help when needed.  Lutnick Decl. ¶¶ 11-15.

At the same time, there is no evidence FOSTA will, in fact, curtail sex trafficking, and censorship of online content is a questionable approach – at best – to combatting it.  Indeed, there is evidence that it actually hinders anti-trafficking efforts.  Lutnick Decl. ¶¶ 16-19.  It also hinders law enforcement in targeting trafficking.  *See* Winkler Statement, *supra* note 2, at p.4.  As expert Dr. Mehlman-Orozco testifies, trafficking is clandestine and difficult to identify; so where law enforcement could once turn to a small number of concentrated, open-access websites in the U.S. to catalyze arrests and rescues, FOSTA caused commercial sex ads to disperse to

hundreds of platforms, leaving trafficking even more hidden from law enforcement.  Mehlman-Orozco Decl. ¶¶ 16, 24-25, 28, 31.  As noted above, Congress was warned of this very outcome.

Given that Plaintiffs have demonstrated irreparable injury if a preliminary injunction does not issue, the balance of equities clearly tips in Plaintiffs' favor.  *See Winter*, 555 U.S. at 20.  The balance of equities also favors injunctive relief because "no substantial harm to others can be said to inhere" in allowing a violation of constitutional rights to continue.  *Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*, 274 F.3d 377, 400 (6th Cir. 2001).

## IV.    PRELIMINARY RELIEF WOULD SERVE THE PUBLIC INTEREST

A preliminary injunction is particularly warranted in this case because, as this Court has held, "[s]imply stated, it is in the public interest to uphold a constitutionally guaranteed right." *PHE, Inc. v. U.S. Dep't of Justice*, 743 F. Supp. 15, 26 (D.D.C. 1990); *cf. Pearson v. Shalala*, 130 F. Supp. 2d 105, 119 (D.D.C. 2001) ("it is clearly in the public interest to ensure that [the] government[] … fully compl[ies] with the law, especially when that law concerns the parameters of a party's First Amendment rights" ).  As the D.C. Circuit has stressed, allowing unconstitutional government action to stand "is always contrary to the public interest," which lies in "protecting First Amendment rights."  *Pursuing America's Greatness*, 831 F.3d at 511-12 (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)).

Injunctive relief is especially in the public interest here because the public "has a strong interest in having largely-unfettered access to Internet mediums for the purpose of publishing and viewing content and information," consistent with the exercise of First Amendment rights. *Google v. Hood*, 96 F. Supp. 3d at 601.  *See also Pursuing America's Greatness*, 831 F.3d at 511 ("there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation").  For the same reasons that FOSTA's counter-productivity undermines the government's interest, *see supra* 43-44, it is likewise in the public interest to

allow those like Plaintiffs, the platforms that they offer and/or use, and those who would speak through them to continue to do so without the incursion on First Amendment rights that FOSTA imposes.

## CONCLUSION

For the reasons above, Plaintiffs respectfully request that this Court grant a preliminary injunction against enforcement of FOSTA pending resolution of the constitutional challenges to the law.

DATED:   June 28, 2018

<div style="margin-left: 50%;">

Respectfully submitted,


_____/s/ Robert Corn-Revere_____
ROBERT CORN-REVERE
D.C. Bar No. 375415
RONALD G. LONDON
D.C. Bar No. 456284
**Davis Wright Tremaine LLP**
1919 Pennsylvania Ave. NW, Suite 800
Washington, D.C. 20006
Telephone: (202) 973-4200
Facsimile: (202) 973-4499
Email: bobcornrevere@dwt.com
        ronnielondon@dwt.com

LAWRENCE G. WALTERS
Florida Bar No.: 0776599
*Pro Hac Vice* Admission Pending
**Walters Law Group**
195 W. Pine Ave.
Longwood, FL 32750-4104
Telephone: (407) 975-9150
Facsimile: (408) 774-6151
Email: Larry@FirstAmendment.com
        Paralegal@FirstAmendment.com

</div>

AARON MACKEY
D.C. Bar No. 1017004
DAVID GREENE
(admitted in California)
*Pro Hac Vice* Admission Pending
CORYNNE MCSHERRY
(admitted in California)
**Electronic Frontier Foundation**
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
Email:  amackey@eff.org
          davidg@eff.org

DAPHNE KELLER
Cal. Bar No. 226614
**Stanford Law School Center**
  **for Internet and Society**
559 Nathan Abbott Way
Stanford, CA 94305-8610
(650) 723-1417
Email:  daphnek@law.stanford.edu

Attorneys for Plaintiffs