# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WOODHULL FREEDOM FOUNDATION,  )
HUMAN RIGHTS WATCH, ERIC KOSZYK,  )
JESSE MALEY, a/k/a ALEX ANDREWS, and  )
THE INTERNET ARCHIVE,  )
    )    Case No. 1:18-cv-1552
    Plaintiffs,  )
    )
    v.  )
    )
THE UNITED STATES OF AMERICA  )
and WILLIAM P. BARR, in his official  )
capacity as ATTORNEY GENERAL  )
OF THE UNITED STATES,  )
    )
    Defendants.  )

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

    A.  FOSTA's Specific Provisions ..................................................................... 2

    B.  FOSTA's Impact ........................................................................................ 4

ARGUMENT ....................................................................................................... 7

I.  FOSTA'S BROAD UNDEFINED PROHIBITIONS COMBINED WITH THE
SELECTIVE MODIFICATION OF ONLINE INTERMEDIARY IMMUNITY IN
SECTION 230 VIOLATE THE FIRST AMENDMENT ....................................... 7

    A.  The First Amendment Sharply Limits Restrictions on Intermediaries Because
Such Measures Inevitably Lead to Overcensorship ...................................... 7

    B.  FOSTA Imposes Particular Burdens on Online Intermediaries ................. 10

II.  FOSTA VIOLATES THE FIRST AND FIFTH AMENDMENTS................................. 12

    A.  FOSTA's Prohibitions are Imprecise, Excessively Broad, and Lack Necessary
Scienter Requirements ................................................................................ 13

        1.  FOSTA is Unconstitutionally Vague ................................................. 13

        2.  FOSTA's Prohibitions are Unconstitutionally Overbroad ................. 18

        3.  FOSTA Lacks the Scienter the First Amendment Requires .............. 22

    B.  FOSTA Fails Strict Scrutiny....................................................................... 26

III.  FOSTA IS AN UNCONSTITUTIONAL *EX POST FACTO* LAW ................................ 30

IV.  PLAINTIFFS ARE ENTITLED TO INJUNCTIVE AND DECLARATORY RELIEF . 32

    A.  Plaintiffs and All Other Internet Publishers and Users Have Suffered and Will
Continue to Suffer Irreparable Harm.......................................................... 33

    B.  The Balance of Equities Favors Injunctive Relief....................................... 35

    C.  An Injunction Would Serve the Public Interest........................................... 37

D.  Declaratory Relief is Warranted ................................................................................. 37

CONCLUSION ............................................................................................................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Abuelhawa v. United States,*
556 U.S. 816 (2009)................................................................................................15

*Amusement Devices Ass'n v. Ohio,*
443 F. Supp. 1040 (S.D. Ohio 1977) ..............................................................14, 16

*Ashcroft v. ACLU,*
542 U.S. 656 (2004)..........................................................................................27, 28

*Ashcroft v. Free Speech Coalition,*
535 U.S. 234 (2002)........................................................................................ *passim*

*Backpage.com v. Cooper,*
939 F. Supp. 2d 805 (M.D. Tenn. 2013)....................................................22, 23, 29

*Backpage.com v. Hoffman,*
2013 WL 4502097 (D.N.J. 2013) ...........................................................................22

*Backpage.com v. McKenna,*
881 F. Supp. 2d 1262 (W.D. Wash. 2012)..............................................................22

*Backpage.com, LLC v. Dart,*
807 F.3d 229 (7th Cir. 2015) ...................................................................................4

*Backpage.com, LLC v. Lynch,*
216 F. Supp. 3d 96 (D.D.C. 2016) ...................................................................25, 30

*Baggett v. Bullitt,*
377 U.S. 360 (1964)........................................................................................13, 14, 16

*Bantam Books, Inc. v. Sullivan,*
372 U.S. 58 (1963)....................................................................................................8, 9

*Barr v. Am. Ass'n of Political Consultants,*
140 S. Ct. 2355 (2020)............................................................................................26

*Bartniki v. Vopper,*
532 U.S. 514 (2001)................................................................................................23

*Batzel v. Smith,*
333 F.3d 1018 (9th Cir. 2003) ...............................................................................10

*Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*,
  482 U.S. 569 (1987)......................................................................................................14

*Boggs v. Bowron*,
  842 F. Supp. 542 (D.D.C. 1993), *aff'd*, 67 F.3d 972 (D.C. Cir. 1995)....................................37

*Brandenburg v. Ohio*,
  395 U.S. 444 (1969)......................................................................................................19

*Brown v. Entm't Merchs. Ass'n*,
  564 U.S. 786 (2011).........................................................................................13, 27, 28, 29

*Center for Democracy & Technology v. Pappert*,
  337 F. Supp. 2d 606 (E.D. Pa. 2004) ...........................................................................9, 10, 29

*Cramp v. Bd. of Pub. Instruction*,
  368 U.S. 278 (1961)......................................................................................................16

*Cubby v. CompuServe, Inc.*,
  776 F. Supp. 135 (S.D.N.Y 1991) .......................................................................................9

*Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*,
  274 F.3d 377 (6th Cir. 2001) ...........................................................................................32

*Denver Area Educ. Telecomms. Consortium v. FCC*,
  518 U.S. 727 (1996)....................................................................................................8, 9

*Elonis v. United States*,
  135 S. Ct. 2001 (2015)...............................................................................................22, 24

*Elrod v. Burns*,
  427 U.S. 347 (1976)......................................................................................................32

*Giboney v. Empire Storage & Ice Co.*,
  336 U.S. 490 (1949)......................................................................................................23

*Google, Inc. v. Hood*,
  822 F.3d 212 (5th Cir. 2016) ..........................................................................................10

*Google, Inc. v. Hood*,
  96 F. Supp. 3d 584 (S.D. Miss. 2015), *aff'd*, 822 F.3d 212 (5th Cir. 2016)...............17, 33, 37

*Gordon v. Holder*,
  721 F.3d 638 (D.C. Cir. 2013) .....................................................................................33, 37

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972)......................................................................................................13

*Guffey v. Duff*,
　　2020 WL 2065274 (D.D.C. Apr. 29, 2020) ........................................................7, 32

*Holder v. Humanitarian Law Project*,
　　561 U.S. 1 (2010)........................................................................................27

*J.B. v. G6 Hospitality, LLC*,
　　2020 WL 4901196 (N.D. Cal. Aug. 20, 2020) ...........................................6

*Jones v. Dirty World Entm't Recordings LLC*,
　　755 F.3d 398 (6th Cir. 2014) .....................................................................11

*Kingsley Int'l Pictures Corp. v. Regents of Univ. of N.Y.*,
　　360 U.S. 684 (1959).....................................................................................29

*Landgraf v. USI Film Prods.*,
　　511 U.S. 244 (1994).....................................................................................30

*Loveday v. FCC*,
　　707 F.2d 1443 (D.C. Cir. 1983) ...............................................................9, 10

*Members of City Council v. Taxpayers for Vincent*,
　　466 U.S. 789 (1984).....................................................................................18

*Midwest Video Corp. v. FCC*,
　　571 F.2d 1025 (8th Cir. 1978) ...................................................................8

*Mills v. D.C.*,
　　571 F.3d 1304 (D.C. Cir. 2009) .................................................................32

*Mishkin v. New York*,
　　383 U.S. 502 (1966).................................................................................22, 26

*N.Y. Times Co. v. Sullivan*,
　　376 U.S. 254 (1964)..................................................................................8, 29

*NAACP v. Button*,
　　371 U.S. 415 (1963)................................................................................14, 19

*Ogden v. Saunders*,
　　25 U.S. (12 Wheat.) 213 (1827)................................................................31

*Packingham v. North Carolina*,
　　137 S. Ct. 1730 (2017).....................................................................10, 26, 33, 34

*Peugh v. United States*,
　　569 U.S. 530 (2003).....................................................................................32

*PHE, Inc. v. U.S. Dep't of Justice*,
    743 F. Supp. 15 (D.D.C. 1990) ...........................................................37

*Pursuing America's Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) ................................................32, 33, 37

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ......................................................................26, 27

*Reno v. ACLU*,
    521 U.S. 844 (1997) ................................................................ *passim*

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) .............................................................................27

*Sable Commc'ns of Cal., Inc. v. FCC*,
    492 U.S. 115 (1989) ...............................................................................5

*Sandvig v. Sessions*,
    315 F. Supp. 3d 1 (D.D.C. 2018) ........................................................13

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
    502 U.S. 105 (1991) .............................................................................27

*Smith v. California*,
    361 U.S. 147 (1959) .....................................................................8, 9, 22

*Smith v. Goguen*,
    415 U.S. 566 (1974) .............................................................................14

*Snyder v. Phelps*,
    580 F.3d 206 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011) ..................29

*Speiser v. Randall*,
    357 U.S. 513 (1958) .............................................................................26

*Stogner v. California*,
    539 U.S. 607 (2003) .............................................................................31

*True the Vote, Inc. v. IRS*,
    831 F.3d 551 (D.C. Cir. 2016) ............................................................27

*United Gov't Sec. Officers of Am., Local 52 v. Chertoff*,
    587 F. Supp. 2d 209 (D.D.C. 2008) ..........................................7, 33, 37

*United States v. Ali*,
    718 F.3d 929 (D.C. Cir. 2013) ............................................................26

*United States v. Freeman,*
   761 F.2d 549 (9th Cir. 1985) ................................................24

*United States v. Miller,*
   379 F.2d 483 (7th Cir. 1967) ................................................16

*United States v. Miselis,*
   --- F.3d ---, 2020 WL 5015072 (4th Cir. Aug. 24, 2020) ....................15, 19, 23, 24

*United States v. Playboy Entm't Grp., Inc.,*
   529 U.S. 803 (2000)................................................9, 27, 28, 30

*United States v. Reiner,*
   500 F.3d 10 (1st Cir. 2007)................................................21

*United States v. Rundo,*
   No. 18-cr-00759-CJC (C.D. Cal. June 3, 2019)................................................19

*United States v. Seals,*
   2014 WL 3847916 (W.D. Ark. Aug. 5, 2014) ................................................21

*United States v. Stevens,*
   559 U.S. 460 (2010)................................................18

*United States v. Williams,*
   553 U.S. 285 (2008)................................................14, 21, 23, 24

*United States v. X-Citement Video, Inc.,*
   513 U.S. 64 (1994)................................................22

*Universal Commc'n Sys., Inc. v. Lycos, Inc.,*
   478 F.3d 413 (1st Cir. 2007)................................................10, 11

*Video Software Dealers Ass'n v. Webster,*
   968 F.2d 684 (8th Cir. 1992) ................................................22

*Winter v. Natural Res. Def. Council, Inc.,*
   555 U.S. 7 (2008)................................................35

*Woodhull Freedom Found. v. United States,*
   334 F. Supp. 3d 185 (D.D.C. 2018), *rev'd on other grounds,*
   948 F.3d 363 (D.C. Cir. 2020)................................................21

*Woodhull Freedom Found. v United States,*
   948 F.3d 363 (D.C. Cir. 2020)................................................ *passim*

*Zeran v. America Online, Inc.,*
   129 F.3d 327(4th Cir. 1997)................................................10, 11

**Constitutional Provisions**

U.S. Const. amend. I ................................................................................ *passim*

U.S. Const. amend. V .........................................................................1, 2, 12

U.S. Const. art. I, § 9........................................................................................30

U.S. Const. art. I, § 10......................................................................................30

**Federal Statutes**

Allow States and Victims to Fight Online Sex Trafficking Act of 2017,
    Pub. L. No. 115-164, 132 Stat. 1253 (2018) ...................................... *passim*

18 U.S.C. § 1591(a) .................................................................3, 20, 25, 30

18 U.S.C. § 1591(b) .........................................................................................32

18 U.S.C. § 1591(e) ...............................................................................3, 14, 25

18 U.S.C. § 1595.............................................................................................38

18 U.S.C. § 1595(d) ...............................................................................3, 28

18 U.S.C. § 1952.............................................................................................20

18 U.S.C. § 1952(a) ........................................................................................21

18 U.S.C. § 1952(b) ........................................................................................20

18 U.S.C. § 2101(a)(2) ...................................................................................19

18 U.S.C. § 2202(b) ........................................................................................19

18 U.S.C. § 2421A .................................................................................. *passim*

18 U.S.C. § 2421A(a) ...........................................................2, 13, 24, 28

18 U.S.C. § 2421A(b) ............................................................................ *passim*

18 U.S.C. § 2421A(c) ...........................................................................3, 18, 28

18 U.S.C. § 2421A(d) ...........................................................................3, 18, 28

47 U.S.C. § 230................................................................................... *passim*

47 U.S.C. § 230(c) ..................................................................................11, 12

47 U.S.C. § 230(e) ............................................................................... *passim*

47 U.S.C. § 230(f) ...........................................................................................................13

**State Statutes**

2019 Miss. Laws, Chapter 459 (S.B. 2305), § 1 ........................................................32

Miss. Code § 97-3-54.1(1)(c) .....................................................................................32

Nev. Rev. Stat. § 201.300 ...........................................................................................32

Tex. Penal Code § 43.031 ......................................................................................17, 31

Tex. Penal Code § 43.041 ...........................................................................................31

**Other Authorities**

About FOSTA, Craigslist, https://www.craigslist.org/about/FOSTA ...........................5

Brief of Amici Curiae Equality Now *et al.*, 2019 WL 1773391 (D.C. Cir. Apr. 22, 2019) ....................................................................................................................12, 18

Brief of the States of Texas *et al.*, 2019 WL 1773389 (D.C. Cir. Apr. 22, 2019) ........17

Congressional Research Service, *Sex Trafficking: An Overview of Federal Criminal Law*, June 25, 2015 ...................................................................................26

Daphne Keller, "Empirical Evidence of 'Over-Removal' by Internet Companies under Intermediary Liability Laws," Stanford Ctr. for Internet & Soc'y, Oct. 12, 2015, http://cyberlaw.stanford.edu/blog/2015/10/empirical-evidence-over-removal-internet-companies-under-intermediary-liability-laws ...................................11

*Doe v. Kik Interactive*, No. 0:20-cv-60702-AHS (S.D. Fla.) ...........................................................................6

*Doe v. Rocket Science Grp. (Mailchimp)*, No. 1:19-cv-05393 (N.D. Ga.) .................................................................................6

Eric Goldman, *The Complicated Story of FOSTA and Section 230*, 17 First Amendment L. Rev. 279 (2019) ...........................................................12

H.R. Rep. No. 115-572, pt. 1 ...........................................................................25, 26, 29

Jeff Kosseff, The Twenty-Six Words That Created the Internet 270 (2019) ...................12

*M.L. v. Craigslist Inc.*, No. 3:19-cv-6153 BHS-TLF (W.D. Wash. Apr. 17, 2020) ....................................6

S. Rep. No. 115-199 (2018) ...........................................................................................12

Tex. Sen. Bill 20 (2019)................................................................................................................31

The Federalist No. 44 (James Madison) .........................................................................................31

The Federalist No. 84 (Alexander Hamilton) .................................................................................31

## INTRODUCTION

The Allow States and Victims to Fight Online Sex Trafficking Act of 2017, Pub. L. No. 115-164, 132 Stat. 1253 (2018) ("FOSTA" or "the Act"), the most dramatic attempt to censor online speech since Congress first attempted to regulate the Internet through anti-indecency provisions in the Communications Decency Act of 1996 ("CDA"), violates the First and Fifth Amendments.  FOSTA targets online speech by (1) creating a new federal offense for anyone who "owns, manages, or operates an interactive computer service" with the intent to "promote" or "facilitate" prostitution, (2) expanding potential liability for federal sex trafficking offenses by adding vague definitions and expanding the pool of enforcers, and (3) diluting the CDA's only pro-free speech provision—Section 230—by limiting federal immunity provided online inter- mediaries that host third-party speech.  These new, entirely content-based prohibitions impose harsh criminal penalties and heavy civil liability for online intermediaries based on expansive and undefined terms regarding "promotion" or "facilitation" of "prostitution," *see Woodhull Freedom Found. v United States*, 948 F.3d 363, 372 (D.C. Cir. 2020), and lower thresholds of knowledge and intent.  The government claims that the statute solely targets "sex traffickers," but "FOSTA's text does not limit its scope to 'bad actor websites,' or even to classified advertising."  *Id.*

Since its April 2018 adoption, FOSTA has had a substantial chilling effect on protected speech, causing numerous online platforms to completely shut down or censor material protected by the First Amendment.  This resulted in censorship of constitutionally protected, commercial and non-commercial speech that could be construed to "promote," "assist" or "facilitate" sex work, including constitutionally protected online advocacy and harm reduction efforts, like the speech of Plaintiffs Jesse Maley, Woodhull Freedom Foundation, and Human Rights Watch.  It has abridged Internet speech indiscriminately, causing general-purpose online intermediaries to limit forums for speech, essentially silencing users such as Plaintiff Eric Koszyk, and greatly impeding

users like Woodhull.  Thus FOSTA, like the CDA before it, has "torch[ed] a large segment of the Internet community."  *Reno v. ACLU*, 521 U.S. 844, 882 (1997) (unanimously invalidating indecency prohibition on its face).  For these reasons, Plaintiffs ask this Court to declare FOSTA unconstitutional under the First and Fifth Amendments and to enjoin its enforcement.

## BACKGROUND

### A.      FOSTA's Specific Provisions

FOSTA changed the law in three ways:  (1) it created a new federal crime and civil claim, codified at 18 U.S.C. § 2421A, prohibiting use or attempted use of any facility of interstate commerce, including interactive computer services, to promote or facilitate prostitution; (2) it expanded the prohibition in 18 U.S.C. § 1591 on "participation in a venture" involving sex trafficking to include any action "knowingly assisting, supporting, or facilitating" a venture while recklessly disregarding its violation of the law; and (3) it amended 47 U.S.C. § 230 to allow state authorities to prosecute interactive computer services under state law if the underlying conduct would violate 18 U.S.C. § 2421A or § 1591, and to permit civil causes of action based on violations of § 1591.

Section 2421A makes it a felony for anyone to own, manage, or operate an interactive computer service using any facility or means of interstate commerce "with the intent to promote or facilitate the prostitution of another person."  18 U.S.C. § 2421A(a).  It also creates an "aggravated violation" when the underlying conduct "promotes or facilitates the prostitution of 5 or more persons," or if one "acts in reckless disregard" of the fact that his or her conduct "contributed to sex trafficking."  *Id*. § 2421A(b).  Anyone convicted of violating Section 2421A(a) can be fined, imprisoned for up to 10 years, or both; for "aggravated violations" imprisonment may be for up to 25 years.  *Id*. § 2421A(a)-(b).  Operators of interactive computer services can also face civil suits

2

for violations of 2421A(b).  *Id*. § 2421A(c).  Sections 2421A(c) and (d) allow for, respectively, civil recovery of damages and attorneys' fees, and mandatory restitution for victims of the crime.

As the D.C. Circuit recognized, FOSTA does not define what it means to "promote" or "facilitate" prostitution, nor even what constitutes "prostitution," which is undefined in federal law.  *Woodhull Freedom Found*., 948 F.3d at 372.  Nor are the terms "promote," "facilitate," or "contribute to sex trafficking" defined for purposes of an aggravated offense under Section 2421A(b).  *Id*.  The court observed that "'promote' and 'facilitate,' when considered in isolation, are 'susceptible of multiple and wide-ranging meanings,'" and the statutory terms are not "limited by a string of adjacent verbs (such as advertises, distributes, or solicits) that would convey a 'transactional connotation' that might narrow the statute's reach."  *Id.*

FOSTA also expands the federal criminal trafficking law in 18 U.S.C. § 1591 by adding a definition for "participation in a venture" to mean "knowingly assisting or supporting, or facilitating a violation of" the sex trafficking law.  *See* 18 U.S.C. § 1591(e)(4).  However, where liability is based on benefitting financially or receiving anything of value from "a venture" under Section 1591(a)(2), FOSTA does not require a showing of specific intent, but only "knowing" or "reckless disregard" of whether or not trafficking has taken place.  Violations of Section 1591 are punishable by mandatory minimum sentences of ten or fifteen years, and fines of $250,000 for individuals, and $500,000 for organizations.  Additionally, FOSTA amends Section 1595 to provide that state attorneys general may bring civil actions *parens patriae* if there is reason to believe "an interest of the residents of that State has been or is threatened or adversely affected by any person who violates section 1591."  *See* 18 U.S.C. § 1595(d).

FOSTA reduced preexisting immunities for online intermediaries by amending 47 U.S.C. § 230(e) to eliminate immunity for:  "(A) any claim in a civil action [] under section 1595 of title

18 … if the conduct underlying the claim constitutes a violation of section 1591 …;" "(B) any charge in a criminal prosecution [] under State law if the conduct underlying … would constitute a violation of section 1591 …;" or "(C) any charge in a criminal prosecution [] under State law if the conduct underlying … would constitute a violation of section 2421A."   *See* 47 U.S.C. § 230(e)(5).  The amendments to Section 230, like all of FOSTA, became effective upon the date of enactment.  However, these changes to the CDA's statutory immunities are *retroactive* in that they apply "regardless of whether the conduct alleged occurred, or is alleged to have occurred, before, on, or after … enactment."  *See* FOSTA, Pub. L. No. 115-164, § 4(b).

### B.    FOSTA's Impact

FOSTA had precisely the wide censorial effect predicted during its consideration. Numerous online service providers that enabled interpersonal communication by users—including contacts with no connection to sexual activity—immediately removed content, eliminated entire sections of websites, or were shuttered altogether out of fear of state or federal prosecution, or ruinous civil liability.  *See* Plaintiffs' Statement of Undisputed Material Facts ("SMF") ¶ 1. FOSTA caused censorship of online platforms that host classified ads (whether or not sexually-oriented) and platforms that host discussions of sex work, *id*., even though most presumed speech about sex is legal and protected by the First Amendment.  *Backpage.com, LLC v. Dart*, 807 F.3d 229, 234 (7th Cir. 2015) ("not all advertisements for sex are advertisements for illegal sex").

Some online service providers took these actions because they feared the new law would be interpreted to require monitoring the activities of third parties on their sites, which would be both impractical and financially ruinous.  For example, just two days after the Senate passed H.R. 1865, online classified ad service Craigslist eliminated all personals ads, including non-sexual categories such as "Missed Connections" and "Strictly Platonic," stating:  "Any tool or service can be misused.  We can't take such risk without jeopardizing all our other services, so we are

regretfully taking [the] personals offline."[1]  Google changed enforcement of its Google Play policy to forbid publishing "sexually explicit or pornographic images or videos," SMF ¶¶ 1, 22, even though any "[s]exual expression which is indecent but not obscene is protected by the First Amendment," and cannot be criminalized under FOSTA.  *See Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989).

For its part, social media platform Reddit banned user groups, called subreddits, that it feared "might be misconstrued as promoting or facilitating prostitution." SMF ¶¶ 1, 3.  Before FOSTA, Reddit would respond to potential terms-of-service compliance issues by warning their volunteer community moderators of the problem and working with them to address it.  Given FOSTA's vagueness and scope of liability of the new law, Reddit no longer does so, for fear that its actions could be misinterpreted as knowingly assisting, supporting, or facilitating the activity. It reluctantly shut down groups that it believes were valuable harm-reduction resources for vulnerable people, such as the r/escorts subreddit, a well-moderated community of approximately 8,000 subscribers, "with a focus on education, safety, and health for clients and providers alike."  *Id*. This group had specific rules forbidding providers from advertising their services, including a ban on posting links to external provider websites, profiles, and reviews.  It also forbade requests from potential clients to help find providers.  Despite these precautions, Reddit felt obligated to ban the group when FOSTA was passed, due to the potential risk of liability it presented under the new law.  *Id*.  Its loss removed an important discussion space for voluntary sex workers trying to stay safe.

---

[1]  *See* About FOSTA, CRAIGSLIST, https://www.craigslist.org/about/FOSTA (last visited Aug. 27, 2020).  Users now receive "404 Errors" if they try to access URLs where Craigslist's personals formerly appeared.

As expected, civil litigants have quickly moved to take advantage of FOSTA.  In *J.B. v. G6 Hospitality*, for example, the plaintiff alleged, *inter alia*, that Craigslist conspired with sex traffickers between 2007 and 2010 by providing an "erotic services" and "adult services" section on its website, and argued that FOSTA had changed the law so as to allow her claims.  *See J.B. v. G6 Hospitality, LLC*, 2020 WL 4901196 (N.D. Cal. Aug. 20, 2020).  Craigslist successfully moved to dismiss, but only after months of expensive litigation, which may not be over should the plaintiff appeal.  *Id*.  And this lawsuit is far from unique.  *See, e.g.*, *M.L. v. Craigslist Inc.*, No. 3:19-cv-6153 BHS-TLF (W.D. Wash. Apr. 17, 2020) (citing FOSTA and alleging, *inter alia*, that Craigslist conspired with sex traffickers by providing an "erotic services" and "adult services" section on its website); *Doe v. Kik Interactive*, No. 0:20-cv-60702-AHS (S.D. Fla.) (citing FOSTA, alleging that provider of messaging application used in connection with sex trafficking conspired with the traffickers); and *Doe v. Rocket Science Grp. (Mailchimp)*, No. 1:19-cv-05393 (N.D. Ga.) (alleging Mailchimp facilitated trafficking by allowing an alleged sex trafficker to use its marketing services and technology).

And FOSTA continues to negatively affect the Plaintiffs.  As set forth in more detail below, for example, Eric Koszyk still can't use Craigslist to find customers for his therapeutic massage business and attempts at other methods of advertising, including his own website, have generated less than half his previous revenue; Jesse Maley is still prevented from improving or developing digital tools that sex workers could use to share health, safety, and other harm-reduction information—and now with the COVID-19 pandemic impeding in-person communication, has eschewed online alternatives; and due to adoption of restrictive content moderation policies by online intermediaries in response to FOSTA, Woodhull has been unable to promote and livestream its Sexual Freedom Summit as desired, and had to postpone or abandon some of its Summit

programs, based on its fear of losing its established platform accounts, followers, and stored content.  *See infra* §§ IV.A-C.

## ARGUMENT

FOSTA violates well-established First Amendment principles pertaining to the constitutional rights to publish, post to, and access websites:  the law is unconstitutionally overbroad and vague, fails strict scrutiny, and lacks the proper scienter.  Additionally, FOSTA is an unconstitutional *ex post facto* law.  Summary judgment lies because there are no genuine issues as to any material fact and, as demonstrated below, Plaintiffs are entitled to judgment as a matter of law on FOSTA's constitutionality.  *E.g.*, *Guffey v. Duff*, 2020 WL 2065274, at *8 (D.D.C. Apr. 29, 2020) (quoting F.R.C.P. 56(a)).  Injunctive relief is warranted because Plaintiffs and others subject to FOSTA will suffer irreparable injury absent an injunction, and both the balance of interests and the public interest favor relief.  *Id.*  at *9.  Declaratory relief is also proper due to the substantial controversy over whether FOSTA violates the First Amendment and the need for definitive statement in that regard, especially given its potential attempted application by those not before this Court.  *E.g.*, *United Gov't Sec. Officers of Am., Local 52 v. Chertoff*, 587 F. Supp. 2d 209, 222 (D.D.C. 2008).

## I.    FOSTA'S BROAD UNDEFINED PROHIBITIONS COMBINED WITH THE SELECTIVE MODIFICATION OF ONLINE INTERMEDIARY IMMUNITY IN SECTION 230 VIOLATE THE FIRST AMENDMENT

### A.  The First Amendment Sharply Limits Restrictions on Intermediaries Because Such Measures Inevitably Lead to Overcensorship

FOSTA violates fundamental First Amendment principles by imposing liability on online intermediaries without sufficient safeguards for protected speech.  By creating powerful incentives to eliminate whole platforms and broad categories of speech, it restricts not only the speech of the intermediaries themselves, including major platforms like Facebook or Google and smaller

operators like Plaintiffs Jesse Maley and the Internet Archive, but of speakers who rely on those intermediaries, like Koszyk, Woodhull, and Human Rights Watch.

For the Internet, the Supreme Court repeatedly recognized that laws threatening to impose liability on those who provide a forum for the speech of others pose special threats to the rights of speakers and readers who depend on those services.  In *Smith v. California*, 361 U.S. 147 (1959), for example, the Court struck down a law holding booksellers strictly liable for obscene books on their shelves because the law would in effect compel self-censorship by the bookstore. The problem, the Court noted, was "[t]he bookseller's limitation in the amount of reading material with which he could familiarize himself, and his timidity in the face of his absolute criminal liability, thus would tend to restrict the public's access to forms of the printed word which the State could not constitutionally suppress directly."  *Id.* at 153-54.

For similar reasons, the Court rejected Rhode Island's bookseller liability laws in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), and later upheld cable programmers' First Amendment challenge to laws requiring cable operators to segregate and block patently offensive sexual content.  *Denver Area Educ. Telecomms. Consortium v. FCC*, 518 U.S. 727 (1996).  *See also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964) (holding that imposing liability on a newspaper for third-party advertisements "would discourage newspapers from carrying 'editorial advertise- ments' … and so might shut off an important outlet for the promulgation of information and ideas by persons who do not themselves have access to publishing facilities"); *Midwest Video Corp. v. FCC*, 571 F.2d 1025, 1056 (8th Cir. 1978) (striking FCC's requirement for cable operators to block programmers' unlawful speech, noting created "a corps of involuntary government surrogates, but without providing the procedural safeguards respecting 'prior restraint' required of the govern- ment").

The concerns expressed in *Smith*, *Bantam Books*, and *Denver Area* are amplified in the Internet context due to the volume of speech passing through online intermediaries.  Thus, in *Center for Democracy & Technology v. Pappert*, 337 F. Supp. 2d 606, 649-50 (E.D. Pa. 2004), the court struck down a Pennsylvania statute requiring ISPs to block child pornography upon notice, which had led ISPs to block additional, lawful content as well.  The court reasoned that even though the law, "on its face, does not burden protected speech[,] … the action taken by private actors to comply with the Act has blocked a significant amount of speech protected by the First Amendment."  *Id.* at 652 (applying *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000)).  *See also Cubby v. CompuServe, Inc.*, 776 F. Supp. 135, 139 (S.D.N.Y 1991) (expressing concerns "deeply rooted in First Amendment" that intermediary not be treated as a publisher in defamation case).

Courts have been particularly wary of the "heckler's veto," whereby a law empowers others to censor speech by simply complaining to the intermediary about it.  *See Reno*, 521 U.S. at 880.  They recognize that intermediaries will often respond to a complaint by simply deleting the speech complained of or by eliminating the platform, rather than expend the resources to investigate the complaint's merits.  *Id.*  As the Supreme Court observed, the concern for censorship is magnified with respect to online intermediaries which may have to deal with thousands and thousands of complaints every day.  Regimes that require website operators to remove content based on such knowledge "confer broad powers of censorship, in the form of a 'heckler's veto,' upon any opponent of indecent speech."  *Id.*[2]

---

[2]  Even outside the Internet context, courts have noted how such a regime leads to censorship. In *Loveday v. FCC*, 707 F.2d 1443 (D.C. Cir. 1983), the D.C. Circuit rejected a claim that broadcasters had a duty to investigate after receiving conflicting claims about a political ad's sponsorship.  Such a requirement would "invite abuse" in that "opponents of groups sponsoring political messages would have a ready means of harassing and perhaps silencing their adversaries

Given inevitable overcensorship, courts "must exercise extreme caution" and review with special scrutiny any law that purports to regulate speech on the "vast democratic forums of the Internet." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735-36 (2017) (quoting *Reno*, 521 U.S. at 868). Because of the scale of speech burdened by clumsy lawmaking, courts are especially ready to "presume that governmental regulation of the content of speech is more likely to interfere with the free exchange of ideas than to encourage it." *Reno*, 521 U.S. at 885. *See, e.g.*, *Pappert*, 337 F. Supp. 2d at 655 (striking down law where "[m]ore than 1,190,000 innocent web sites were blocked in an effort to block less than 400 child pornography web sites").

### B. FOSTA Imposes Particular Burdens on Online Intermediaries

Before FOSTA, federal law was specifically designed to reinforce First Amendment protections for online intermediaries so as to protect freedom of speech for Internet users. Congress recognized that Internet speech would be stifled if online intermediaries faced civil liability risks or state law prosecutions for speech posted by third parties. Accordingly, it adopted CDA Section 230 to promote free online expression by incorporating First Amendment values, freeing intermediaries from threats of liability for hosting third-party speech, and encouraging websites to make editorial judgments without risking liability.[3]

---

by making charges, however baseless." Targeted broadcasters in turn would likely seek to "avoid carrying ad[s] of the type involved here" rather than incur the expense and risk of assessing ads under an unclear legal standard with minimal ability to gather evidence. *Id.* at 1457-58.

[3] *See Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016) ("First Amendment values … drive the CDA"); *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418-19 (1st Cir. 2007) (Section 230 was adopted to avoid the "obvious chilling effect" of intermediary liability); *Batzel v. Smith*, 333 F.3d 1018, 1027-29 (9th Cir. 2003) (Section 230 was added to the CDA "to further First Amendment and e-commerce interests on the Internet while also promoting the protection of minors"); *Zeran v. America Online, Inc.*, 129 F.3d 327, 331(4th Cir. 1997) ("Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect.").

Section 230 was specifically designed to mitigate the special risks facing online inter-mediaries. *Lycos, Inc.*, 478 F.3d at 418-19 (explaining that online intermediaries are especially vulnerable to threats of liability "given the volume of material communicated ..., the difficulty of separating lawful from unlawful speech, and the relative lack of incentives to protect lawful speech"). In particular, the CDA's immunities were an effort to avoid the "heckler's veto" in the online environment. *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 407-09 (6th Cir. 2014). As the Fourth Circuit explained in *Zeran*, the seminal case interpreting 47 U.S.C. § 230, service providers' inability to screen each of the millions of postings they may host requires them either to make "an on-the-spot editorial decision whether to risk liability by allowing the continued publication," or else yield to the "natural incentive simply to remove messages upon notification, whether the contents were [unlawful] or not[.]" 129 F.3d at 333. Thus, Section 230(c) was adopted to implement First Amendment values and to avoid this "moderator's dilemma."[4]

FOSTA took the law sharply in the opposite direction, targeting anyone who "owns, manages, or operates an interactive computer service" with broad and ambiguous speech prohibi-tions, increasing the number of actors who could seek to impose such liability, and whittling away the immunities previously provided by Section 230. At the same time, FOSTA leaves unchanged immunity under Section 230(c)(2), which immunizes only "good faith" actions taken to *restrict* speech in various categories "whether or not protected by the First Amendment." FOSTA's

---

[4] Empirical research into the Digital Millennium Copyright Act ("DMCA"), which creates notice liability for platforms in copyright cases, supports the *Zeran* court's concern. Platforms receive literally millions of false accusations, and often remove lawful speech—despite the DMCA's inclusion of penalties and procedures, lacking in FOSTA, to reduce erroneous removals. Daphne Keller, "Empirical Evidence of 'Over-Removal' by Internet Companies under Inter-mediary Liability Laws," Stanford Ctr. for Internet & Soc'y, Oct. 12, 2015, http://cyber-law.stanford.edu/blog/2015/10/empirical-evidence-over-removal-internet-companies-under-intermediary-liability-laws.

congressional sponsors, and those who advocate its enforcement, conflate the different immunities provided by Section 230(c)(1) and (c)(2) and interpret FOSTA as preserving immunity only for intermediaries' moderation decisions made in "good faith."[5]  This heightens the extent to which online platforms must err on the side of censorship.

As a consequence, "FOSTA effectively resurrects a dilemma Section 230 had been designed to eliminate."  Eric Goldman, *The Complicated Story of FOSTA and Section 230*, 17 FIRST AMENDMENT L. REV. 279, 288 (2019).  The predictable outcome, as discussed above, is that most large platforms began to over-censor to avoid potential liability and many smaller sites simply shut down.  *Id*. at 288-89.  FOSTA's impact was immediate because it confronted "well-intentioned platforms with the choice of censoring legitimate speech or risking lawsuits and criminal prosecution," forcing them to "err on the side of caution."  Jeff Kosseff, THE TWENTY-SIX WORDS THAT CREATED THE INTERNET 270-72 (2019).  And users, including Plaintiffs here, suffered the consequences.  *See supra* 4-7; *infra* §§ IV.A-C.

## II.    FOSTA VIOLATES THE FIRST AND FIFTH AMENDMENTS

Beyond the particular problems of intermediaries, any law that purports to regulate speech across "the entire universe of cyberspace" risks suppressing not merely a large amount of speech, but speech that is unfathomably diverse, constantly expanding, and globally interconnected.  *Reno*,

---

[5]   For example, the Senate Report discussed the immunities provided by Section 230(c)(1) and 230(c)(2), and observed that interactive computer service providers "would not have their good faith efforts to restrict access to objectionable content used against them" because the legislation "would not abrogate section 230(c)(2)(A)."  S. Rep. No. 115-199, at 4 (2018).  Amici who filed in support of FOSTA in the D.C. Circuit argued the law "discourages misconduct by internet service providers by exposing them to additional liability," and extends immunity only to "actors who can demonstrate that they undertook a good-faith effort to prevent their platforms from being utilized for sex trafficking."  Brief of Amici Curiae Equality Now *et al*. ("*Equality Now Amici*"), 2019 WL 1773391, at *15-16, *Woodhull Freedom Found. v. United States*, No. 18-5298 (D.C. Cir. Apr. 22, 2019).

521 U.S. at 868.[6]  Accordingly, the "special attributes of Internet communication" require robust application of the First Amendment doctrines of overbreadth and vagueness.  *Id.* at 863 (citation omitted).  As a content-based speech restriction, it is particularly vital that it satisfy strict scrutiny and rigorous *mens rea* requirements.  The principle that the "Government may not suppress lawful speech as the means to suppress unlawful speech," *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002), has special application on the Internet.

### A. FOSTA's Prohibitions are Imprecise, Excessively Broad, and Lack Necessary Scienter Requirements

### 1. FOSTA is Unconstitutionally Vague

The Supreme Court has repeatedly recognized that although vague laws generally offend due process, an imprecise law that regulates expression "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 807 (2011) (quoting *Reno*, 521 U.S. at 871-72); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  Vague statutes that affect "sensitive areas of basic First Amendment freedoms" will "inevitably lead citizens to 'steer far wider of the unlawful zone' … than if the boundaries of the forbidden areas were clearly marked." *Id.* at 109 (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964)).  The vagueness doctrine thus demands a greater degree of specificity "[w]here a statute's literal scope … is capable of reaching expression sheltered by the First

---

[6]  Regulating the Internet inherently has First Amendment implications, *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 12-13 (D.D.C. 2018) (quoting *Reno*, 521 U.S. at 870), and FOSTA is clearly a regulation specifically targeting online speech.  Section 2421A applies only to one who "owns, manages, or operates an interactive computer service, as such term is defined in … 47 U.S.C. 230(f)," 18 U.S.C. § 2421A(a), (b), and FOSTA amends 47 U.S.C. § 230, which, as explained by Congress, uses the same language.  If FOSTA had been enacted pre-Internet and imposed penalties on anyone who "owns, manages, or operates [a printing press] or conspires or attempts to do so, with the intent to promote or facilitate the prostitution of another person," no one would doubt it was a regulation of the press and subject to strict First Amendment limits.

Amendment." *Smith v. Goguen*, 415 U.S. 566, 573 (1974).  And where penal statutes are involved, "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP v. Button*, 371 U.S. 415, 438 (1963).[7]

FOSTA's restrictions fall well short of that required precision.  The law imposes criminal penalties based entirely on speaking or publishing online with "intent" to "promote" or "facilitate" the prohibited offenses, but does not define those terms.[8]  As the D.C. Circuit held, "FOSTA does not define 'promote' or 'facilitate,' nor does it specify what constitutes 'prostitution,' a term undefined by federal law."  What is worse, these terms are not "limited by a string of adjacent verbs (such as advertises, distributes, or solicits) that would convey 'a transactional connotation' that might narrow the statute's reach." *Woodhull Freedom Found.*, 948 F.3d at 372 (quoting *United States v. Williams*, 553 U.S. 285, 294 (2008)).  The statutory terms "are susceptible of multiple and wide-ranging meanings," and lack companion terms to narrow their reach to include only unprotected speech. *Williams*, 553 U.S. at 294-95.  Likewise, the operative verbs in Section 1591(e)(4)—assisting, supporting, and facilitating—are not presented in a context that narrows their meanings to avoid broad application to speech protected by the First Amendment.

---

[7]  Questions involving overbreadth and vagueness in laws that regulate speech necessarily are related.  However, a restriction can be unconstitutionally overbroad without being vague. *E.g.*, *Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 570, 577 (1987) (resolution banning all "First Amendment activities" at Los Angeles International Airport is overbroad).  At the same time, vague restrictions on speech are inherently overbroad, because a nebulous law really imposes "no rule or standard at all." *Baggett*, 377 U.S. at 374. *Reno*, 521 U.S. at 864 (vagueness is relevant to the First Amendment overbreadth inquiry).

[8]  FOSTA's inclusion of an "intent" standard does nothing to cure the law's vagueness where the operative terms "promote" or "facilitate" are ambiguous and undefined. *Amusement Devices Ass'n v. Ohio*, 443 F. Supp. 1040, 1051 (S.D. Ohio 1977) ("[T]he Supreme Court has never to our knowledge held that the imposition of a scienter element upon a statute necessarily renders the statute's prohibitions sufficiently precise to withstand a vagueness challenge.").  In any event, the law's scienter elements are defective, as explained *infra* § II.A.3.

14

In this regard, the only clearly discernible rule is that FOSTA broadened the reach of existing law.  Congress impermissibly sought to impose liability on a wide range of non-trafficking speech by asserting that sex trafficking and prostitution are "inextricably linked" and purposefully adopting expansive language.  As the D.C. Circuit explained,

> [t]he common meaning of facilitate is "'to make easier'" or "less difficult," or "to assist or aid."  *United States v. Rivera*, 775 F.2d 1559, 1562 (11th Cir. 1985) (quoting *United States v. Phillips*, 664 F.2d 971, 1032 (5th Cir. 1981)); *see also* Black's Law Dictionary (11th ed. 2019) ("To make the occurrence of (something) easier; to render less difficult."); *cf. United States v. Bennett*, 1996 WL 477048, at *5 (9th Cir. Aug. 21, 1996).

*Woodhull Freedom Found.*, 948 F.3d at 372.  *See also Abuelhawa v. United States*, 556 U.S. 816, 819 (2009) (acknowledging that the common definition of "facilitate" includes "the act of making it easier for another person to commit a crime") (quoting Black's Law Dictionary 627 (8th ed. 2004)).[9]

Notably, "the verbs 'promote' and 'facilitate' are disjunctive."  *Woodhull Freedom Found.*, 948 F.3d at 372.  Thus, FOSTA can apply to any act that would cause the unlawful activity to be accomplished or to assist in the unlawful activity in any way, even in the absence of "promoting" it, that is, "advancing or actively supporting it."  *See also infra* 19-20.  The Act creates further ambiguity by increasing punishment for those who act "in reckless disregard … that … conduct contributed to sex trafficking," without defining how one "contributes to sex trafficking."  18 U.S.C. § 2421A(b)(2).  The vagueness of "contributed to sex trafficking" is compounded by

---

[9]   The D.C. Circuit acknowledged that one possible reading of FOSTA could limit its scope, based on the background law of aiding and abetting.  *Woodhull Freedom Found.*, 948 F.3d at 372.  However, it also observed that the operative terms in FOSTA are *not* "limited by a string of adjacent verbs (such as advertises, distributes, or solicits) that would convey 'a transactional connotation' that might narrow the statute's reach."  *Id.  See, e.g.*, *United States v. Miselis*, --- F.3d ---, 2020 WL 5015072, at *11 (4th Cir. Aug. 24, 2020) (holding that statutory terms "promote" and "encourage" in Anti-Riot Act are facially invalid because they reach protected speech and are not susceptible to a narrowing interpretation).

Congress's belief that sex trafficking and consensual sex work are "inherently linked," thus raising the probability that it considers anything that "contributes to" sex work, whatever that means, to also "inherently" "contribute to sex trafficking."  Even under normal due process standards, an intent to "facilitate" criminal activity can be unconstitutionally vague.[10]

It is notable that other federal statutes with terms like "promote" or "facilitate" have been interpreted fairly boundlessly (although not in the First Amendment context), with "facilitate," for example, meaning simply "to make easy or less difficult."  *E.g.*, *United States v. Miller*, 379 F.2d 483, 485-86 (7th Cir. 1967) (interpreting provisions of Travel Act).  Under these vague parameters, if applied to a speech regulation, any online communication that might be considered encouraging to sex workers, or that provides services or seeks to minimize harm in a way that makes sex work easier and safer for sex workers, could be swept up in prosecutions or civil claims.  Or, as the Court put it in *Reno*, no one could say with confidence that such speech would avoid legal sanctions.  521 U.S. at 871.

The operative terms of FOSTA impose a far more amorphous burden on protected speech than the terms the Supreme Court held unconstitutionally vague in *Reno*:  "obscene or indecent" and "patently offensive."  *Reno*, 521 U.S. at 858-59, 871-79.  And as the Court observed in *Baggett*, the Constitution does not permit statutory language regulating speech that can be interpreted "to require the forswearing of an undefined variety of 'guiltless knowing behavior.'"  377 U.S. at 366-68 (striking down a statute requiring teachers to sign oaths affirming they did not "advise, teach, abet, or advocate" overthrow of government).  *See also Cramp v. Bd. of Pub. Instruction*, 368 U.S.

---

[10]   *E.g.*, *Amusement Devices Ass'n*, 443 F. Supp. at 1051 (invalidating state law prohibiting provision of legal services to criminal syndicate with a purpose of "establishing or maintaining" the syndicate or "facilitating any of its activities" because the language "fails to specify with reasonable clarity which kind or kinds of conduct it prohibits").

278, 281 (1961) (invalidating Florida law that required public employees to swear they never lent "aid, support, advice, counsel or influence to the Communist Party").

Moreover, the threats that ordinarily accompany vagueness are exponentially greater here, because FOSTA vastly multiplies the number of people who can enforce the law.  Even if a party were confident that DOJ would not find that its speech "facilitates" prostitution, it would ignore reality—as well as the history of Internet censorship—to disregard how FOSTA's vague mandate will be used by prosecutors and private litigants in all 50 states to censor speech and threaten lifestyle choices with which they disagree.  In fact, these efforts are already underway.  *See supra* 6; Tex. Penal Code § 43.031(a) (creating a state criminal law based on FOSTA's 18 U.S.C. § 2421A).  Amicus briefs submitted in the D.C. Circuit appeal in this case show this is far from just speculation.  Law enforcement officials from twenty-one states admitted that because, in their view, "federal law no longer can be said to provide legal protection for websites that unlawfully facilitate sex trafficking" states "may now pursue state-law prosecutions based on conduct that would also violate FOSTA," and Attorneys General may now pursue FOSTA's new civil remedy. Brief of the States of Texas *et al.*, 2019 WL 1773389, at *9-10 (D.C. Cir. Apr. 22, 2019).[11]

Private parties, for their part, foreshadowed plans to use FOSTA as a heckler's veto.  They contended FOSTA "discourages misconduct by internet service providers by exposing them to additional liability," and add that Section 230 now extends immunity only to "those actors who can demonstrate that they undertook a good-faith effort to prevent their platforms from being

---

[11] Notably, certain signatories to the states' brief have a history of interpreting their authority to regulate online speech very broadly while disregarding First Amendment limits.  *See, e.g.*, *Google, Inc. v. Hood*, 96 F. Supp. 3d 584, 593 (S.D. Miss. 2015) (Mississippi AG threatened to prosecute Google after demanding it "take down entire websites that possibly contain illegal or dangerous content and, in his opinion, facilitate illegal activity," including human trafficking), *vacated on other grounds*, 822 F.3d 212 (5th Cir. 2016).

utilized for sex trafficking." *See Equality Now Amici*, 2019 WL 1773391, at *15-16. They argued that this would alter the incentives of online platforms to "encourage monitoring" of third-party content, and they offer to provide "education" to "encourage[] web platforms … to accept accountability for [] trafficking that they facilitate." *Id*. at *16, *20. Under FOSTA, such "encouragement" comes with an implied "or else," which is the very definition of the heckler's veto. *See Reno*, 521 U.S. at 880 (law "would confer broad powers of censorship" on private parties).[12] These plans are now playing out in extant litigation. *See supra* 6. Even the prospect of having to defend a meritless lawsuit brought by a state attorney general or private litigant creates a powerful disincentive to speak anywhere close to FOSTA's blurry lines.

### 2.   FOSTA's Prohibitions are Unconstitutionally Overbroad

FOSTA is also facially unconstitutional because its plain terms restrict a substantial amount of protected speech. The Constitution "gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere," *Free Speech Coal.*, 535 U.S. at 244, and the overbreadth doctrine is particularly vital when laws target online speech. *Reno*, 521 U.S. at 863. A law "may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation omitted). *See Free Speech Coal.*, 535 U.S. at 244 (a law is "unconstitutional on its face if it prohibits a substantial amount of protected expression"). Likewise, a law that targets speech is facially unconstitutional if there is a "likelihood that the statute's very existence will inhibit free expression" by "inhibiting the speech of third parties who are not before the Court." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 799-

---

[12] Notably in this regard, Sections 2421A(c)-(d) offer a bounty for, respectively, civil recovery and attorney's fees and mandatory restitution.

800 (1984).  "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."  *NAACP*, 371 U.S. at 433.

The Fourth Circuit applied these overbreadth principles recently to strike down terms of the Anti-Riot Act, 18 U.S.C. §§ 2101(a)(2), 2202(b), that prohibit speech tending to "encourage" or "promote" a riot, as well as speech "urging" others to riot or that "involv[e]" mere advocacy of violence.  *Miselis*, 2020 WL 5015072, at *11-13.  The court upheld only those aspects of the Anti-Riot Act that specifically addressed *conduct* that amounted to participation in illegal activity (*e.g.*, to "organize" a riot) or that involved unprotected speech subject to a precise legal definition (*e.g.*, to "incite" a riot).  *Id*. at *10-11 (upholding incitement restriction under *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (*per curiam*)).  But it held the verbs "encourage" or "promote" "fail[ed] to bear the requisite relation between speech and lawlessness," *id*. at *10, because such language "sweeps up a substantial amount of speech that retains the status of protected advocacy."  *Id*. at *5.  The "central overbreadth question," the court explained, is "whether any of the purposes included in the statute's specific-intent element implicate protected advocacy."  If so, "those purposes can't form the basis of an attempt to engage in unlawful speech."  *Id*. at *10.[13]

The same overbreadth problem plagues FOSTA.  Under its plain terms, anything on any online platform, commercial or non-commercial alike, that can be said to "promote" or "facilitate" prostitution or trafficking creates a risk of criminal prosecution or ruinous civil liability.  Websites that support sex workers by providing health-related information or safety tips could be viewed as promoting or facilitating prostitution, *see* SMF Ex. E ¶¶ 30-31, as could those that "facilitate" it by advocating decriminalization.  SMF Ex. I ¶¶ 8-9.  Merely indicating online, in anything other

---

[13]  *See also United States v. Rundo*, No. 18-cr-00759-CJC (C.D. Cal. June 3, 2019) (order dismissing indictments under the Anti-Riot Act because its terms are facially overbroad and reach protected speech).

than a negative light, that a person is a sex worker—thus "promoting the[ir] prostitution"—could trigger similar ruinous liability.  Additionally, websites that enable interpersonal or intimate connections, such as "personals" or "dating" information, face obvious risks.[14]  As set forth below, this overbreadth is not hypothetical.  Intermediaries have predictably, inevitably, and understand-ably responded to FOSTA by censoring wide swaths of protected speech, to the detriment of Plaintiffs here and the general public.  *See infra* §§ IV.A-C.

Contrary to this Court's preliminary assessment, the law's overbreadth cannot be cured by referring to the Travel Act.  First, unlike the Travel Act, FOSTA applies *exclusively* to (online) speech.  Conversely, the Travel Act's prohibitions are focused on non-speech *conduct*, applying to "whoever travels in interstate or foreign commerce or uses … any facility in interstate or foreign commerce."  18 U.S.C. § 1952.

Second, the Travel Act applies only when the requisite intent to violate specific laws exists, *id*. § 1952(b) (defining "unlawful activity" as a violation of specific state or U.S. laws).  FOSTA, by contrast, makes it illegal simply "to promote or facilitate the prostitution of another person," without incorporating any specific state or federal law.  And its affirmative defense for local legality does not ameliorate this—the fact that it is an *affirmative defense* proves illegality is *not* part of the prosecution's case.  *See Free Speech Coal.*, 535 U.S. at 255-56 (rejecting government reliance on statutory affirmative defense which left substantial amount of speech unprotected).

Third, while the terms "facilitate" and "promotion" appear in both laws, the Travel Act directly includes only one term used in FOSTA:  "promote."  The term "facilitate" is used only as

---

[14]   Other FOSTA provisions create overbreadth problems as well.  Section 1591 as expanded by FOSTA prohibits not only specific acts of traffickers, but those of anyone who "participates in a venture," which broadly reaches anyone who "benefits" either financially, or by receiving "anything of value" from their participation, and requires only "reckless disregard" to make out a violation.  18 U.S.C. § 1591(a)(2).

integrally connected to promotion, *i.e.*, to "facilitate the promotion of."  18 U.S.C. § 1952(a)(3).

Moreover, in the Travel Act these terms are constrained by a string of verbs ("promote, manage,

establish, carry on, or facilitate the promotion, management, or establishing, or carrying on, of any

unlawful activity") connoting active participation in crime.  *See Williams*, 553 U.S. at 294.  In

FOSTA, however, "promote" and "facilitate" are used in the disjunctive and can apply to any

speech that could make prostitution "easier."  *See supra* 15-16.[15]

The Travel Act prosecutions to which this Court looked previously[16] only underscore the

extent to which the Travel Act is focused on *conduct*, and why FOSTA's speech restrictions are

overbroad.  *United States v. Reiner*, 500 F.3d 10, 13 (1st Cir. 2007), was a Travel Act prosecution

where the defendant was convicted because he made all personnel decisions and handled the

business's financial aspects, while *United States v. Seals*, 2014 WL 3847916, at *9 (W.D. Ark.

Aug. 5, 2014), involved a defendant who hired prostitutes and handled the business's finances.

These cases may illustrate what it means to "promote, manage, establish, carry on, or facilitate the

promotion, management, establishing, or carrying on, of any unlawful activity" in violation of

specified state laws (under 18 U.S.C. § 1952(a)), but say nothing about how a law prohibiting

Internet speech that may "facilitate" prostitution could satisfy constitutional standards.

Finally, FOSTA is also unconstitutionally overbroad to the extent it seeks to revitalize prior

efforts to restrict online intermediaries.  In past years, various states had passed laws designed to

close down online classified ad services based on claims that ad sections for "adult" services or

---

[15]   In any event, the Supreme Court has recognized that in the First Amendment context, simply borrowing language from one law does not necessarily cure vagueness created when the terms are planted into a new statute.  *Reno*, 521 U.S. at 873-74 (rejecting government's argument to the contrary both factually and in its reasoning).

[16]   *See Woodhull Freedom Found. v. United States*, 334 F. Supp. 3d 185, 200 (D.D.C. 2018), *rev'd on other grounds*, 948 F.3d 363 (D.C. Cir. 2020).

"escorts" were synonymous with prostitution, but these laws were uniformly struck down. *Backpage.com v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012); *Backpage.com v. Cooper*, 939 F. Supp. 2d 805 (M.D. Tenn. 2013); *Backpage.com v. Hoffman*, 2013 WL 4502097 (D.N.J. 2013).  Courts held that each of those laws was preempted by Section 230—which was one factor that motivated Congress to adopt FOSTA—but those courts also held those laws violated the First Amendment because they were vague, overbroad, and lacked sufficient *scienter* requirements. *McKenna*, 881 F. Supp. 2d at 1278-81; *Cooper*, 939 F. Supp. 2d at 828-36; *Hoffman*, 2013 WL 4502097 at *7-11.  As discussed herein, FOSTA suffers from the same constitutional infirmities, but is overbroad for an even more basic reason:  "FOSTA's text does not limit its scope to 'bad-actor websites,' or even to classified advertising."  *Woodhull Freedom Found.*, 948 F.3d at 373 (citation omitted).

### 3.   FOSTA Lacks the Scienter the First Amendment Requires

FOSTA's vagueness and overbreadth are further underscored by its failure to prescribe constitutionally sufficient *mens rea* requirements.  The Supreme Court has long held the First Amendment bars the State from imposing liability for distributing expressive materials without proof of scienter.  *Smith*, 361 U.S. at 153-54; *Mishkin v. New York*, 383 U.S. 502, 511 (1966) ("The Constitution requires proof of scienter to avoid the hazard of self-censorship of constitutionally protected material ....").[17]  This knowledge and intent requirement is particularly vital for any restrictions targeting online speech, because "websites … will bear an impossible burden to review

---

[17]   *See also United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994) ("[A] statute completely bereft of a scienter requirement as to the age of the performers would raise serious constitutional doubts."); *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690 (8th Cir. 1992) ("Statutes that impose criminal responsibility for dissemination of unprotected speech must contain a knowledge requirement."); *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) ("[W]rongdoing must be conscious to be criminal.") (citation omitted).

all of their millions of postings or, more likely, shut down their adult services section entirely." *Cooper*, 939 F. Supp. 2d at 830.

In a case like this, where the government seeks to prohibit speech that it alleges promotes criminal acts *by others*, a showing of specific intent is required:  the government must  prove <u>both</u> that (1) a defendant had knowledge of specific content that is integrally related to a particular crime *and* (2) specifically intended to bring about the illegal result.  *Miselis*, 2020 WL 5015072, at *10 ("the government must at a minimum prove that … the defendant acted with specific intent to engage in unprotected speech or conduct").  For speech to fall into the First Amendment exception for "speech integral to criminal conduct," the government must show the targeted speech is for the "sole immediate purpose" of furthering a specific crime.  *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498-502 (1949).

Importantly, an intermediary's mere knowledge that a third party's speech relates in some way to criminal conduct does not overcome First Amendment protection on the theory it facilitates that conduct.  *Bartniki v. Vopper*, 532 U.S. 514, 529-30 (2001).  And to satisfy the "intent" standard, it is not enough to suggest that speech the government seeks to prohibit "encourages" another person's criminal behavior.  *Free Speech Coal.*, 535 U.S. at 253-54 ("The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it.").  Nor is it sufficient to claim speech "promotes" criminal behavior.  For speech to satisfy the criminal intent requirement, it must in some way be participatory, or as the Supreme Court put it, "transactional."  *Williams*, 553 U.S. at 294.  *See also id*. at 300 ("It refers to the recommendation of a particular piece of purported child pornography *with the intent of initiating a transfer*.") (emphasis added).[18]  *See United States*

---

[18]   A statutory proscription fails to target criminal intent where it is broad enough to include mere advocacy "such as the statement 'I believe that child pornography should be legal' or even 'I encourage you to obtain child pornography.'"  *Williams*, 553 U.S. at 299-300.

*v. Freeman*, 761 F.2d 549, 551-52 (9th Cir. 1985) (reversing convictions for 12 counts for counseling tax evasion but affirming two where defendant "not only counseled *but also assisted* in the filing of false returns") (emphasis added).

FOSTA's *mens rea* terms do not speak to these requirements and are thus facially deficient. Section 2421A lacks any specific knowledge element, and although it includes an "intent" requirement, it is not limited to speech that is integrally related to, or supportive of, criminal activity.[19] As discussed above, the operative "terms 'promote' and 'facilitate' … 'are susceptible of multiple and wide-ranging meanings,'" which are commonly understood as "'to make easier' or less difficult, or to assist or aid," and are not linked to a specific crime, and thus do not necessarily identify criminal activity. *See Woodhull Freedom Found.*, 948 F.3d at 372. This means a prosecution under the law could be based on legally protected speech, such as political advocacy, education or harm reduction.[20]

Further, FOSTA's "aggravated" offense imposes liability based on "reckless disregard" of the fact that speech "contributed to sex trafficking." 18 U.S.C. § 2421A(b)(2). Instead of requiring specific knowledge, this provision imposes liability based on generalized knowledge that online speech may be construed to "promote or facilitate" prostitution or to "contribute to sex trafficking." *See Elonis*, 135 S. Ct. at 2009 (defendant "must 'know the facts that make his conduct fit the

---

[19]   The Fourth Circuit recently addressed this same problem in the Anti-Riot Act, noting that where a statute's intent element implicates protected expression, it "can't form the basis of an attempt to engage in unlawful speech." *Miselis*, 2020 WL 5015072, at *10.

[20]   This deficiency is not cured by Section 2421A's focus on an intent to facilitate "the prostitution of another person." 18 U.S.C. § 2421A(a). The supposed crime is the "facilitation," which can include education, advocacy, safety information, or mere encouragement, and First Amendment protection is not lost if such information is provided directly to one person as opposed to many. In any event, the phrase "prostitution of another person" does not render the facilitation "transactional," as did the string of verbs analyzed in *Williams*.

definition of the offense, even if he does not know that those facts give rise to a crime'") (citation omitted).

Finally, FOSTA's adoption renders the *mens rea* requirements of Section 1591 confusing and conflicting; the only thing that is clear is that Congress changed the law to reduce the required level of scienter for "participation in a venture" that may include sex trafficking.  Except where "the act constituting the violation … is advertising," knowledge may be established based on a showing of "reckless disregard."  18 U.S.C. §§ 1591(a)(2), (e)(4).  Under FOSTA, advertising is actually treated *more favorably* than other prohibited acts, whereas liability for other activities, including non-advertising speech that assists, facilitates, or supports a venture involved in sex trafficking, requires an undetermined *mens rea*, no more than a reckless disregard.  18 U.S.C. § 1591(e).

The statutory language is convoluted, but the touchstone for understanding FOSTA is that Congress amended Section 1591 to broaden the meaning of "participation in a venture" specifically to undo the stricter *mens rea* standard articulated in *Backpage.com, LLC v. Lynch*, 216 F. Supp. 3d 96 (D.D.C. 2016).  The House Report on the legislation explained that the purpose of this change was to create a workaround to the specific knowledge requirement for advertising in the prior version of Section 1591.  It noted Section 1591's previous knowledge requirement was difficult to prove because "online advertisements rarely, if ever, indicate that sex trafficking is involved."  H.R. Rep. No. 115-572, pt. 1, at 5.  The Report added that "federal prosecutors usually cannot demonstrate beyond a reasonable doubt that the website operators knew the ad[s] involved sex trafficking."  The Government confirmed this point in the law's "signing statement," which explains that FOSTA was adopted because, under prior law, prosecutors were "limited by the high

evidentiary standard needed to bring federal criminal charges."  *See* Letter from Prim F. Escalona to Mick Mulvaney, Director, Office of Management and Budget.  ECF 15-1.

But the bar FOSTA lowered served a crucial constitutional purpose.  Under the new lax and confusing *mens rea* requirements, online platforms have no clear way to avoid liability without monitoring and over-censoring users' posts.[21]  Platforms lacking resources to effectively monitor user-generated content face enormous risks if they continue to operate.  The predictable result of this law has been "self-censorship of constitutionally protected material" on a massive scale, *Mishkin*, 383 U.S. at 511, such as where Craigslist eliminated its entire personals section and Reddit banned certain subreddits.  *See supra* 4-5.  Such mainstream, general-purpose websites, of the sort that the Supreme Court viewed as indispensable in *Packingham*, 137 S. Ct. at 1735-36, have restricted themselves in an effort to "steer far wide[] of the unlawful zone."  *Speiser v. Randall*, 357 U.S. 513, 526 (1958).

### B.  FOSTA Fails Strict Scrutiny

Strict scrutiny applies to FOSTA because it imposes content-based restrictions on speech. As a general matter, "the First Amendment means that government … has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2355, 2346 (2020) (citation and internal quotation marks omitted).  "[R]egulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163

---

21   H.R. Rep. No. 115-572, pt. 1, at 9 (unlawful intent will not be present "where the material appears despite the operator's good faith efforts to moderate, remove, or restrict such material from appearing on or through the facility").  Civil liability creates even greater pressure to actively police users' speech, as a defendant may be liable under a reckless disregard standard if it does not "seek out the facts that would be reasonable and prudent under the circumstances."  Congressional Research Service, *Sex Trafficking: An Overview of Federal Criminal Law*, June 25, 2015, at 6 (quoting *United States v. Ali*, 718 F.3d 929, 936 (D.C. Cir. 2013)).

(2015).  Such content-based restrictions of speech, "enforced by severe criminal penalties, have the constant potential to be a repressive force in the lives and thoughts of a free people."  *Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004).  The First Amendment "demands" that such restrictions "be presumed invalid, and that the Government bear the burden of showing their constitutionality."  *Id*. (internal citation omitted).  Under strict scrutiny, "[i]t is rare that a regulation restricting speech because of its content will ever be permissible."  *Brown*, 564 U.S. at 799 (quoting *Playboy Entm't Grp.*, 529 U.S. at 818).

FOSTA criminalizes particular subject matter:  speech that "promote[s]" or "facilitate[s]" the prostitution of another person.  18 U.S.C. § 2421A.  Section 2421A thus targets speech based on its "message" and "function."  *Reed*, 576 U.S. at 163-64.  *See also Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (statute restricting speech about crime is content-based).  Section 2421A "focuses *only* on the content of the speech ….  This is the essence of content-based regulation."  *Playboy Entm't Grp.*, 529 U.S. at 811-12 (internal citation omitted).

Section 2421A also allows the government to discriminate against certain viewpoints, which is an even more "blatant" and "egregious form of content discrimination."  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *True the Vote, Inc. v. IRS*, 831 F.3d 551, 560 (D.C. Cir. 2016).  By criminalizing speech that promotes or facilitates prostitution, the law's sweep includes speech such as harm-reduction education aimed at sex workers, and advocacy intended to bring about decriminalization of sex work.  Speech condemning prostitution or seeking to perpetuate criminalization faces no such prohibition.  *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 7 (2010) (statute prohibiting "material support" of terrorist organizations meant "any contribution" that "facilitate[d]" their criminal conduct); *id.* at 36 (statute applied even

where providers of support meant to "*promote* only the groups' nonviolent ends") (emphasis added).

To satisfy strict scrutiny, the government must prove the law is "narrowly tailored to promote a compelling Government interest," and that no "less restrictive alternative would serve [its] purpose." *Playboy Entm't Grp.*, 529 U.S. at 813; *Brown*, 564 U.S. at 799. This means it may limit speech "no further than necessary to achieve the goal," to "ensure that legitimate speech is not chilled or punished." *Ashcroft*, 542 U.S. at 666. The government has the burden to show any speech restriction directly advances its asserted interest. *Reno*, 521 U.S. at 874.

This burden is particularly heavy where, as here, Congress has adopted "nuclear option" penalties to ensure compliance. *See Free Speech Coal.*, 535 U.S. at 244 ("a law imposing criminal penalties on protected speech is a stark example of speech suppression" and "a textbook example of why we permit facial challenges to statutes that burden expression"). In *Reno*, the Supreme Court noted that violations of the CDA could be punished by up to two years in prison and concluded "the severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *Reno*, 521 U.S. at 872. But where the threat of such sanctions under the CDA were undeniably chilling, FOSTA imposes a deep freeze: violations of Section 2421A are subject to 10 years in prison, while aggravated violations carry a sentence of up to 25 years. 18 U.S.C. § 2421A(a)-(b). While the CDA raised possible enforcement by federal prosecutors, FOSTA authorizes criminal enforcement by federal authorities, 50 state attorneys general, *and* hundreds of local prosecutors. 18 U.S.C. § 2421A(a); 47 U.S.C. § 230(e)(5); 18 U.S.C. § 1595(d).[22]

---

[22]   In addition, FOSTA authorizes civil damages, strips away existing statutory immunities from civil liability in state and federal courts, and imposes mandatory restitution "in addition to any other civil or criminal penalties." 18 U.S.C. § 2421A(c)-(d); 47 U.S.C. § 230(e)(5). As with

The government cannot meet that heavy burden.  FOSTA is overinclusive:  it restricts substantially more speech than necessary to further the government's interest.  *See Brown*, 564 U.S. at 805 (holding that a law is not narrowly tailored if it is either overinclusive or underinclusive). Even granting that there is a compelling interest in preventing sex trafficking, "[t]he prospect of crime … by itself does not justify laws suppressing protected speech."  *Free Speech Coal.*, 535 U.S. at 244-45; *see also Kingsley Int'l Pictures Corp. v. Regents of Univ. of N.Y.*, 360 U.S. 684, 689 (1959).  Section 2421A reaches beyond prostitution and sex trafficking, criminalizing speech intended to promote sex workers' rights and safety, including advocacy and education that may "facilitate" prostitution.  Congress's belief that such speech about sex work can be equated with sex trafficking illustrates the law's lack of tailoring.  *See supra* 12.

Moreover, the law is overinclusive to the extent that the Court accepts the government's position that FOSTA was enacted specifically to target classified advertising sites.  H.R. Rep. No. 115-572, pt. 1, at 3-6.  Far from targeting this limited category, FOSTA applies to *every* online service provider and not just "bad actor websites" or even classified advertising.  *Woodhull Freedom Found.*, 948 F.3d at 372.  This is the opposite of narrow tailoring.  *Cf. Pappert*, 337 F. Supp. 2d at 655 (holding that law imposing liability on ISPs for online speech fails both strict and intermediate scrutiny).  With FOSTA, Congress used "a butcher knife on a problem that requires a scalpel to fix."  *Cooper*, 939 F. Supp. 2d at 813.

Lastly, FOSTA fails strict scrutiny because there are less speech-restrictive alternatives that would effectively further the government's stated interest in eliminating sex trafficking. "When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is

---

criminal penalties, the prospect of significant civil liability based on the exercise of free speech is circumscribed by the First Amendment.  *Snyder v. Phelps*, 580 F.3d 206, 217-18 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011); *N.Y. Times Co. v. Sullivan*, 376 U.S. at 264-65.

the Government's obligation to prove that [it] will be ineffective to achieve its goals." *Playboy Entm't Grp.*, 529 U.S. at 816.  Some of these alternatives already exist in federal law; prior to FOSTA's enactment, it was already a crime to "advertise[]" sex trafficking (on the Internet or elsewhere) and to "benefit[] financially" from a venture involving such ads.   18 U.S.C. § 1591(a)(1), (2).  Such laws, subject to First Amendment limits and when enforced pursuant to constitutionally required *mens rea* requirements, constitute less restrictive ways to address the government's interest.  *Backpage.com, LLC v. Lynch*, 216 F. Supp. 3d at 108-09; *Playboy Entm't Grp.*, 529 U.S. at 816-26 (holding that enforcing existing law was an available least restrictive alternative).  As the government admitted on Rule 12 briefing, "before FOSTA was enacted, websites could have been prosecuted in federal court for those same or substantially similar crimes." ECF 16, at 19.  By targeting intermediaries for publishing a broad range of user speech, instead of punishing the sex traffickers themselves, FOSTA actually adopts the *most speech restrictive* alternative.

## III.    FOSTA IS AN UNCONSTITUTIONAL *EX POST FACTO* LAW

FOSTA enables enforcement "regardless of whether the conduct alleged occurred, or is alleged to have occurred, before, on, or after such date of enactment."  FOSTA § 4(b).  This provision implements changes to 47 U.S.C. § 230(e), which authorizes (1) civil claims that are predicated on violations of criminal law in 18 U.S.C. § 1591; (2) criminal prosecutions under state law where the underlying conduct violates Section 1591; and (3) criminal prosecutions under state law where the underlying conduct violates newly adopted prohibitions in 18 U.S.C. § 2421A.

Thus, on its face, FOSTA violates the Constitution's command that "[n]o … *ex post facto* Law shall be passed."  U.S. Const. art. I, § 9.  *See also* U.S. Const. art. I, § 10 (barring states from adopting *ex post facto* laws).  "[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *Landgraf*

*v. USI Film Prods.*, 511 U.S. 244, 265 (1994).[23]   The Supreme Court has thus long recognized retroactive legislation as "oppressive, unjust, and tyrannical," and therefore "condemned by the universal sentence of civilized man." *Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213, 266 (1827).

FOSTA violates these principles in at least two ways.

First, FOSTA added 47 U.S.C. § 230(e)(5)(C), which removed the statute's immunity from state criminal prosecutions and creates new, retroactive liability under state criminal laws modeled after 18 U.S.C. § 2421A.   This creates new state criminal liability for past conduct that Section 230 previously immunized.   Doing so violates the *Ex Post Facto* Clause.   *See Stoner v. California*, 539 U.S. 607 (2003) (holding California statute unconstitutional because its extension of the statute of limitations for certain crimes permitted previously time-barred criminal prosecutions).   Texas responded to Congress' signal and in 2019 enacted a law modeled after Section 2421A.[24]   Under FOSTA, a party now faces new criminal liability under this Texas law for any conduct that occurred prior to FOSTA's passage—conduct that previously would have been immunized from state criminal prosecution under Section 230.

Second, although Section 230 has always excepted criminal prosecution under federal law, FOSTA's addition of 47 U.S.C. § 230(e)(5)(B) results in higher penalties for individuals prose-cuted under state laws than would be possible under federal law.   At least two states have greater

---

[23]   The Constitution's Framers were keenly aware of the dangers posed by such laws. *See* The Federalist No. 44 (James Madison) ("ex-post-facto laws … are contrary to the first principles of the social compact, and to every principle of sound legislation"); The Federalist No. 84 (Alexander Hamilton) ("the prohibition of ex-post-facto laws … are perhaps greater securities to liberty and republicanism" than any other constitutional principles).

[24]   *See* Tex. Sen. Bill 20 (2019), *codified at* Tex. Penal Code §§ 43.031, 43.041 (incorporating Section 2421A's elements into a new criminal law, *e.g.*, § 43.031(a): "A person commits an offense if the person owns, manages, or operates an interactive computer service … with the intent to promote the prostitution of another person or facilitate another person to engage in prostitution."). https://capitol.texas.gov/BillLookup/BillStages.aspx?LegSess=86R&Bill=SB20.

penalties for sex trafficking than federal law.  Mississippi's legislature amended its criminal anti-trafficking statute in 2019 to increase the mandatory minimum for trafficking a minor beyond the mandatory minimum proscribed by 18 U.S.C. § 1591(b).  *Compare* 2019 Miss. Laws, Ch. 459, (S.B. 2305), § 1 (amending Miss. Code § 97-3-54.1(1)(c) to increase mandatory minimum for trafficking a minor from 5 years to 20 years) *with* 18 U.S.C. § 1591(b) (mandatory minimums of 15 years for trafficking a minor under age 14, and 10 years for trafficking a minor over age 14).  Nevada's anti-trafficking statute creates a mandatory minimum of life in prison where the victim is a minor—a more punitive penalty than Section 1591(b).  *See* Nev. Rev. Stat. § 201.300.

Thus, parties face even greater punishment under Mississippi and Nevada law for conduct that occurred prior to FOSTA's enactment.  This is unconstitutional.  *See Peugh v. United States*, 569 U.S. 530 (2003) (finding *ex post facto* violation because new sentencing guidelines promulgated after the crime increased the punishment).

## IV.    PLAINTIFFS ARE ENTITLED TO INJUNCTIVE AND DECLARATORY RELIEF

Injunctive relief is proper because FOSTA is unconstitutional for the reasons set forth above, Plaintiffs (and others subject to FOSTA) will suffer irreparable injury absent an injunction, and both the balance of equities and public interest favor relief.  *E.g.*, *Guffey*, 2020 WL 2065274, at *9.  It is settled law that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Mills v. D.C.*, 571 F.3d 1304, 1312 (D.C. Cir. 2009); *see also Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).  The balance of equities favors Plaintiffs given these constitutional harms, as "no substantial harm to others can be said to inhere" in allowing violations of constitutional rights to continue.  *Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*, 274 F.3d 377, 400 (6th Cir. 2001).  If anything, the harm suffered by speakers engaged in constitutionally protected expression like Plaintiffs, coupled with the public interest in preserving

a free and open internet, *see Google, Inc. v. Hood*, 96 F. Supp. 3d at 601, weigh strongly in favor of enjoining FOSTA. *See Packingham*, 137 S. Ct. at 1735-36. Allowing unconstitutional laws to stand "is always contrary to the public interest," which lies in "protecting First Amendment rights." *Pursuing America's Greatness*, 831 F.3d at 511-12 (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)).

Declaratory relief is also proper. There is a substantial controversy between Plaintiffs and the government regarding whether the FOSTA violates the First Amendment, and as to whether it can be constitutionally enforced by federal and state officials by seeking criminal penalties for asserted violations, and by litigants seeking to impose civil liability. Consequently, there is a real and immediate need warranting a declaration of unconstitutionality. *E.g.*, *United Gov't Sec. Officers of Am., Local 52*, 587 F. Supp. 2d at 222.

### A. Plaintiffs and All Other Internet Publishers and Users Have Suffered and Will Continue to Suffer Irreparable Harm

Plaintiffs have already had their protected speech curtailed or silenced due to FOSTA's chilling effect, and self-censored their expression, causing a significant loss of First Amendment rights. The same is true for other websites, and the members of the public who use them.

That loss of freedom has caused significant practical harm. Since FOSTA was signed into law, Plaintiff Eric Koszyk, a licensed massage therapist who had found clients primarily through ads placed on Craigslist's Therapeutic Services section, completely lost access to that platform due to its reaction to FOSTA. "Mr. Koszyk's massage business reported less than half the revenue it generated in the year before FOSTA, a change he attributes to an inability to advertise on Craigslist." SMF ¶ 11. In the two years since then, Mr. Koszyk has tried to use a variety of other online advertising services, but none of them—on their own or combined—offers Mr. Koszyk the same reach and ability to connect with customers as Craigslist did. *Id.* ¶¶ 8, 12-13.

Mr. Koszyk's circumstance also highlights the harm suffered by others not presently before the Court.  SMF ¶¶ 3, 5.  Users have seen their First Amendment rights undermined by removal of content, shuttering of services, and changes in policies outlined above by numerous online services.  This is especially true of websites and interactive computer services that enable inter-personal contact by users such as those for personal ads, dating services, and similar platforms, *id*., which facilitate the "unlimited … communication of all kinds" that the Supreme Court has deemed vital.  *Packingham*, 137 S. Ct. at 1735-36 (citation omitted).

Plaintiff Woodhull, a tax-exempt education, advocacy and lobbying organization, has experienced adverse impacts from FOSTA on its mission, annual Summit, publications, and advocacy efforts.  SMF ¶¶ 19-20.  Most recently, Woodhull has been forced to conduct its advocacy efforts and Summit online, due to COVID-19, causing it to become even more reliant on large, online platform providers such as Facebook, YouTube, Zoom and Streamyard.  Due to the adoption of restrictive content moderation policies in response to FOSTA, Woodhull has been impeded in being able to promote itself and its events and to livestream content via these services. *Id*. ¶¶ 21-22.  This has included Facebook's post-FOSTA rejection of ads of the type that the web-site allowed prior to the passage of FOSTA.  *Id*. ¶ 22 & Ex. 1.  And though Woodhull considered launching its own online platform to conduct the Summit, it concluded the risks of civil and criminal liability under FOSTA were too great, causing it to postpone or abandon some of its Summit programs.  *Id*. ¶¶ 24-25.

FOSTA continues to thwart the efforts of Plaintiff Jesse Maley, a long-time proponent of sex worker rights (under the name "Alex Andrews"), to use, improve or develop digital tools that sex workers could use to share health, safety, and other harm-reduction information.  SMF ¶¶ 15-17.  Central to these efforts is the Rate That Rescue website, a free, community effort to share

information about all types of entities that provide services sex workers use, including those that do not focus on sex workers but products or services they use, such as Twitter, Wix, or PayPal. Due to the nature of Rate That Rescue and that it hosts content created by both organizations and the sex worker community, it could face claims of direct liability under Section 2421A's ban on owning, managing, or operating a website with the intent to promote or facilitate prostitution, and the site's heavy reliance on Section 230 immunity raises the specter that it now it faces potentially ruinous liability. These effects are magnified because the site produces no revenue, is volunteer-operated, and cannot actively or comprehensively review, edit, or moderate user-generated content. *Id.* ¶ 16. FOSTA has also foreclosed an effort to purchase a smartphone application and website designed to increase sex worker safety. *Id.* ¶ 17. Most recently, Ms. Maley found herself unable rely on digital communications or other online tools to share information with sex workers amid the ongoing COVID-19 pandemic in her efforts to share accurate, timely information about public health and community organizations' services. *Id.* ¶ 18.

This erosion of Plaintiffs' practical access to the tools of free expression, and the self-censoring conduct of non-parties, constitute irreparable harm. They also reflect the real consequences of creating new civil and especially criminal liability risks. If the Supreme Court agreed in *Reno* that a threat of two years in prison under the CDA justified the district court's entry of a preliminary injunction, *see* 521 U.S. at 862, 885; *see also id.* at 872, the prospect of ten years in prison, ratcheting up to as many as 25 under FOSTA, certainly warrants injunctive relief here.

## B.  The Balance of Equities Favors Injunctive Relief

Given that Plaintiffs have demonstrated irreparable injury, the balance of equities clearly tips in Plaintiffs' favor. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Any harm the government might cite pales compared to the loss of First Amendment freedoms

Plaintiffs and others have suffered, particularly given that all laws that already criminalize the conduct of traffickers will continue to apply.[25]

Further, although FOSTA is premised on preventing sex trafficking and helping ameliorate harm that may be involved in sex work, it is having a decidedly opposite impact.  As explained above, organizations like Woodhull and websites like Rate That Rescue, seek to provide information, education, and strategies geared to the safety and well-being of their constituencies.  Yet FOSTA has forced them to curtail those efforts.  *See supra* 34-35.  The same is true of online services and forums such as Reddit or VerifyHim.com, which have limited or eliminated opportunities for users to communicate in these areas.  SMF ¶¶ 1, 3.

Moreover, by eliminating online forums for sex workers, FOSTA is having a devastating impact of sex workers' health and safety.  Studies attribute these harms and others to the loss of online services described above that sex workers previously used to advertise, screen clients, and share safety information.  *Id*. ¶¶ 3-4.  These findings echo economic research establishing a link between the presence of adult services advertisements on Craigslist and a decrease in violence against women.  http://gregoryjdeangelo.com/workingpapers/Craigslist5.0.pdf.  At the same time, experts have observed that there is no evidence FOSTA will, in fact, curtail sex trafficking, and censorship of online content is a questionable approach—at best—to combatting it.  SMF ¶ 2.  To the contrary, there is evidence that it actually hinders anti-trafficking efforts.  *Id*. ¶¶ 4-5.  It has also been observed, and studies have shown, that it hinders law enforcement in targeting trafficking.  *Id*. ¶ 5.  Where law enforcement could once turn to a small number of concentrated, open-access websites in the U.S. to catalyze arrests and rescues, FOSTA caused commercial sex

---

[25]   The government has already argued in this case that anything reached by FOSTA could be prosecuted under existing law.  Defs.' Opp. to Mot. for Prelim. Inj. (ECF 15), at 18-19.

ads to disperse to hundreds of platforms, leaving trafficking even more hidden from law enforcement.  *Id*.

### C.  An Injunction Would Serve the Public Interest

An injunction is particularly warranted because "it is in the public interest to uphold a constitutionally guaranteed right."  *PHE, Inc. v. U.S. Dep't of Justice*, 743 F. Supp. 15, 26 (D.D.C. 1990) (citation omitted).  As the D.C. Circuit has stressed, allowing unconstitutional government action to stand "is always contrary to the public interest," which lies in "protecting First Amendment rights."  *Pursuing America's Greatness*, 831 F.3d at 511-12 (quoting *Gordon*, 721 F.3d at 653).  Further, the public "has a strong interest in having largely-unfettered access to Internet mediums for the purpose of publishing and viewing content and information," consistent with the exercise of First Amendment rights.  *Google, Inc. v. Hood*, 96 F. Supp. 3d at 601.  For the same reasons that FOSTA's counter-productivity undermines the government's interest, *see supra* 36-37, it is likewise in the public interest to allow those like Plaintiffs, the platforms that they offer and/or use, and those who would speak through them to continue to do so without the incursion on First Amendment rights that FOSTA imposes.

### D.  Declaratory Relief is Warranted

Many of the same considerations favor injunctive relief support granting the declaratory relief Plaintiffs seek.  *Boggs v. Bowron*, 842 F. Supp. 542, 547 (D.D.C. 1993) (actions for declaratory relief are a common method for challenging federal statutes that threaten First Amendment rights), *aff'd*, 67 F.3d 972 (D.C. Cir. 1995).  Declaratory relief is proper because there is a substantial controversy between the parties, and a definitive statement regarding FOSTA's constitutionality will resolve it.  *See supra* 33 (citing *United Gov't Sec. Officers of Am., Local 52*, 587 F. Supp. 2d at 222).

**CONCLUSION**

For the reasons above, Plaintiffs respectfully request that the Court grant summary judgment in their favor, declare FOSTA unconstitutional on the grounds set forth herein, and enjoin enforcement 18 U.S.C. § 2421A and the amendments to 18 U.S.C. §§ 1591 and 1595 and 47 U.S.C. § 230 enacted by FOSTA.

DATED:  August 31, 2020

Respectfully submitted,

_____/s/ Robert Corn-Revere_____
ROBERT CORN-REVERE
D.C. Bar No. 375415
RONALD G. LONDON
D.C. Bar No. 456284
**Davis Wright Tremaine LLP**
1301 K Street, NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200
Facsimile: (202) 973-4499
Email: bobcornrevere@dwt.com
        ronnielondon@dwt.com

LAWRENCE G. WALTERS
Florida Bar No.: 0776599
*Pro Hac Vice*
**Walters Law Group**
195 W. Pine Ave.
Longwood, FL 32750-4104
Telephone: (407) 975-9150
Facsimile: (408) 774-6151
Email: Larry@FirstAmendment.com
        Paralegal@FirstAmendment.com

AARON MACKEY
D.C. Bar No. 1017004
DAVID GREENE
(admitted in California)
*Pro Hac Vice*
CORYNNE MCSHERRY
(admitted in California)
**Electronic Frontier Foundation**
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
Email:  amackey@eff.org
        davidg@eff.org

DAPHNE KELLER
Cal. Bar No. 226614
**Stanford Cyber Law Center**
616 Jane Stanford Way #E016
Stanford, CA 94305
(650) 725-0325
Email:  daphnek@stanford.edu

Attorneys for Plaintiffs