# Exhibit 1

# THE VIRTUES OF UNVIRTUOUS SPACES

### *A. F. Levy*[*]

> *"A few nights ago a drunken man—there are lots of them everywhere nowadays—was crawling on his hands and knees under the bright light at Broadway and Thirty-fifth street.  He told an inquiring policeman he had lost his watch at Twenty-third street and was looking for it.  The policeman asked why he didn't go to Twenty-third street to look.  The man replied, 'The light is better here.'"*[1]

### INTRODUCTION

Almost exactly a century after Chicago's Superintendent of Compulsory Education warned that "[m]ore girls enter the White Slaver's mart through the portals of the disorderly dance hall than through all other agencies,"[2] a nonprofit advocate publicly denounced the Internet marketplace Craigslist.org ("Craigslist") as "the Wal-Mart of online sex trafficking."[3]  The similarity between these accusations evinces the strong general resemblance between the early-twentieth-century fight against so-called "white slavery" and the modern war on sex trafficking.  More specifically, however, it points to a shared mistake: namely, the notion that fighting venues in which exploitation takes place is tantamount to fighting exploitation itself.  In fact, neither the "disorderly dance hall" nor Craigslist *caused* abuse; both, however, brought heterodox (and sometimes exploitative) sexual practices out of the shadows.[4]  Both were consequently denounced as unvirtuous spaces and turned into the targets of anti-exploitation campaigns.  But this strategy is

---

[*]   Adjunct Professor of Law, Notre Dame Law School.

    1.   *Washington's Birthday*, KINGSTON DAILY FREEMAN, Feb. 21, 1925, at 7, https://perma.cc/ADV4-GDJZ.

    2.   H.W. LYTLE & JOHN DILLON, FROM DANCE HALL TO WHITE SLAVERY 1 (1912).

    3.   Steve Turnham & Amber Lyon, *Sold on Craigslist: Critics Say Sex Crackdown Inadequate*, CNN (Aug. 4, 2010, 5:25 AM), https://perma.cc/PD6G-ZMBF.

    4.   *See* Backpage.com, LLC v. Dart, 807 F.3d 229, 234 (7th Cir. 2015), *cert. denied*, 137 S. Ct. 46 (2016) ("Fetishism? Phone sex? Performances by striptease artists? (Vulgar is not violent.)  One ad in the category 'dom & fetish' is for the services of a 'professional dominatrix'—a woman who is paid to whip or otherwise humiliate a customer in order to arouse him sexually. . . .  It's not obvious that such conduct endangers women or children or violates any laws, including laws against prostitution." (citations omitted)).  Other common posts include ads for apartment rentals, political screeds, and personal ads.  *See id.* at 230.

dangerous: removing exploitation from view works at odds with recovering victims. Indeed, many of today's anti-sex-trafficking advocates, like last century's anti-white-slavery crusaders, unwittingly foster abuse by seeking to subvert the spaces in which it sometimes takes place.

Websites that facilitate sexual commerce have, in recent years, become pet enemies of some self-styled antitrafficking advocates. The underlying premise is that any centralized, unregulated marketplace for sexual services will inevitably attract some sex traffickers; therefore, websites that host such marketplaces abet (or, according to some, actively encourage) exploitation.[5] An online clearinghouse between trafficking victims and clients is, at first glance, an understandable target of antitrafficking advocates.[6] However, a closer and more rigorous inspection reveals that the war on Internet platforms like Craigslist and, more recently, Backpage.com ("Backpage") is (at best) based on a misunderstanding of their relationship to human trafficking. Even though some traffickers make use of these platforms, there is neither an empirical foundation for the assumption that the platforms cause trafficking, nor any evidence that shuttering them would reduce trafficking. To the contrary, allowing Internet platforms on which sexual services are brokered to thrive may be key to apprehending traffickers and recovering victims.

On January 9, 2017, in the immediate aftermath of a U.S. Senate report accusing Backpage of knowingly fostering human

---

5. *See, e.g.*, OFFICE OF THE ATTORNEY GEN., STATE OF CALIFORNIA, ATTORNEY GENERAL KAMALA D. HARRIS ANNOUNCES CRIMINAL CHARGES AGAINST SENIOR CORPORATE OFFICERS OF BACKPAGE.COM (2016), https://perma.cc/L3MW -ECVC (equating "essentially operating as an online brothel" with "raking in millions of dollars from the trafficking and exploitation of vulnerable victims").

6. Many activists who target online intermediaries operate on the premise that *all* sexual commerce is exploitative. Among signatories to amicus briefs discussed *infra*, for example, the Coalition against Trafficking in Women "recognize[s] prostitution as violence against women and a violation of human rights." *Projects and Campaigns, Measures to Combat Trafficking in Human Beings*, COALITION AGAINST TRAFFICKING IN WOMEN, https://perma.cc /9KL2-SGH5 (last visited Apr. 21, 2017). Demand Abolition "is committed to eradicating the illegal commercial sex industry." *Our Approach*, DEMAND ABOLITION, https://perma.cc/Y4T4-TYYZ. My Life My Choice vehemently opposes decriminalization, arguing that Amnesty International's recommendation that sex work be decriminalized is based on a "ludicrous idea." *See* Lisa Grace, *Are You Listening, Amnesty? #NoAmnesty4Pimps*, MY LIFE MY CHOICE (Oct. 21, 2015), https://perma.cc/RY7N-2SW5. Others acknowledge the possibility of consent; Nicholas Kristof, in particular, admits that "many prostitution ads on Backpage are placed by adult women acting on their own without coercion." Nicholas Kristof, Opinion, *Where Pimps Peddle Their Goods*, N.Y. TIMES (Mar. 17, 2012), http://www.nytimes.com/2012/03/18/opinion /sunday/kristof-where-pimps-peddle-their-goods.html. For a discussion of factual inaccuracies in this article, see *What Nick Kristof Got Wrong: Village Voice Media Responds*, VILLAGE VOICE (Mar. 21, 2012), https://perma.cc/M5PY- 42XJ.

trafficking, Backpage shuttered its so-called "adult" section.[7] The menu of adult subcategories (escorts, body rubs, "dom & fetish," etc.) remained intact, but each list item linked to a page alleging that the original content had been "unconstitutionally censored" by the government.[8] In an official statement, Backpage claimed that its decision was prompted by "an accumulation of acts of government censorship using extra-legal tactics" and "years of effort by government at various levels to exert pressure on Backpage.com."[9] It promised to "continue to pursue its efforts in court to vindicate its First Amendment rights and those of other online platforms for third party expression," even as its own operations had become "too costly to continue" due to the government's coercive tactics.[10]

In fact, pressure on Backpage to censor its sexual content had been mounting for years. Its detractors included not just the government, but also private litigants,[11] the press,[12] self-styled antitrafficking advocates,[13] and concerned citizens,[14] all of whom sought to hold Backpage accountable for trafficking brokered on the website. Backpage's large share of the online sex ad market, combined with its unwillingness to capitulate to the exhortations of activists, had earned it significant notoriety;[15] it was decried as greedy, calculating, indifferent to the plight of trafficking victims—a veritable "pillar of sex trafficking."[16]

Crucially, the fact that a high number of victims have been recovered through Backpage is commonly marshaled as evidence that Backpage *caused* trafficking—but not, notably, that Backpage

---

7. *See* PERMANENT SUBCOMM. ON INVESTIGATIONS, U.S. SENATE COMM. ON HOMELAND SEC. & GOV'T AFFAIRS, BACKPAGE.COM'S KNOWING FACILITATION OF ONLINE SEX TRAFFICKING (2017), https://perma.cc/PCE5-6P3E [hereinafter SENATE REPORT].

8. *Censored*, BACKPAGE.COM, https://perma.cc/6YFH-83TN (last visited May 9, 2017).

9. Press Release, Backpage.com, Statement of Backpage.com Regarding the U.S. Permanent Subcommittee on Investigations' Censorship of Adult Classified Advertisements (Jan 9, 2017), https://perma.cc/3YSZ-9RUF.

10. *Id.*

11. *See, e.g.*, Complaint, J.S. v. Vill. Voice Media Holdings, LLC, No. 12-2-11362-4 (Super. Ct. Wash. 2012).

12. *See, e.g.*, Women in the World Staff, *Adult Classified Ad Website Backpage Raided, CEO Arrested for Facilitating Child Prostitution*, N.Y. TIMES: WOMEN IN THE WORLD (Oct. 7, 2016), https://perma.cc/ZZ3R-ALHQ.

13. *See, e.g., id.*

14. *See, e.g.*, *Larimer County Concerned Citizens Against Human Trafficking*, A FACE TO REFRAME, https://perma.cc/H8AJ-Z79Y.

15. *See* OFFICE OF ATTORNEY GEN., *supra* note 5; PERMANENT SUBCOMM. ON INVESTIGATIONS, U.S. SENATE COMM. ON HOMELAND SEC. & GOV'T AFFAIRS, RECOMMENDATION TO ENFORCE A SUBPOENA ISSUED TO THE CEO OF BACKPAGE.COM, LLC 6 ("Backpage is a market leader."); *infra* Part III (discussing various amicus briefs).

16. Women in the World Staff, *supra* note 12.

allowed trafficking victims to be recovered.[17]  The attention paid to Backpage's role in facilitating trafficking, but not its role in stopping it, demonstrates the illogic at the heart of this position.  In fact, it is nonsensical to hold Backpage accountable for what traffickers do with it (engage in sex trafficking) but to simultaneously refuse to credit it for what law enforcement does with it (apprehend traffickers and recover victims).  The closure of Backpage's "adult" section is no less a loss for law enforcement as it is a blow to traffickers.

This asymmetry speaks to a fundamental misunderstanding about the role of online intermediaries in human trafficking.[18] Internet platforms are, by definition, nothing more than forums— forums for the good and the bad and the vulgar and the humorous. To the extent that they are forums for trafficking, they are also forums for its antidote.  Indeed, all they provide is a space in which people become visible.  The consequences of visibility are up to users—exploiters, law enforcement, nongovernment organizations ("NGOs"), and concerned citizens, among others.

Like many forums, Internet platforms are generally not legally liable for content created by others.[19]  The fantasy that these websites are bad actors—and are thus worthy enemies of antitrafficking advocates—not only distracts from efforts to hold traffickers accountable, but causes an invaluable resource for apprehending traffickers and recovering victims to be squandered.

Imagine that the FBI designed a way for children to quickly and easily upload their "image[s] [and] whereabouts . . . from a cellular phone" in the event they were kidnapped or trafficked for sex.[20] These emergency communications would also transmit the trafficker's contact information, giving law enforcement a direct

---

17.  *See infra* Part III.  A survey of over 1000 federal human trafficking cases brought over a seven-year period also reveals a high percentage of traffickers being apprehended through Backpage, with or without Backpage's cooperation (data on file with author).

18.  The analysis of intermediaries and "unvirtuous spaces" in the commission of sex-trafficking crimes presented in this Article applies, in limited ways, to other brokered crimes as well.  However, a more generalized argument is outside the scope of this Article.

19.  *See* 47 U.S.C. § 230(c)(1) (2012).  A critical distinction exists between interactive computer services and information content providers.  An interactive computer service is defined under the law as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server."  *Id.* § 230(f)(2).  Information content providers, on the other hand, are defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  *Id.* § 230(f)(3).

20.  Amicus Curiae Brief of the Coalition Against Trafficking in Women ("CATW"), in Support of Respondents at 16, J.S. v. Vill. Voice Media Holdings, LLC, 359 P.3d 714 (Wash. 2015) (No. 90510-0), 2014 WL 4808970 [hereinafter CATW Brief].

path to the victim.   Remarkably, these messages could be sent without raising the trafficker's suspicions—a victim could make use of this website even "while her pimp loomed threateningly over her shoulder."[21]   In some cases, the trafficker would even inadvertently post the very message that would tip off the police to the whereabouts of his victim.

A limitation of this instrument, however, would be that the victim's information would be broadcast widely—not just to law enforcement, but also to would-be exploiters.   This would put considerable pressure on law enforcement to move quickly before bad actors accessed the victim.   But even if the law enforcement response was imperfect, it is difficult to imagine that such a tool would be heralded as anything but a miracle.   To the extent that it led to victims' ongoing exploitation, the blame would likely fall on law enforcement for not acting swiftly enough.

Despite the fact that websites allowing sexual commerce fit this description, they are nevertheless decried by many as traffickers' allies and enablers.   The only difference between these websites and the tool described above is intent: internet platforms are profit-seeking, while the sole purpose of the FBI's imaginary mechanism would be to help victims.   Practically speaking, however, they are identical.   The effect is the same regardless of motive.

This Article posits that Internet platforms on which sexual commerce is brokered are natural allies in the fight against trafficking—*no matter the intentions of those who run them*.[22]   To the extent that traffickers use the platforms to make their victims more visible to potential customers, they also increase victims' visibility to law enforcement and others seeking to recover them.   The evidence marshaled against such websites shows that the use of Internet platforms is correlated with the amount of sex trafficking that is reported—in other words, their proliferation aligns with an increase in the amount of information available to law enforcement about sex-trafficking crimes.   Crucially, however, there is no evidence that they cause a rise in the incidence of sex trafficking itself.   An increasing number of *reports* of sex trafficking and an increase in the incidence of sex trafficking do not necessarily go hand in hand.

This Article proceeds in four parts.   Part I provides a history of Internet platforms and their role in sexual commerce and discusses the legal framework in which these platforms currently operate.

---

21.  *Id.*

22.  The extent to which Backpage cooperates with law enforcement is disputed; anecdotal evidence suggests that they are very helpful in trafficking investigations, while briefs filed by advocacy organizations often indicate otherwise.   *See infra* Part III.   Empirical investigation is called for, but, in the absence of data, this Article will operate on the assumption that all the worst claims about Backpage are true—namely, that it is purely profit-maximizing and uncooperative.   This is not an endorsement of this view, but the argument of this Article is strongest if made under these assumptions.

Part II challenges the key premises that underlie the attack on websites that broker sexual commerce and calls into question the notion that the websites themselves cause trafficking.

Part III examines four amicus briefs filed on behalf of the plaintiffs in a lawsuit against Backpage that reveal Backpage's (perhaps unwitting) contribution to the fight to apprehend traffickers and recover victims. These briefs also demonstrate how statistics on trafficking may be misused. Part III also discusses the allegations contained in the recent Senate report.

Part IV compares online platforms for sexual commerce to an institution that sustained almost identical attacks around a century ago: the "disreputable dance hall."[23] Disreputable dance halls, like these platforms, brought a wide range of sexual practices to light.[24] Both venues were decried as unvirtuous spaces—not merely contexts for transgression, but causes of it.[25] An examination of the century-old fight against "white slavery" provides insights into what is at stake for some modern antitrafficking activists—and offers some possible reasons for why they so insistently target the spaces in which trafficking sometimes takes place.

## I. SEXUAL COMMERCE ON THE INTERNET

The commercial sex industry is naturally suited to the Internet.[26] Indeed, sex workers and clients began to find each other and exchange information online as early as the 1980s.[27] Eros.com, the first nationwide marketplace for sexual services, was created in 1997;[28] within a few years, "cyberhookers" were thriving in "the Web's burgeoning Rent-a-Woman world."[29] Some commercial sex was transacted on dedicated sites; however, much of it thrived in more heterogeneous marketplaces, where other services were also exchanged, and other (noncommercial) sexual connections were also made.

Craigslist, which originated as a private email distribution list, was, by the mid-2000s, a forum for all kinds of commerce and conversation.[30] It was also a hub of sexual activity. In 2005, after multiple syphilis infections were traced back to Craigslist-brokered

---

23.  *See infra* Part IV.

24.  *See id.*

25.  *See id.*

26.  In general terms, it allows people to find one another while remaining anonymous until any eventual meeting.

27.  *See* Scott Cunningham & Todd D. Kendall, *Prostitution 2.0: The Changing Face of Sex Work*, 69 J. URB. ECON. 273, 273 (2011).

28.  *About Eros Guide*, EROS BLOG, https://perma.cc/ANF2-S7J6.

29.  *See* Cunningham & Kendall, *supra* note 27, at 273; Scott Shuger, *Hookers.com: How E-commerce is Transforming the Oldest Profession*, SLATE (Jan. 28, 2000), https://perma.cc/2BQG-CPXT.

30.  *On the Record: Craig Newmark*, SF GATE (Aug. 15, 2004), https://perma.cc/PU9K-4KHJ.

encounters, San Francisco's Department of Public Health urged Craigslist to "take a more active stand to promote sexual health."[31] Craigslist resisted pressure to crack down on unsafe sex, citing the "company mantra of letting customers police themselves."[32] Its governing policy was to "turn[] over a lot of control to people who use the site" and intervene only as a last resort.[33]

Though Craigslist refused to engage in any kind of proactive intervention into its users' sex lives, it did permit the San Francisco City Clinic to voice its concerns directly, as it were, to the individuals engaged in risky sexual behavior. The City Clinic was allowed to post a link to a "safer-sex forum" in which men visiting the "men seeking men" page could share health concerns and ask questions to medical professionals.[34] Thus, to whatever extent the existence of Craigslist exacerbated a problem (syphilis) by facilitating sexual connections, it also deployed its antidote (information and medical advice). The issue was resolved organically, without top-down regulation or censorship.

Backpage launched in 2004 using a similar model.[35] Like Craigslist, it facilitated communication and commerce but did not publish its own content; also like Craigslist, it took a hands-off approach to sexual material and did not censor the (sometimes veiled) advertisement of sexual services.[36] It thus expanded the space, pioneered by Craigslist, that was without analog in the physical world: a one-stop-shop, as it were, for everything from lawn care to sex acts.

The integration of sexual and nonsexual commerce brought sexual commerce onto the radar of people who were not looking for it.[37] This sudden visibility may have been at the root of the myth that the U.S. is experiencing an "explosion in domestic sex

---

31. Ann Rostow, *The Hottest Spot Online*, ADVOCATE, Aug. 16, 2005, at 68, 68–69.

32. *Id.*

33. *On the Record: Craig Newmark*, *supra* note 30. In the event that someone persisted in posting abusive material, a member of the company's tiny staff would "try reasoning with" them as a last resort. *Id.*

34. Rostow, *supra* note 31, at 69.

35. *See* David Ovalle, *The "Adult" Section Might Be Closed but Miami Sex Workers Still on the Job*, MIAMI HERALD (Feb. 2, 2017), https://perma.cc/9RS5 -F6TG.

36. Variations on "adult services" have included "erotic services," and, presently, "escorts." *Attorneys General Call for Craigslist to Get Rid of Adult Services Ads*, CNN (Aug. 26, 2013), https://perma.cc/2RC2-WPWU.

37. Physical sex markets have, historically, been physically confined; a breaching of the physical boundary, however, may have serious repercussions. *See* DAVID J. LANGUM, CROSSING OVER THE LINE: LEGISLATING MORALITY AND THE MANN ACT 21 (1994) ("In the closing decades of the nineteenth century and the first decade of the twentieth, every American city of significant size supported a segregated district wherein prostitution was practiced openly. Prostitution in this form was not legal as such, but it was tolerated so long as it was kept within the boundaries of the district . . . .").

trafficking,"[38] and it was in this context that activists first began to rally against websites that allowed advertisements for sexual services.

But holding Internet platforms legally accountable for content they display (but do not create) is all but impossible thanks to the Communications Decency Act of 1996 ("CDA").[39]   In the 1990s, Congress tackled the thorny (and at the time novel) question of websites' accountability for speech posted by users, following a case called *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*[40]   In *Stratton Oakmont*, a securities investment banking firm sued the owner and operator of a computer network for defamatory statements posted by an unidentified user.[41]  The network, Prodigy, argued that it was not really a publisher, but more akin to a distributor, and thus not legally accountable for the content defaming the plaintiff.[42]   The court focused on the question of whether Prodigy had "exercised sufficient editorial control over its computer bulletin boards to render it a publisher with the same responsibilities as a newspaper" and found that it had.[43]   Unlike other "computer bulletin boards," which were more akin to "bookstores, libraries, and network affiliates," Prodigy had advertised itself as family friendly, in

---

38. *See, e.g.*, ALICIA PETERS, RESPONDING TO HUMAN TRAFFICKING: SEX, GENDER, AND CULTURE IN THE LAW 16–18 (2015) (pointing out the lack of data and statistical rigor in the field of trafficking research); David A. Feingold, *Trafficking in Numbers: The Social Construction of Human Trafficking Data*, *in* SEX DRUGS, AND BODY COUNTS: THE POLITICS OF NUMBERS IN GLOBAL CRIME AND CONFLICT 56 (Peter Andreas & Kelly M. Creenhill eds., 2010) (stating that there is "almost never any indication as to either the provenance or the basis for the figures" on trafficking); Ronald Weitzer, *The Social Construction of Sex Trafficking: Ideology and Institutionalization of a Moral Crusade*, 35 POLS. & SOC'Y 447, 455–56 (2007) (discussing the lack of support for the claim that "[t]he magnitude of both prostitution and sex trafficking is high and has greatly increased in recent years"); Elizabeth Nolan Brown, *The War on Sex Trafficking is the New War on Drugs*, REASON.COM (Nov. 2015), https://perma.cc/2VTT-LGGJ ("Some data suggest that the Internet has allowed the commercial sex market to expand."). This does *not* necessarily mean, however, that there is a proportional rise in nonconsensual commercial sex. *See, e.g.*, URBAN INSTITUTE, ESTIMATING THE SIZE AND STRUCTURE OF THE UNDERGROUND COMMERCIAL SEX ECONOMY IN EIGHT MAJOR US CITIES 235–37 (2014) ("The results presented here corroborate . . . findings that the use of the Internet . . . is likely helping to expand the underground commercial sex market") (cited by S. REP. NO. 114–214, at 3 (2016) to support the claim that "online advertising has transformed the commercial sex trade and in the process has contributed to the explosion of domestic sex trafficking"); Cunningham & Kendall, *supra* note 27, at 286 (concluding that "online solicitation represents an augmentation of the prostitution market, with large displacement effects only among some age groups of sex workers").

39.   47 U.S.C. § 230 (2012).

40.   1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995).

41.   *Id.* at *1.

42.   *Id.* at *3.

43.   *Id.* at *3–4.

essence promoting itself as a website that took responsibility for its content. As a result, the court concluded that it could be held legally liable for this content as well.[44]

Common law defamation developed in a world in which content creators, publishers, and distributors were clearly distinct entities.[45] Early attempts (including *Stratton Oakmont*) to figure out how to regulate online forums contemplated analogies to newspapers, radio, common carriers, and private real property owners, but none were fully instructive.[46]   The Internet involved a different set of constraints: systems operators were in a good position to exert some editorial content over materials posted by others, but could not reasonably be expected to function as gatekeepers for all of it. If websites' legal accountability for posted material were to be determined by the extent of their editorial control, websites might simply refuse to exert any editorial control whatsoever (or, in the alternative, shut down completely).[47]   Refusal to exercise any editorial control would, in turn, likely result in a net increase in the publication of libelous or obscene material.

Congress responded by passing the CDA, which provided that interactive computer services should not "be treated as the publisher or speaker of any information provided by another."[48]  In order to avoid incentivizing websites to give up editorial control (lest they be held responsible for posted content), Congress created a safe harbor. Under the "Good Samaritan" provision, "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected,"[49] would not turn interactive computer services into a content provider. Websites could thus exercise some amount of editorial control without fearing liability for content posted under their watch.

The CDA adeptly differentiates between the roles played by information content providers and interactive computer services. The movement to hold interactive computer services accountable for

---

44.  *Id.* at *5.

45.  *Id.* at *3.

46.  Eric Schlachter, *Cyberspace, the Free Market and the Free Marketplace of Ideas: Recognizing Legal Differences in Computer Bulletin Board Functions*, 16 HASTINGS COMMS. & ENT. L. J. 87, 99 (1993).

47.  Interestingly, this fear was dismissed out of hand by the *Stratton Oakmont* court.   There, the court expressed the belief that "the market will . . . compensate a network for its increased control and the resulting increased exposure."  *Stratton Oakmont*, 1995 WL 323710, at *5.  The notion that the market might not value such censorship very highly—or, in fact, that a website might be *more* sought-after (and would enjoy increased exposure) because of a network's *lack* of control over its content—was not entertained by the court.

48.  47 U.S.C. § 230 (c)(1) (2012).

49.  *Id.* § 230(c)(2)(a).

content crafted by others is based on an optical connection between exploitation and the forum in which it occurs, but it misunderstands the nature of the websites' involvement.  The connection between information content providers and interactive computer services does not justify attributing responsibility to the latter, and policies based on this erroneous placement of blame are ultimately counterproductive.

### A.  *Craigslist*

In 2008, Craigslist collaborated with law enforcement and the National Center for Missing and Exploited Children ("NCMEC") to develop measures to "combat unlawful activity and improve public safety on its web site."[50]  Craigslist, several attorneys general, and NCMEC signed a joint statement laying out steps Craigslist would take to reduce various forms of illegal activity—most importantly, exploitation of minors.[51]

Concerns about human trafficking were at the heart of the statement; aside from a brief section on spam operators, the document was essentially a list of practices designed to fight trafficking.  For example, Craigslist agreed to "implement credit card verification and fees to post for its 'erotic services' category . . . [so as to] reduce ad volume" and to make "credit card information . . . available to law enforcement agencies through a subpoena process."[52]  It likewise committed to making postings in the "erotic services" section include verified telephone numbers that could subsequently be blocked.[53]  More broadly, Craigslist expressed its willingness to help law enforcement at various important turns by "develop[ing] search capabilities that enhance its ability to assist NCMEC and law enforcement agencies to locate missing persons . . . protect[ing] children . . . [and] cooperat[ing] with law enforcement utilizing the subpoena process."[54]   A cooperative arrangement seemed within reach.

Within months, however, the attorney general of South Carolina threatened criminal charges against Craigslist if it did not remove "categories for and functions allowing for the solicitation of prostitution" in South Carolina.[55]   Craigslist weathered further attacks, including a lawsuit brought by a sheriff wishing to recover the operational costs of prostitution arrests (the lawsuit was

---

50.  Press Release, Craigslist et al., Joint Statement (Nov. 6, 2008), https://perma.cc/G5S4-9BR6.

51.  *Id.*

52.  *Id.*

53.  *Id.*

54.  *Id.*

55.  Michael Arrington, *South Carolina Gives Craiglist Ultimatum: Remove Prostitution or Face Criminal Charges*, TECHCRUNCH (May 5, 2009), https://perma.cc/839P-9R9F.

dismissed).[56]   Efforts to punish them for their intermediary role sometimes involved extralegal forms of pressure and shaming—including frivolous charges and lawsuits designed to intimidate.[57] Craigslist continued to fight, however, insisting that "[c]ommunity moderation as exemplified by our flagging system is arguably the most successful system ever conceived for eliminating inappropriate activity from a massive Internet community."[58]

Then, in 2010, two victims who had allegedly been trafficked on Craigslist published an open letter to the website's CEO.[59] The girls reported being kidnapped, raped, and brutalized, in part because "Craigslist makes horrific acts like this so easy to carry out, and the men who arrange them very rich."[60]   This prompted seventeen attorneys general to call on the website to "immediately take down the Adult Services portion of craigslist."[61]   In their letter to Craigslist, the attorneys general highlighted the girls' accounts and alleged that "other reports about the Adult Services webpage support these claims."[62]   But the "support" offered was a single report that a fictional prostitution advertisement posted on Craigslist had yielded fifteen phone responses in three hours.[63] Further allegations—for instance, that "once an ad goes live on the site, it is a virtual certainty that someone will be victimized"[64]— were based on "evidence" such as "an actual advertisement found on craigslist depicting a young woman in highly suggestive attire and clearly listing hourly rates."[65]

Nevertheless, Craigslist caved under the pressure, shuttering its Adult Services section in September 2010.[66]   Many applauded this decision.      Congresswoman Jackie Speier stated that "Craigslist's decision demonstrates a commitment to seeing these horrific abuses end," and "commend[ed] them for taking this step."[67] The attorney general who spearheaded the letter also offered his

---

56.   Dart v. Craigslist, 665 F. Supp. 2d 961, 963 (N.D. Ill. 2009).

57.   *See, e.g., id.* at 969; Mike Masnick, *Guy Sues Wikipedia & Craigslist for $1 Billion Because (He Claims) He Found Nudity on Both*, TECHDIRT, (Nov. 22, 2010, 11:30 AM), https://perma.cc/R6WN-ETNR.

58.   Greg Sandoval, *Craigslist's Statement About Closing Erotic Services*, CNET (May 16, 2009, 5:17 PM), https://perma.cc/H9BX-ZMSJ/.

59.   Letter from AK & MC, Survivors of Craigslist Sex Trafficking, to "Craig," https://perma.cc/UDS2-NJB9.

60.   *Id.*

61.   Letter from Seventeen State Attorneys General to Jim Buckmaster, CEO of Craigslist, & Craig Newmark, Founder of Craigslist (Aug. 24, 2010), https://perma.cc/35A4-PWR6 [hereinafter Letter from Seventeen State Attorneys General].

62.   *Id.*

63.   *Id.*

64.   *Id.*

65.   *Id.*

66.   James Temple, *Craigslist Removes Ads for Adult Services*, SF GATE, (Sept. 5, 2010, 4:00 AM), https://perma.cc/A63P-RHCW.

67.   *Id.*

commendation and expressed his further hope "that their example in doing the right thing will lead others to follow them."[68]  Though some voiced concerns that the ads would simply migrate to other sites—and possibly to sites that had no interest in cooperating with law enforcement[69]—it seems no follow-up study took place to find out whether there was any impact on sex trafficking.  Instead, activists immediately called for the fight to be reprised elsewhere, insisting that "lawmakers need to fight future machinations of Internet-driven sites that peddle children."[70]  In the following years, many activists complained that Craigslist had passed the mantle to Backpage[71]—a fact intended to justify the subsequent war on Backpage.  In reality, however, the interchangeability of Craigslist and Backpage simply shows that fighting websites is not an effective strategy for fighting human trafficking.

### B.  *Backpage*

Soon after Craigslist shut down, Backpage became the market leader in sex work ads, inheriting not only listings and revenue, but the attention and ire of the public.[72]  In 2011, attorneys general wrote a similar letter to Backpage, highlighting anecdotes of trafficking and demanding information about its screening procedures.[73]  Also in 2011, a minor filed a federal lawsuit against Backpage under the Trafficking Victims Protection Act,[74] in which she sought to hold Backpage liable for sexual services brokered on

---

68.  David A. Fahrenthold, *Craigslist Stops Offering Links to 'Adult Services' Ads*, WASH. POST, (Sept. 4, 2010, 9:57 PM), https://perma.cc/XM8T-N2BV.

69.  William Saletan, *Pimp Mobile: Craigslist Shuts its "Adult" Section. Where Will Sex Ads Go Now?*, SLATE (Sept. 7, 2010 8:39 AM), https://perma.cc/2F7A-AU5D.

70.  *Id.*

71.  Brief of Amici Curiae: Covenant House et al. in Support of Plaintiff-Appellants and Reversal of the Ruling Below at 17, Doe v. Backpage.com, LLC, 817 F.3d 12 (1st Cir. 2016) (No. 15-1724).

72.  *See Backpage Replaces Craigslist as Prostitution Leader*, AIM GROUP, (Oct. 19, 2010), https://www.aimgroup.com/2010/10/19/backpage-replaces-craigslist-as-prostitution-ad-leader/.  Even the comparison to Walmart was passed on.  *Compare* Turnham & Lyon, *supra* note 3 (branding Craigslist as "the Wal-Mart of online sex trafficking") *with* Gaye Clark, *9 Things You Need to Know About Backpage.com and Sex Trafficking*, THE GOSPEL COALITION (Apr. 4, 2016), https://perma.cc/VN9S-P6K4 (declaring Backpage "the Walmart of sex trafficking").

73.  Letter from National Association of Attorneys General, to Attorney Samuel Fifer, Counsel for Backpage.com, LLC (Aug. 31, 2011), https://perma.cc/KP2N-3FN6.

74.  18 U.S.C. § 1595 (2012).

its website.[75]     The court dismissed the case on grounds that Backpage was shielded from liability by § 230 of the CDA.[76]

With the website's status as an interactive computer service all but settled, the private challenges to Backpage became more creative. In June 2015, the same sheriff who sued Craigslist in 2009 sent a letter, on official stationary, to Visa and MasterCard that read:

> As the Sheriff of Cook County, a father and a caring citizen, I write to request that your institution immediately cease and desist from allowing your credit cards to be used to place ads on websites like backpage.com. . . . It has become increasingly indefensible for any corporation to continue to willfully play a central role in an industry that reaps its cash from the victimization of women and girls across the world. . . . Within the next week, please provide me with contact information for an individual with your organization that I can work with on this issue.[77]

The credit card companies immediately stopped allowing their cards to be used to purchase ads on Backpage.[78] Sheriff Dart issued a "triumphant press release" and Backpage filed suit, seeking to stop the sheriff's crusade to circuitously crush its "adult" section.[79] The Seventh Circuit Court of Appeals sided with Backpage, ordering the District Court to enjoin the sheriff from taking further actions "intended to ban credit card or other financial services from being provided to Backpage.com." [80]

The nature of Sheriff Dart's maneuver was at first glance surprising, given that the reason Internet platforms had begun requiring credit cards for payments for their adult services ads in the first place was because NCMEC had asked them to.[81] Similarly unexpected was Nicholas Kristof's giddy proclamation that "[p]imps can no longer easily use American Express, Visa or MasterCard to pay for prostitution ads in which they sell 15-year-old girls as if they were pizzas. . . [they] are reduced to figuring out how to pay to promote their ads with, yes, Bitcoin!"[82] Neither Dart nor Kristof offered any explanation for why denying access to credit card

---

75. M.A. ex rel. P.K. v. Vill. Voice Media Holdings, LLC, 809 F. Supp. 2d 1041, 1043–44 (E.D. Mo. 2011).

76. *Id.*

77. Backpage.com, LLC v. Dart, 807 F.3d 229, 231–32 (7th Cir. 2015).

78. *Id.* at 232.

79. *Id.*

80. *Id.* at 239.

81. *See* Press Release, Craigslist et al., *supra* note 50; *see also* CATW Brief, *supra* note 20, at 13 (marshaling the fact that Backpage allows unverified credit cards as proof of their complicity).

82. Nicholas Kristof, Opinion, *Making Life Harder for Pimps*, N.Y. TIMES (Aug. 6, 2015), https://www.nytimes.com/2015/08/06/opinion/nicholas-kristof -making-life-harder-for-pimps.html.

companies was now the preferred strategy, when only a few years earlier, getting Internet platforms to require the use of credit cards was considered a victory.

Indeed, the war on Backpage has been full of moves intended to destabilize Backpage with little regard for legal viability or long-term impact. These have included legislation directly contradicting the CDA passed in Washington in 2012,[83] a civil suit in which the plaintiffs brought "[c]harges hinting at Machiavellian manipulation" (which, the court reminded the litigants, "cannot serve as surrogates for well-pleaded facts"),[84] and, most recently, felony pimping charges brought (and swiftly dismissed) against Backpage's CEO and two controlling shareholders.[85]

Around the same time that Dart sent his letter, the U.S. Senate began investigating Backpage's practices. The Senate Subcommittee on Investigations subpoenaed Backpage in July 2015 and again in October 2015, requesting "documents concerning Backpage's moderation efforts, including information related to editing or modifying ads before publication [as well as] documents concerning metadata, document retention, basic corporate information, and revenue derived from adult advertisements."[86] Backpage objected to most of the requests, citing First Amendment concerns; these objections were overruled, and Backpage's CEO, Carl Ferrer, was ordered to appear in front of the Senate Subcommittee on November 19, 2015.[87] On November 16, 2015, he informed the Subcommittee that he did not plan to show up.[88]

The Senate Legal Counsel brought a civil action to enforce the subpoena in March 2016, and the U.S. District Court for the District of Columbia granted the motion.[89] Litigation concerning document production continued throughout 2016, and, on January 9, 2017, the Permanent Subcommittee on Investigations published a staff report titled *Backpage.com's Knowing Facilitation of Online Sex Trafficking*.[90] The report alleged, in sum, that Backpage

---

83. Backpage.com, LLC, v. McKenna, 881 F. Supp. 2d 1262, 1273 (W.D. Wash. 2012).

84. Doe v. Backpage.com LLC, 817 F.3d 12, 25 (1st Cir. 2016).

85. *See* Tentative Ruling on Request for Judicial Notice and Demurrer at 2, 7, People v. Ferrer, No. 16FE019224, 2016 WL 6905743 (Cal. Super. Ct. 2016) (tentatively granting Defendant CEO Ferrer's demurrer based on immunity under the CDA).

86. SENATE REPORT, *supra* note 7.

87. *Id.* at 11–12.

88. *Id.* at 12.

89. Senate Permanent Subcommittee on Investigations v. Ferrer, Misc. Action No. 16-mc-621 (D.D.C. Aug. 5, 2016).

90. *See* SENATE REPORT, *supra* note 7, at 12; *see also Chairman Johnson Statement on Backpage.com Hearing*, U.S. SENATE COMM. ON HOMELAND SECURITY & GOVERNMENTAL AFFAIRS (Jan. 10, 2017), https://perma.cc/3AZB-86MP.

intentionally facilitated trafficking that occurred on its website.[91] Backpage shuttered its "adult" section that same day.[92]

Many were positive about the decision: NCMEC, for example, reported being "gratified";[93] Nicholas Kristof proclaimed it "a moment to celebrate";[94] and Senator Amy Klobuchar called it "another positive step forward . . . against human trafficking."[95] But this is only a victory if shuttering online intermediaries is an effective way of reducing trafficking—a question that proponents of this strategy seem altogether uninterested in asking.[96]

---

91. The Permanent Subcommittee on Investigations highlighted Backpage's alleged practice of stripping words suggestive of trafficking from ads, rather than removing ads containing these words altogether. SENATE REPORT, *supra* note 7, at 2. The so-called "Strip Term From Ad filter" allegedly allowed Backpage to "conceal[] the illegal nature of countless ads and systematically delete[] words indicative of criminality, including child sex trafficking." *Id.* The report claimed that by prohibiting the use of keywords indicating youth (e.g., "Lolita"), but nevertheless running ads that had originally contained those words, Backpage helped traffickers by editing out incriminating information before posting their ads. *Id.* The problem with this argument is that Backpage had no incentive to engage in term-stripping at all. Under the CDA, they did not need to take any steps to censor the content of the posts. And stripping the terms must have reduced the value of the ads—had the terms not added value, traffickers would simply have chosen not to use them in the first place.

92. Barbara Hollingsworth, *Backpage Shuts Down Adult Ad Section, Execs Take 5th After Release of Senate Report*, CNSNEWS.COM (Jan. 11, 2017), https://perma.cc/BQ2L-GD5M.

93. Nat'l Ctr. for Missing & Exploited Children, *Backpage Update*, MISSINGKIDS.COM, https://perma.cc/93GP-6CVA.

94. Nicholas Kristof, Opinion, *When Backpage.com Peddles Schoolgirls for Sex*, N.Y. TIMES (Jan. 12, 2017), https://www.nytimes.com/2017/01/12/opinion/when-backpagecom-peddles-schoolgirls-for-sex.html. Mr. Kristof's celebration is apparently not incompatible with his realization that "when Backpage closed its adult section, ads selling sex immediately moved over to the site's dating section." *Id.*

95. Karen Zamora, *Sen. Amy Klobuchar Calls Backpage.com Shutdown 'Long Overdue*,' STAR TRIB. (Jan. 10, 2017), https://perma.cc/DM83-Z26C.

96. *See* Kristof, *supra* note 6. A rare reference to a study looking at the effects of a website's closure in this context was made by Nicholas Kristof, but his analysis is misleading. *Id.* After acknowledging that "Backpage's exit from prostitution advertising wouldn't solve the problem, for smaller Web sites would take on some of the ads," Kristof nevertheless insisted that shutting down Backpage "would be a setback for pimps," because, after Craigslist stopped publishing escort ads, "online prostitution advertising plummeted by more than 50 percent, according to AIM Group." *Id.* The AIM Group study in fact states that "[t]he number of prostitution listings counted on nine sites . . . dropped 11.5 percent" in the year following Craigslist's departure—a far cry from Kristof's claim of fifty percent. Mark Whittaker, *Online Prostitution Advertising Stunted by Craigslist Departure*, AIM GROUP (Sept. 6, 2011), https://www.aimgroup.com/2011/09/06/online-prostitution-advertising-stunted-by-craigslists-departure/. The study does indicate that the total *revenue* from online prostitution advertising plummeted by fifty percent—but of course a drop in revenue does not necessarily mean a corresponding drop in quantity. It could simply mean that prices dropped and demand is relatively inelastic—a

## II. LOGICAL FALLACIES

Essentially all arguments for holding Internet platforms liable for human trafficking rest on a simple premise: that the existence of the website (and perhaps of the Internet in general) has caused an uptick in sex trafficking.[97]  But the actual uptick is in the number of *reports* of sex trafficking—a measure that is an (at best) unreliable proxy for the robustness of the sex-trafficking market itself.[98]  It is certainly possible that the relationship between the number of reports and the incidence of trafficking is positive, but it is equally conceivable that it is not.[99]  In fact, one might hypothesize that the correlation would be inverse—more reporting, after all, means higher risk for traffickers, and lower reward.

hypothesis supported by the fact that when Backpage raised its rates in mid-2013, escort-ad revenue jumped more than fifty percent.  Mark Whittaker, *Backpage Raises Rates Again, Escort-ad Revenue Jumps 55 Percent*, AIM GROUP (Apr. 1, 2013).  In any event, the AIM group study looks at prostitution, not sex trafficking—a distinction Kristof initially acknowledges ("many prostitution ads on Backpage are placed by adult women acting on their own without coercion") but then ignores (when concluding that shuttering Backpage would stymie pimps).  *See* Kristof, *supra* note 6.

97.  *See* Amicus Curiae Brief of the National Center for Missing and Exploited Children, J.S. v. Vill. Voice Media Holdings, LLC, 359 P.3d 714 (Wash. 2015) (No. 90510-0), 2014 WL 4913544 [hereinafter NCMEC Brief] ("*Because* of Backpage's deliberate design and absence of protective protocols, children are advertised for sex on its site every day and, as a direct result, are raped repeatedly by adults who pay Backpage's customer, the child's pimp, for their perverse pleasure." (emphasis added)); *see also* SENATE REPORT, *supra* note 7 ("Online advertising has . . . contributed to the explosion of domestic sex trafficking.") (citing Meredith Dank, et. al, *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities*, URBAN INST. 234 (Mar. 2014), https://perma.cc/FDR3-DJLY.  Much of the time, this claim is not stated, but simply assumed to be true.

98.  *See, e.g.*, NCMEC Brief, *supra* note 97, at 3 ("In  2013  alone,  NCMEC documented over 10,000 reports of child sex trafficking. This is only a tiny percentage of the abuse, misery, and exploitation suffered by children who are victimized through child sex trafficking. In the past five years, NCMEC has seen a 1,432% increase in reports of suspected child trafficking.").

99.  For example, Polaris Project notes a similar trend, but comes to the opposite conclusion: according to call data from its hotline, "[r]eports of human trafficking in the U.S. increase every year" but "[t]his is mostly due to people spreading awareness of human trafficking."  *2016 Hotline Statistics*, POLARIS PROJECT (Jan. 2017), https://perma.cc/E3TY-KBN4.  Polaris has nevertheless taken a strong stance against Backpage, partly because of the high volume of reports they receive involving the website.  *Polaris Statement on Backpage.com*, POLARIS PROJECT (Jan. 10, 2017), https://perma.cc/LX6V-W3EP.  In sum, Polaris appears to be operating on the premise that more reporting of trafficking in general is due to more awareness of trafficking (but is not evidence of more trafficking), while more reporting of trafficking *on Backpage* is due to more trafficking on Backpage (rather than greater visibility).

Given that reported cases of trafficking are overrepresented among identified cases,[100] there is no reliable way to test the covariance of trafficking and reports of trafficking.[101] Yet a positive relationship is regularly assumed.   Worse, the fact that an increasing number of reports of trafficking involve Internet platforms is marshaled as proof that these platforms are *causing* an increase in trafficking.[102]   This reasoning is further used to justify claims about individual websites' relative liability for trafficking. NCMEC, for example, cites the fact that "[a] majority of the child sex-trafficking cases being reported to NCMEC now involve ads posted on backpage.com" as proof that Backpage in particular is causing more trafficking.[103]      The notion that disproportionate representation among reported cases might mean just that—that ads on one website are disproportionately likely to be reported—is apparently never contemplated.

And yet, this question is pivotal.  The claim that "[a]lmost every time a girl is rescued from traffickers, it turns out that she was peddled on Backpage"[104] can mean one of two things: most girls who were trafficked were "peddled on Backpage," or most girls *who were recovered* from trafficking were "peddled on Backpage."  Which one of these is true determines whether Backpage ultimately increases or decreases the incidence of trafficking—and whether, by extension, attacking Backpage is actually a good strategy for fighting trafficking.

There are three baseless inferences at play (so far): (1) a rise in the number of reports of trafficking means a rise in the amount of trafficking, (2) the fact that a disproportionate number of reports of trafficking involve Internet platforms means that Internet platforms are *causing* the alleged uptick in trafficking, and (3) the fact that a majority of reports of trafficking involve a *particular* website (here, Backpage) means that that website is responsible for a greater amount of trafficking. Meanwhile, however, there are also accounts to suggest that the amount of trafficking has *decreased* during the

---

100. Some cases are identified without being reported; for example, law enforcement might come upon a trafficking victim as part of a drug or immigration raid.

101. Relatedly, victims who are in recovery may be disproportionately likely to have had their services advertised on Backpage—a fact that may be related to the prevalence of such ads, or may be related to the fact that, holding other numbers constant, advertisements on Backpage are more likely to be reported (and children recovered).  *See* NCMEC Brief, *supra* note 97, at 5–6.

102. *See id.* at 14–16.

103. *Id.* at 3 (alteration in original);  *see also* Kristof, *supra* note 6 (noting that "the Brooklyn district attorney's office says that the great majority of the sex trafficking cases it prosecutes involve girls marketed on Backpage").

104. Kristof, *supra* note 82.

past decade, while the number of online platforms on which sexual commerce is brokered has increased.[105]

In fact, the proliferation of the Internet could be causally implicated in both trafficking and reporting, or in neither—this is unknown and presently unknowable. But, notably, it would be all but impossible for it to affect only one of the two. If Internet platforms make sex trafficking easier, it is because they decrease barriers between potential customers and victims; their ubiquity allows traffickers to reach a larger pool of potential customers. And to the exact same extent that they increase victims' visibility to potential customers, they also increase their visibility to people invested in their recovery.

Making trafficking victims more visible is not, on its own, bad or good; what is clear, however, is that to the extent that it enables trafficking, it also potentially enables recovery.[106] Whether that recovery occurs, however, is up to law enforcement. Ads are beneficial to victims as long as they have a larger positive effect on the chances of recovery than they do on the incidence of trafficking. Because visibility is a double-edged sword, it is reasonable to assume that there is a positive relationship between the risk of exploitation and the chance of recovery. Whether each additional advertisement does more harm or more good, then, depends in large part on who responds to it.

The question comes down to this: is trafficking minimized when scarce law enforcement resources are allocated to efforts to recover victims based on information provided about their whereabouts in advertisements for their sexual services, or when resources are used to punish and deter websites for publishing that information? Notably, a not-insignificant number of organizations that make use of information to recover victims are vociferously in favor of having that very same information censored. Specific examples are discussed in the next section.

### III. THE CASE FOR BACKPAGE, MADE BY ITS DETRACTORS

In July 2012, three minor girls, J.S., S.L., and L.C., brought suit against Backpage in a Washington court.[107] The girls' traffickers had advertised their sexual services on the website, and they now sought to hold Backpage partly accountable.[108] Their complaint

---

105. *See* Brief for the Cato Institute, Reason Foundation, and DKT Liberty Project as Amicus Curiae Supporting Plaintiff-Appellant, at 3, Backpage.com, LLC v. Dart, 807 F.3d 229 (7th Cir. 2015) (No. 15-3047) (discussing evidence that trafficking may have declined in the early 2000s). Of course, no causal relationship can be inferred in this direction either.

106. *See infra* Part III (citing numerous examples of trafficking victims being recovered in part through their advertisement on websites).

107. Complaint, J.S. v. Vill. Voice Media Holdings, LLC, No. 12-2-11362-4 (Super. Ct. Wash. 2012).

108. *Id.* at 1.

alleged that Backpage "conspires with pimps and prostitutes to advertise prostitutes for sale on the Backpage.com escort website," that "Backpage.com's entire business model is predicated around the development and display of commercial sexual service advertising," and that its "façade of minimal respectability" was essentially part of a ploy to divert attention from its illegal activities.[109]  Backpage sought to dismiss the suit on grounds of immunity under the CDA; breaking with every other court to consider this question, the Supreme Court of Washington refused to dismiss the claim.[110]

Four nonprofit organizations filed amicus curiae briefs on the plaintiffs' behalf, arguing that Backpage indeed played a meaningful role in the trafficking operation and should be held accountable.[111]  These filings provide insight into the general theory of liability that underlies activists' hostility towards websites that allow sexual commerce.  The briefs all rely on some variation of the following claims: (1) sex trafficking is at epidemic levels; (2) a high percentage of victims known to the advocate are trafficked through Backpage; (3) Backpage is generally uncooperative and unwilling to remove material at the advocate's request; and (4) imposing legal liability on Backpage will reduce the amount of trafficking.[112]  The briefs also contain emotional, graphic descriptions of the experience of being trafficked[113]—accounts that are truly horrific but ultimately irrelevant to the legality or wisdom of holding Backpage accountable.

Notwithstanding their intended message, the anecdotes and evidence contained in the amicus briefs actually make a strong case *for* Backpage.  Crucially, this case for Backpage is strong regardless of whether Backpage has good intentions or chooses to cooperate with antitrafficking efforts.  Backpage's usefulness to antitrafficking advocates is, in fact, fully compatible with a profit-seeking approach.

109.  *Id.* at 7.

110.  J.S. v. Vill. Voice Media, No. 90510-0, slip op. at 9 (Sept. 3, 2015) (ongoing as of May 1, 2017).   Courts dismissing TVPA claims against intermediaries under the CDA include the Eastern District of Missouri (M.A. ex rel. P.K. v. Vill. Voice Media Holdings, LLC, 809 F. Supp. 2d 1041 (E.D. Mo. 2011)), the District of Massachusetts (Jane Doe v. Backpage, 104 F. Supp. 3d 149 (D.Mass. 2015)), and the 1st Circuit (Jane Doe No. 1 v. Backpage.com, LLC, 817 F.3d 12 (1st Cir. 2016), *cert denied*, 137 S. Ct. 622 (2017)); *see also* Dart v. Craigslist, 665 F. Supp. 2d 961, 963 (N.D. Ill. 2009) (holding that Craigslist is immune under the CDA from liability for prostitution postings).

111.  Amicus Curiae Brief of FAIR Girls in Support of Respondents at 9, J.S. v. Vill. Voice Media Holdings, LLC, 359 P.3d 714 (Wash. 2015) (No. 90510-0) [hereinafter FAIR Girls Brief]; Brief for Crime Victims Law Institute as Amici Curiae, J.S. v. Vill. Voice Media Holdings, LLC, 359 P.3d 714 (Wash. 2015); NCMEC Brief, *supra* note 97.  The State of Washington filed a fifth brief; because their brief dealt almost exclusively with the CDA issues, it is not discussed here.

112.  *See, e.g.*, NCMEC Brief, *supra* note 97, at 3.

113.  *Id.* at 5.

This is because Backpage's value to traffickers as a means of gaining more customers and its value to law enforcement as a means of accessing and recovering more victims rise and fall together. Put differently, traffickers and law enforcement assess the value of Backpage with reference to the same characteristics, namely, accessibility and visibility of ads.

While more visibility invites more business, it also increases the possibility that victims will be discovered by law enforcement, or anyone else looking for them. By extension, it also makes it more likely that the trafficker himself will be apprehended: exposure to customers necessarily means exposure to law enforcement. [114] This is true with respect to both the number and content of the posts. Any attempts to evade law enforcement will likely reduce profits; if traffickers avoid posting pictures of their victims' faces, for example, their chances of attracting customers—who value information about the provider's appearance—also drop.

Backpage and other websites are uniquely situated to bolster antitrafficking and antiexploitation efforts by nonprofits and law enforcement alike. The war on Internet platforms is pageantry: a kind of theater designed to satisfy people's need to identify and fight bad guys without regard to nuance or long-term outcome. But from a tactical standpoint, it is more than a distraction. Censoring these platforms means forfeiting a resource that naturally facilitates the recovery of victims. Ironically, no one makes a more compelling case for their power to fight trafficking than the very organizations trying to shut them down.

*A.   NCMEC*

NCMEC works with the Department of Justice ("DOJ") to provide support, information, and technical assistance to families, law enforcement, and child-serving professionals in identifying, locating, and recovering victims of child sex trafficking.[115]   It operates "the national reporting mechanism for suspected child sexual exploitation," and, by its own account, fields thousands of reports of child sex trafficking per year.[116]   In conjunction with several major corporations, it seeks to harness technological advances in the quest to find and recover missing children, including victims of sex trafficking.[117]

---

114.   This impact is further magnified by the fact that many traffickers have more than one victim; apprehending one trafficker, then, allows for the recovery of multiple victims.

115.   *Law Enforcement Resources from NCMEC*, U.S. DEP'T JUST.: COPS (Mar. 2, 2017, 7:58 PM), https://perma.cc/VQX6-HKEK.

116.   NCMEC Brief, *supra* note 97, at 2.

117.   *Palantir*, NAT'L CTR FOR MISSING & EXPLOITED CHILDREN (Mar. 2, 2017 8:03 PM), https://perma.cc/3EU4-UWAT.

In its amicus brief for the State of Washington, NCMEC expresses grievances that appear to be based, in large part, on the fact that Backpage refuses to hide trafficking victims—from customers, of course, but, collaterally, from law enforcement, NCMEC, and "concerned citizens" who may be instrumental in their recovery. "Backpage," NCMEC says, "refuses to implement obvious measures to remove these ads from public view."[118] The implication is, of course, that "removing these ads from public view" would be tantamount to recovering the children being exploited. But nowhere does NCMEC even attempt to provide any basis for the claim that making ads disappear from Backpage would result in a lower incidence of trafficking.

NCMEC's accounts, intended to disparage Backpage, instead demonstrate the extent of Backpage's ability to enable the recovery of victims and apprehension of traffickers. In one situation, for example, a child was recovered when a member of the public alerted NCMEC to a Backpage ad based on a visual match.[119] After she went missing again, a Backpage moderator reported the ad because the subject of the ad "appeared young."[120] NCMEC then ran a Google search of the telephone number in the ad and identified more than fifty additional Backpage ads using the same number.[121] This shows how the visibility that Backpage provides allows a wide range of people—including the public, Backpage moderators, and NCMEC—to collaborate to recover children.

Yet NCMEC uses this story against Backpage, complaining that it "did not report any of these other active ads to NCMEC, even though the one ad it did report contained the same telephone number and showed the same child being sold for sex."[122] By its own account, NCMEC found these other ads by running "a basic Google search" of the phone number provided by a Backpage moderator's report—meaning that their grievance, here, boils down to the fact that Backpage gave NCMEC the tools to conduct a Google search instead of doing it itself.

NCMEC calls upon Backpage to implement certain practices that, it says, would make sex trafficking more difficult. For example, it recommends that Backpage "capture and store the customer's IP address when [an] ad is created" and "digitally 'hash' photographs from blocked or removed ads and compare [them] with photographs in other ads submitted for posting."[123] Even if Backpage does nothing to proactively help advocates recover trafficking victims, it is, by hypothesis, not standing between law

---

118. NCMEC Brief, *supra* note 97, at 6.
119. *Id.* at 5.
120. *Id.*
121. *Id.* at 5–6.
122. *Id.* at 6.
123. *Id.* at 12–13.

enforcement and a victim whose contact information is expressly made available in an ad.

Furthermore, it is NCMEC's position that information key to a child's recovery is often obvious in an ad—for example, "it is [often] plain from the ad's photograph that the person being offered for paid sex is a child."[124] NCMEC's description of its own use of the site demonstrates a symbiosis. The same kind of marketing that appeals to profit-seeking traffickers evidently also alerts NCMEC. Indeed, the war on Backpage relies on a biased assessment: as long as an ad is up, Backpage is responsible for what traffickers do with it, but not credited with the benefit it confers on NGOs and law enforcement.

Backpage also gets blamed for law enforcement's failures. By NCMEC's account, some victims' family members have urged Backpage to remove ads—suggesting that they have so little faith in law enforcement to follow through on investigations that they would prefer for evidence of the crime to be hidden from public view.[125] NCMEC's grievance, however, is not that law enforcement is so slow to act that family members want the ads taken down, but rather that Backpage is sometimes unresponsive to their requests. For example, NCMEC quotes one family member:

> This ad has photos of my 16 year old sister who [is] currently being trafficked and we are trying to get home. We have an active investigation going on and are trying to get her away from her pimp and bring her home. Please stop allowing [the trafficker] to post her. She [is] only a minor and we want her home.[126]

The idea that an active investigation would be fostered by the offender's contact information—and the victim's whereabouts—being removed from a publicly available website only makes sense if law enforcement refuses to make use of the information.[127]

The only circumstances under which "removing ads from public view" would foster the recovery of children and a reduction in trafficking—that is, the only set of facts justifying NCMEC's recommendation—is if trafficking were impossible without Backpage. It is not the case that removing ads incrementally reduces harm, because, as discussed previously, there is no evidence of a linear relationship between visibility on Backpage and harm.

124. *Id.* at 3.

125. *Id.* at 7 (failing, however, to explain in one instance why one parent, upon seeing a picture of his son, "age 15 dressed in drag," would demand that Backpage "delete this posting today before" he contacts law enforcement— rather than contacting law enforcement with the information contained in the ad).

126. *Id.*

127. Presumably, taking down the ad would alert the trafficker to possible danger, causing him to change locations, phone numbers, etc.

To the contrary, visibility on Backpage also increases the chance of recovery. That means that removing ads from public view might have a greater negative effect on the chances of recovery than on the positive incidence of harm. Whether this is the case depends on the likelihood that the victim will be trafficked once Backpage shuts down, and on the likelihood that, if she is, she will be recovered. But NCMEC does not query these issues.

### B.   *FAIR Girls*

FAIR Girls is a nonprofit organization dedicated to preventing "the exploitation of young women and girls aged 11 to 24 through education and empowerment."[128] In addition to providing direct services to trafficking victims, FAIR Girls monitors Backpage's "escort" advertisements for images of children who have been reported missing by NCMEC. This "manual review[] of advertisements placed in the Escort section of Backpage.com . . . has resulted in numerous successful efforts by local law enforcement to search for trafficking victims."[129] Indeed, by FAIR Girls' account, victims are routinely recovered thanks to the high visibility of their Backpage ads. FAIR Girls itself relies on Backpage to bring victims to the light—at which point the organization may choose to report their whereabouts to NCMEC, tip off law enforcement, or offer their services directly to victims.

Despite Backpage's integral role in FAIR Girls' rescue operations, however, FAIR Girls adamantly insists that Backpage compromises victims by making them more visible. Its amicus brief includes several examples of situations in which images or text on Backpage revealed exploitation.[130] FAIR Girls marshals these stories as proof that Backpage is responsible for the exploitation, but the stories, on their own, demonstrate Backpage's integral role in fighting trafficking.

Each case cited by FAIR Girls confirms the direct link between exposure on Backpage and recovery, often by law enforcement; nevertheless, each story is offered as a lesson about how Backpage failed to recover the girl. For example, "a Washington, D.C. trafficker lured a 15-year old teenage girl from Washington State with the intention to sell her both on the street and on Backpage.com. This girl's images were found by law enforcement who then worked to recover the child victim."[131] FAIR Girls insists that this is proof that Backpage facilitates trafficking, since "there were numerous [lost] opportunities for Backpage reviewers to find and identify this child victim."[132]

---

128. FAIR Girls Brief, *supra* note 111, at 1.
129. *Id.* at 7.
130. *Id.* at 7–12, 14–15.
131. *Id.* at 15.
132. *Id.*

But what would it mean, practically speaking, for Backpage reviewers to "find and identify" victims? Even putting aside the question of whether Backpage has any obligation to proactively assist antitrafficking efforts—or, indeed, whether their reviewers have the capacity to find and identify child victims—it is far from obvious that screening out or censoring this advertisement would have led to a better outcome for this victim. By FAIR Girls' own account, if Backpage reviewers had refused to post the ad, the trafficker would likely have sold the victim's services "on the street" (if not on another website).[133] Alerting law enforcement directly might have expedited her recovery—or it might not have, since the trafficker would no longer have reason to trust that someone using the contact information provided in the ad was a customer. In fact, this story (as presented) demonstrates the elegance of not interfering with Backpage's functioning: the pathways that were intended to facilitate the victim's exploitation in the end enabled her recovery.

According to FAIR Girls, Backpage ads can even lead to victims' recovery if their faces are obscured. FAIR Girls reports recovering one victim "thru [sic] communication with the child victim's mother" who was able to identify her daughter's tattoos.[134] Furthermore, "huge red flag[s]" known to those "[i]n the world of anti trafficking" allegedly make it very easy to determine which ads feature trafficking victims—for example, ads containing images that the subject did not take herself are, according to FAIR Girls, highly suspect.[135] But accepting that as true means that the benefits of exposure on Backpage accrue not only to victims who are actively being searched for, but to all individuals whose victimization is likely to be evident in a photograph.

FAIR Girls also describes a more nuanced benefit of Backpage: customers themselves may alert other website patrons to the fact that someone who appears to be a sex worker is in fact a trafficking victim. As FAIR Girls reports, an

> advertisement depicting a '19' year old girl appeared on Backpage.com. This advertisement seemingly written by a buyer of sex on Backpage.com sent a 'warning' to other buyers . . . . [U]pon reviewing the advertisement, FAIR Girls learned that the young teen victim had a violent pimp and did not like or was not willing to have sex.[136]

---

133.  *Id.*
134.  FAIR Girls Brief, *supra* note 111, at 15.
135.  One may harbor doubts about whether this is actually a "red flag" without losing sight of the overall point: that, on FAIR Girls' terms, the posts themselves facilitate the fight against trafficking. *See id.* at 14.
136.  *Id.* at 11–12.

Had this information not been posted, FAIR Girls would not have learned of the victim's plight. There is nothing to suggest that the victim would have experienced any less harm. The harm would have simply been concealed from view.

## C.   *Coalition Against Trafficking in Women ("CATW")*

Like FAIR Girls, CATW seeks to end sexual exploitation and advocate for the protection of trafficking victims.[137]  It likewise sees the war on Backpage as consistent with its goal of empowering women and girls.   But, like NCMEC and FAIR Girls, CATW unwittingly extolls Backpage as an ally in the fight against trafficking in its amicus brief.[138]

CATW's agenda is to eliminate not just sex trafficking, but commercial sex in general.   It aims to elide any difference between the two.   CATW declares prostitution to be "a form of violence that deprives prostituted people of human dignity through cruel, degrading, discriminatory, and traumatic acts."[139]   It promises that the "evidence for these assertions, and for the deleterious effects of prostitution on women and children is overwhelming" and proceeds to cite a single study of seventy-nine children performed in 1998.[140] CATW invokes the oft-quoted statistic about the "average age of entry" into prostitution being thirteen.[141]  The source of this statistic is a paper, disowned by its own author, Richard Estes, which bases that average on an interview with 107 teenagers in the 1990s.[142]

For the proposition that "sex trafficking is prevalent in the United States," CATW points to a report by the DOJ indicating that federal human trafficking task forces opened "2,515 suspected incidents of human trafficking for investigation between January 2008 and June 2010."[143]   CATW then proclaims, without support, that "[t]he actual number of victims is almost certainly far higher," despite the fact that, on the same page as the statistic cited, the DOJ states that only 389—or fifteen percent—of these 2515 incidents were confirmed to be human trafficking (implicating a total of 527 victims, 460 of whom were sex trafficking victims).[144]

---

137.  *Who We Are*, COALITION AGAINST TRAFFICKING WOMEN, https://perma.cc /9LZW-2LHH.

138.  359 P.3d 714 (Wash. 2015); *see also* CATW Brief, *supra* note 20, at 11 (noting that, in May of 2012, Backpage ads led to fifty prosecutions in twenty-two states for the advertising of underage girls).

139.  *Id.* at 6.

140.  *Id.* at 7.

141.  *Id.* at 7–8.

142.  *See* Brown, *supra* note 38 (providing a thorough examination of statistical fallacies in writing about trafficking); *see also* Brief Amici Curiae for the CATO Institute, *supra* note 105, at 2, 4–5, 10; *The Average Age of Entry Myth*, POLARIS PROJECT (Jan. 5, 2016), https://perma.cc/F9G5-PVQ7.

143.  CATW Brief, *supra* note 20, at 4.

144.  Characteristics of Suspected Human Trafficking Incidents, 2008–2010, U.S. DEP'T JUST. 1 (Apr. 2011) at 6, https://perma.cc/5T3Q-4XBD.

Though some investigations remained open when the study was concluded, a full thirty-eight percent had been confirmed to not be human trafficking—a fact conveniently omitted by CATW.[145]

By CATW's account, "[l]aw enforcement is keenly aware" that a significant amount of online sexual commerce moved to Backpage after the shuttering of Craigslist's "Adult Services" section in 2010.[146] The FBI routinely involves Backpage in "Operation Cross Country," the FBI's annual effort to "draw[] the public's attention to the problem of sex trafficking" by conducting stings and raids across the country.[147] Indeed, CATW's brief highlights nothing if not the large extent to which law enforcement relies on Backpage as a tool for apprehending traffickers and recovering their victims.

CATW poignantly discusses an incident in which a pimp forced a minor sex trafficking victim, "Brianna," to post her own images on Backpage.[148] "In under five minutes Brianna's image, whereabouts, and price could be uploaded on Backpage.com's website from a cellular phone."[149] Though CATW apparently intends for this story to demonstrate Backpage's blameworthiness, it is actually compelling evidence that Backpage provides a natural pathway for recovering victims. A forum that allows trafficking victims to make themselves known to law enforcement is, on its face, a saving grace—no matter its intentions.

It would be nearly impossible for Backpage to obfuscate the connection between victims and law enforcement, while simultaneously fostering a connection between victims and customers. The only circumstance under which Backpage could allow traffickers to selectively communicate with only customers (while avoiding law enforcement) would be if customers and traffickers had code words. And indeed, CATW claims they do—but then proceeds to make clear that they, along with law enforcement, know exactly what those code words are.[150]

According to CATW, "[m]any advertisements also use code words to suggest youth—telltale signs of sex trafficking of young

---

145. *Id.* at 8.

146. *See* CATW Brief, *supra* note 20, at 11; Claire Cain Miller, *Craigslist Says It Has Shut Its Section for Sex Ads*, N.Y. TIMES: BUS. DAY (Sept. 15, 2010), https://perma.cc/BM6E-PPJV.

147. *See* CATW Brief, *supra* note 20, at 12; Joe Johns & Tom Cohen, *FBI Crackdown Nabs Pimps, Rescues Children*, CNN, https://perma.cc/J3GG-EFA2 (last updated July 30, 2013, 10:59 AM); *Operation Cross Country X*, FBI: NEWS (Oct. 17, 2016), https://perma.cc/VBM2-Z95X.

148. CATW Brief, *supra* note 20, at 16.

149. *Id.*

150. Accounts by law enforcement corroborate the widespread familiarity of these terms, suggesting that obfuscation is not a significant barrier to law enforcement making use of these ads. *See, e.g.*, Gloria Riviera et al, *Daughters for Sale: How Young American Girls are Being Sold Online*, ABC NEWS (May 25, 2016), https://perma.cc/Q4S5-WRVR.

girls."[151]   Similarly, "[l]anguage such as 'just got to town' reveal[s] the likely occurrence of international sex trafficking."[152]   This corroborates FAIR Girls' account that Backpage posts provide a general means of reaching out to victims—that is, its usefulness is not limited to situations in which a victim's face is exposed or the victim is being searched for.   Furthermore, according to CATW, Backpage also provides a more nuanced tactical advantage: it allows law enforcement to track victims that traffickers move between states.[153]   Traffickers have historically maintained control over their victims by frequently relocating them; however, with Backpage in the picture, law enforcement is able to overcome this hurdle.

The amicus brief submitted by the National Crime Victim Law Institute ("NCVLI"), together with Shared Hope International, Covenant House, and Human Rights Project for Girls, is substantively the same as CATW's, and rests on similarly shaky grounds.   In support of the proposition that "[t]he Internet has provided traffickers with a remarkably easy and cost-effective way to [traffic children for sex], opening up new and vast markets for the commercial sex industry," for example, NCVLI provides two sources.[154] The first is a statement by an advocate who also points to "violence in our music lyrics like we see in today's popular rap music" as a significant contributing factor to the alleged rise in trafficking.[155]   Then, by way of several nested citations, NCVLI relies on a website that simply shows that the number of people with access to the Internet is increasing over time.[156]

All of the amicus briefs demonstrate Backpage's power as an ally in the fight against trafficking—yet the facts that underlie that conclusion are marshaled against Backpage.   The only explanation for this apparent dissonance is that activists targeting Backpage are less concerned with fighting instances of exploitation than they are with reducing the extent to which it is made visible.

---

151. CATW Brief, *supra* note 20, at 15.

152. *Id.*

153. *Id.* at 11–12.

154. Brief for The National Crime Victim Law Institute as Amici Curiae Supporting Appellees at 13, J.S. v. Village Voice Media Holdings, 359 P.3d 714 (Wash. 2015) (No. 90510–0).

155. Exploiting Americans on American Soil: Domestic Trafficking Exposed, Hearing on H.R. 972 before the Comm'n on Sec. & Cooperation in Europe, 109th Cong., at 77 (2005), https://perma.cc/BEM6-ASF8.

156. LINDA A. SMITH, ET AL., THE NATIONAL REPORT ON DOMESTIC MINOR SEX TRAFFICKING: AMERICA'S PROSTITUTED CHILDREN 19, 41–42 (2009), https://perma.cc/E6LD-FAWU.

### IV. THE DISREPUTABLE DANCE HALL (REPRISED)

The modern obsession with "sex trafficking" bears significant resemblance to what was called, a century ago, the "white slave panic."[157]  Shocking accounts of young white women being kidnapped, forcibly intoxicated, shackled, and bartered as chattel fomented a nationwide call to arms against so-called "white slavers" and their "organized societies [for] debauching little girls."[158]  The hysteria culminated in legislation nominally aimed at combatting "trafficking in women," but which was actually used to punish against all kinds of heterodox sexual practices, including miscegenation, polygamy, adultery, and promiscuity.[159]  Notwithstanding the dramatic accounts of virginal children wrenched from their homes, "sold for less than hogs!" and "held . . . by iron bands,"[160] "historians have almost all come to the conclusion that there were actually very few cases of white slavery."[161]  Rather, the "white slaver" was an invented villain, a metaphor for people's fears about dramatic social changes and a fiction meant to spook women back into their homes.[162]  Perhaps most significantly, it created cover for "protective" measures that in practical effect constrained women's range of motion and opportunity.  As industrialization and urbanization threatened long-standing social norms at the turn of the twentieth century, the mythos of the "white slaver" served as a bulwark, in more ways than one, against women's growing independence.

A similar confluence of increased female migration, globalization, and changing gender roles prompted the re-emergence of the "white slaver"—now called the "sex trafficker"—at the turn of the twenty-first century.  Then, as now, the tale of hapless, virginal girls being attacked by evil, lustful men was substituted for the more complex (and less sexually arousing) reality, in which hapless, virginal girls were being transformed into independent, sexually active women.[163]  The mythologies of "white slavery" and "sex

---

157.  *See* PETERS, *supra* note 38, at 54 (providing a thorough synopsis of other analogs between the antitrafficking panic of the early twenty-first century and that from one hundred years earlier); Jo Doezema, *Loose Women or Lost Women? The Re-emergence of the Myth of White Slavery in Contemporary Discourses of Trafficking in Women*, 18 GENDER ISSUES 23 (2000).

158.  *See* LANGUM, *supra* note 37, at 28.

159.  Michael Conant, *Federalism, the Mann Act, and the Imperative to Decriminalize Prostitution*, 5 CORNELL J. L. & PUB. POL'Y 99, 112 (1996).

160.  LANGUM, *supra* note 37, at 28.

161.  PETERS, *supra* note 38, at 54 ("[S]tories of white slavery were triggered by actual increases of women, including prostitutes, migrating from Europe to find jobs in the US."); Doezema, *supra* note 157, at 25–26.

162.  Doezema, *supra* note 157, at 26.

163.  "The myths around 'white slavery' were grounded in the perceived need to regulate female sexuality under the guise of protecting women.  They were indicative of deeper fears and uncertainties concerning national identity, women's increasing desire for autonomy, foreigners, immigrants and colonial

trafficking" double down on male dominance: men are the ones doing the raping *and* the rescuing (and, if necessary, are the ones to punish women who resist rescue).[164]   As for the women who deny being raped, and resist being rescued—men are in control of them too; they were the ones who turned those women into the uncontrollable, hypersexual creatures they have become.[165]

It bears mention that identifying both "white slavery" and "sex trafficking" as part of a social mythos does not mean denying the reality that some commercial sexual exploitation does occur.[166]  It does, however, call into question the alarming idea that there is an "explosion in domestic sex trafficking"[167]—a claim based on flawed studies, anecdotes, or simply fabrications, and highly reminiscent

---

peoples." *Id.* at 24.  "It also presents a popular sexual fantasy in a culturally acceptable manner." *Id.* at 35.

164.  Another parallel arises in what can be described as the *carceral rescue* response.  In the early twentieth century, women who dared resist rescue were to be "sent to an industrial farm with hospital accommodations on an indeterminate sentence" because "[o]bviously it is necessary that some such measures of almost drastic control should obtain if such women are to be permanently helped and society serviced."   CLIFFORD ROE, HORRORS OF THE WHITE SLAVE TRADE: THE MIGHTY CRUSADE TO PROTECT THE PURITY OF OUR HOME 390 (1911); *see also In re* Carey, 57 Cal. App. 297, 306 (Cal. Ct. App. 1922). Today's programs are similar.  *See, e.g.*, MELISSA GIRA GRANT, PLAYING THE WHORE 11 (2014) ("Even the most seemingly benign 'rehabilitation' programs for sex workers are designed to isolate them from the rest of the population. They may be described as shelters, but the doors are locked, the phones are monitored, and guests are forbidden.  When we construct help in this way we use the same eye with which we build and fill prisons.  This isn't compassion. This isn't charity.  This is control.").  Then as now, women who reject the victim narrative create an existential threat of destabilization, which is critical to the overall schema: in 1910, one reformer complained that it "has been almost impossible to do anything in the state courts because the law in this state, through the interpolation in each section, of the statute, of the words 'against her will,' has rendered farcical the prosecution of 'white slavers.'"  ROE, *supra*, at 337.  Women who not only consented but recruited were an ultimate threat:

> Transactions which involve outrages such as cannot be surpassed in
> the worst annals of Turkish misrule these women procurers often will
> perform without the quiver of a lip, or the droop of an eyelash.  Richly
> attired, of fascinating manner, sometimes possessing remnants of
> former beauty, and withal keen as razors, and sharp as steel traps,
> *these women are the most dangerous creatures extant in the civilized
> world.*

*Id.* at 104 (emphasis added).

165.  *See* ROE, *supra* note 164, at 170.  This has resonance in today's "end demand" movement, which recapitulates the premises that (1) men are agents of women's sexual oppression, even when women claim otherwise, and (2) men hold the keys to women's rescue, even when women claim otherwise.  The theory behind it lacks economic logic, and is widely rejected by sex workers' rights organizations.  *See, e.g.*, *End Demand Fact Sheet*, DESIREE ALLIANCE, https://perma.cc/FD7N-PEWW.

166.  *See* Doezema, *supra* note 157, at 36.

167.  S. REP. No. 114-214, at 3 (2016).

(in syntax as well as content) of the propaganda disseminated at the turn of the twentieth century.[168]

A 1911 book titled *Horrors of the White Slave Trade: The Mighty Crusade to Protect the Purity of Our Homes*, put the "Disreputable Dance Hall" first on the list of "Economic Causes of White Slavery."[169] The 448-page treatise featured a testimonial by "one of Chicago's foremost women," Louise de Koven Bowen:

> In such halls the laws of common decency are violated, and they are resorted to by evil minded men and women seeking victims. The proprietors of these places either connive at or participate in this use of their halls, and no effort whatever is made to protect the young people.[170]

After discussing the superlative evil of masquerade balls, and explaining the importance of good ventilation, Mrs. Bowen went on to demand that a police presence be brought in to transform dance halls into "brilliantly lighted" venues, free of "immoral dancing," "familiarity," and, unsurprisingly, alcohol.[171] Bowen was hardly alone in her fixation on the institution of the dance hall; it was commonly condemned as "the training-ship of prostitution," "the ante-room to hell," a "portal," and "a canker."[172] In retrospect, of course, it is easy to see that it was simply the locus of changing social norms, a venue for sexual expression, a place for men and women to socialize, unsupervised—and, yes, perhaps a context for some exploitation, but certainly not its cause.

The fixation has been reprised, almost verbatim, one hundred years later: while the dance hall was the "White Slaver's mart," websites with "adult" services sections are "the Wal-Mart of sex trafficking."[173] Like dance halls, Internet platforms provide a semipublic space for a range of sexual practices.[174] It may be the case that these sexual practices are disproportionately exploitative – but if that is true, the venues are at most responsible for making that exploitation visible. Initiatives to shutter these venues elide the difference between *causing* exploitation and *revealing*

---

168.  See *supra* Part II.

169.  ROE, *supra* note 164, at 281.

170.  *Id.* at 281, 284.

171.  *Id.* at 289.

172.  MARK KNOWLES, THE WICKED WALTZ AND OTHER SCANDALOUS DANCES: OUTRAGE AT COUPLE DANCES IN THE 19TH AND EARLY 20TH CENTURIES 12 (2009).

173.  *See* LYTLE & DILLON, *supra* note 2, at 1.

174.  The apex of one of that many battles against Craigslist, as described in a letter signed by seventeen attorneys general, went like this: "Ms. Lyon then confronted Mr. Newmark with *an actual advertisement* found on craigslist depicting a young woman in highly suggestive attire and clearly listing hourly rates. She then asked Mr. Newmark pointedly what services he thought the ad was selling." Letter from Seventeen State Attorneys General, *supra* note 61.

exploitation and are, in the end, little more than efforts to send trafficking back into the shadows.

The net effect of this strategy is, of course, that it ushers out of sight a whole panoply of heterodox sexual practices – commercial sex, sex with strangers, "fetishism," etc.[175]—all allegedly in service of protecting victims. But the fight against trafficking—real trafficking—is won by making victims *more* visible. To the extent that websites bring abuses to light, their existence is a tremendous help. The notion that they cause trafficking is unsubstantiated, and ultimately part of the fantasy articulated, in so many words, by Mrs. Bowen: that the complex and fearsome array of social changes can be undone by shuttering the places in which they play out.

## CONCLUSION

The role of online intermediaries in human trafficking has received significant press in recent years, and the recent capitulation of Backpage's "adult" section has brought yet more attention to the issue. The optics of websites' involvement make them easy targets of outrage, but a closer look shows that websites have no independent identity: they are simply conduits for good and bad. Nicholas Kristof, an outspoken critic of online intermediaries, provides the following account:

> Last year I wrote about a missing 15-year-old Boston girl whose parents were beside themselves with worry. In their living room, I pulled out my laptop, opened up Backpage and quickly found seminude advertisements for the girl, who turned out to be in a hotel room with an armed pimp.[176]

The story is clearly meant to elicit outrage at Backpage and gratitude to Mr. Kristof. Such a takeaway, however, poignantly misunderstands the nature of the Internet platform's role. Backpage is just as responsible for the child's recovery (facilitated by Mr. Kristof) as it is for the child's trafficking (facilitated by pimps).

To the extent that websites expand customers' access to victims, they likewise increase victims' exposure to law enforcement—which, in theory, improves their chances of being recovered. The recent strike against Backpage was a victory for those seeking to get trafficking out of sight. This is both a superficially appealing goal (because visibility is easily mistaken for incidence) and ultimately counterproductive (because visibility increases chances of recovery). Indeed, confusing a problem's disappearance with its resolution is doubly dangerous where, as here, visibility actually contributes to

---

175. *See* Backpage.com, LLC v. Dart, 807 F.3d 229, 234 (7th Cir. 2015), *cert. denied*, 137 S. Ct. 46 (2016).

176. Kristof, *supra* note 82.

the solution.   Indeed, the greatest casualties in the war on online intermediaries may well be trafficking victims themselves.

Exhibit 2

sun-sentinel.com

# Brother takes action after girl, 14, is advertised online for sex, officers say

*Caitlin Randle*

2-3 minutes

Stanley Martin had sex with a 14-year-old girl, then advertised her on backpage.com, police say.

A man sprang into action when he found his runaway 14-year-old sister being advertised for sex on an online dating site.

He used the phone number listed in the ad to arrange a date — then confronted the man who showed up with the minor, according to the Broward Sheriff's Office.

Deputies located the suspect, Stanley Martin, by tracing multiple business and cellphone numbers, and arrested him on Aug. 2.

Martin, 28, had sex with the 14-year-old and then posted photos

of her online and advertised her services at $150 for hour, according to a Sheriff's Office arrest report.

Martin is facing four counts of lewd and lascivious battery on a child between 12 and 16.

According to the arrest report, the teen began communicating with Martin after she ran away from Covenant House, a Fort Lauderdale homeless shelter for kids and teens.

Martin picked up the girl and brought her to his house and a hotel in Deerfield Beach, where he had sex with her four times, the report says.

The girl "did not want to have sexual intercourse with Martin but felt she did not have a choice," the report says. She was afraid of Martin because of "previous threats of physical violence."



Stanley Martin (Broward Sheriff's Office)

When relatives told the teen's brother that his sister "was possibly being advertised on Backpage.com," he used the ad's

listed phone number to take the action that led to the arrest, the report said.

Martin, who has also lived in Sunrise and Fort Lauderdale has a lengthy criminal record. He is being held without bond because of previous arrests.

## Breaking News Alerts Newsletter

As it happens

Get updates on the coronavirus pandemic and other news as it happens with our free breaking news email alerts.

It's not clear whether Martin will face additional charges related to prostitution or human trafficking.

A spokesman for the State Attorney's Office said Thursday that prosecutors are still reviewing Martin's case.

- Prostitution
- Crime

Exhibit 3

Case 1:18-cv-01552-RJL   Document 34-9   Filed 08/31/20   Page 39 of 61

**The New York Times**   |   https://nyti.ms/1W3fjEY

# Making Life Harder for Pimps

 **By Nicholas Kristof**

Aug. 6, 2015

In the long struggle against sex trafficking, we finally have a breakthrough!

It didn't come from Congress, or the White House, from the courts or the police. Rather, it came from credit card companies: Pimps can no longer easily use American Express, Visa or MasterCard to pay for prostitution ads in which they sell 15-year-old girls as if they were pizzas.

That upended the business model of sex trafficking. Pimps all over the country are reduced to figuring out how to pay to promote their ads with, yes, Bitcoin!

Human trafficking is one of the most insidious human rights abuses in the United States — some 100,000 minors are trafficked into the sex trade each year in America. So let me explain how we came to enjoy a triumph over traffickers.

A website called Backpage.com has for years dominated the sex trade advertising business. In April alone it published more than 1.4 million ads in its adult services section in the United States. Almost every time a girl is rescued from traffickers, it turns out that she was peddled on Backpage.

Last year I wrote about a missing 15-year-old Boston girl whose parents were beside themselves with worry. In their living room, I pulled out my laptop, opened up Backpage and quickly found seminude advertisements for the girl, who turned out to be in a hotel room with an armed pimp.

Backpage is allowed to operate because of a loophole in the Communications Decency Act. Attorneys general from 48 states have pleaded with Backpage to stop this exploitation, to no effect. Girls who have been sold on Backpage when they were as young as 13 have sued the company, but haven't succeeded because of the loophole.

Then suddenly this summer, the miracle of the market intervened.

Sheriff Tom Dart of Cook County, Ill., wrote tough letters to Visa and MasterCard, calling on them to stop allowing their cards to pay for sex ads on Backpage. Both companies effectively agreed. To its great credit, American Express in April stopped working with Backpage for adult ads, so as of the beginning of July pimps had no easy way to pay for advertisements.

Flummoxed, Backpage responded by making its basic sex ads free, but, even with a fee to promote a free ad, that's not a business model that can sustain it. Backpage is suing Sheriff Dart, but my sense is that pimps won't be using their credit cards again on the site any time soon.

Case 1:18-cv-01552-RJL   Document 34-9   Filed 08/31/20   Page 40 of 61



Massage therapists wait in a common room as a San Francisco task force looks for evidence of human trafficking at their studio. Jim Wilson/The New York Times

"If it's down for six months, that's six months of children who aren't raped," says Yiota Souras of the National Center for Missing and Exploited Children.

So bravo to American Express, MasterCard and Visa — and to Sheriff Dart — for getting results where Congress failed.

There will still be human trafficking, of course, and pimps will find other ways to peddle kids. But it may not be quite so easy for traffickers as it was.

"When on Backpage, I was advertised in the same way as a car or a phone, but with even less value than a bike," one girl told me late last year. She said she was advertised at the age of 15 and 16 and raped 1,000 times as a result.

My guess is that a majority of sex ads on Backpage are for consenting adults. But a significant minority are for sex with children or with women who are coerced — representing some of the largest and most mistreated classes of human rights victims in America. We don't have the moral authority to tell other countries to end modern forms of slavery when we don't clean up our own act.

There has also been progress in other areas. The police in America are going after pimps more, and sometimes johns, as well (that still needs to happen more).

The Nordic model to combat trafficking and exploitation, pioneered in Sweden, has been gaining ground, too. It provides for the arrest of johns while offering help rebuilding the lives of women who were selling sex. Nothing works all that well in curbing sex trafficking, but this model has succeeded better than other approaches.

Yet in some quarters, there's still a myopia about the degree to which this is a human rights issue. Amnesty International will consider a proposal in the coming days that would call for full decriminalization of the sex trade, including for johns, on the theory that this would benefit sex workers. Nice theory, but a failed one. It has been tried repeatedly and it invariably benefited johns while exacerbating abuse of women and girls: A parallel underground market emerges for underage girls.

Let's hope Amnesty comes to its senses and, as Swanee Hunt of Harvard put it, avoids "endorsing one of the most exploitative human rights abuses of our time." Then we can go back to celebrating the struggles of America's sex traffickers as their business model is upended.

Exhibit 4

wrtv.com

# IMPD arrests first suspected pimp in 7 months

*By: Jordan Fischer*

12-15 minutes

---

*Author's Note: This story contains explicit language and descriptions of real prostitution cases. Reader discretion is advised.*

INDIANAPOLIS -- The man on the stoop told her she could keep $70 of every $100 she made if she came to work for him as a prostitute. He told her he would keep her safe. She told him he was under arrest.

In a probable cause affidavit filed earlier this month, the detective wrote that she was working undercover to investigate a complaint about prostitution in a nearby alley when 39-year-old Lamont King yelled at her to come over to him.

"This is my neighborhood, so I know everything that goes on, ya feel me?"

After asking for a light, King wanted to know what she was doing. The detective said she was "trying to work my hustle." To that, she said, King replied that she was in the wrong spot. Then

he suggested they "work together"

"This is my neighborhood, so I know everything that goes on, ya feel me?" King said, according to the affidavit. "I know you ain't in the right spot, though."

*Explore the data on the map below to see every prostitution arrest in Indianapolis in 2017:*

The detective told King she was "independent," meaning she didn't have a pimp. King, she said, suggested she needed someone to protect her. People "get killed out here," he said.

King then began walking westbound, the detective said, and promised her that he knew everyone in the neighborhood and would be able to get her customers.

The detective asked what her cut of the business would be.

"He replied, 'You give me $20 off each $100,'" the detective wrote. "He then changed it to, '$30 off of each $100.'"

When King then said he had a house nearby they could work out of, according to the affidavit, the detective signaled for her backup and King was placed under arrest.

Once he was in handcuffs, the detective explained that she was an officer, and that King was under arrest. She said he told her, "You still sexy, though," and then asked about the charge he faced.

"He asked, 'What is promoting prostitution like?'" the detective wrote. "'Like trying to sell somebody or something? Like trying

about:reader?url=https://www.wrtv.com/longform/running-blind-im...

to sell somebody and make some money?'

"Pimping," she said. King nodded his head. "Oh."

## Without Backpage, Police Running Blind

King's arrest was the first in Indianapolis on a charge of promoting prostitution since November (by comparison, a search of IMPD records just for 2018 turned up 48 prostitution reports). The cases, according to Sgt. John Daggy, an undercover officer with IMPD's vice unit, have just dried up.

The reason for that is pretty simple: the feds closed police's best source of leads, the online personals site Backpage, earlier this year.

"We've been a little bit blinded lately because they shut Backpage down," Daggy said. "I get the reasoning behind it, and the ethics behind it, however, it has blinded us. We used to look at Backpage as a trap for human traffickers and pimps."

U.S. authorities seized Backpage, which has been accused of facilitating human trafficking and prostitution, in April. Legislation signed by President Donald Trump in April known as SESTA-FOSTA (Stop Enabling Sex Traffickers Act and Fight Online Sex Trafficking Act) made it illegal to knowingly assist, facilitate or support sex trafficking and removed immunity for civil liability that online services previously had. The result has been that other sites like Backpage, including Craigslist's personals section, have gone dark.

**READ MORE** | Backpage seized for allegedly enabling sex

trafficking | Backpage.com shutdown means more street
prostitution, Florida sheriff says

The legislation was hailed as a win by groups that fight sex
trafficking, particularly of minors. But Daggy says it also
removed one of the best tools police had for finding trafficking
cases.

"With Backpage, we would subpoena the ads and it would tell a
lot of the story," Daggy said. "Also, with the ads we would catch
our victim at a hotel room, which would give us a crime scene.
There's a ton of evidence at a crime scene. Now, since
[Backpage] has gone down, we're getting late reports of them
and we don't have much to go by."

Even with Backpage, the numbers weren't stellar. A Call 6
Investigation in May found that, in Indianapolis, women were 20
times more likely to be arrested for prostitution than men were
for promoting prostitution.

Loading video...


In 2017, Marion County prosecutors filed just four cases on
promoting prostitution charges. All four cases stemmed from
IMPD investigations through Backpage, including the case that
nabbed Jason Young in November.

## 'I post, he texts'

The ad on Backpage made it pretty clear what sort of "fun" was

being offered. The posting – "young, sexy, thick 'n fun" – was followed by a description promising a woman who "love[s] to pleasure Hats on at all times [sic]." "Hats" meant condoms. The ad ended with a phone number with an Indianapolis area code.

An IMPD detective responded to the ad. Someone texted back asking if he was "in or out" – whether he wanted to meet the girl at her place, or have her come to him.

"In," he replied.

The response was a series of numbers, "100 140 180," which signified the girl's prices for a short visit, 30 minutes and a full hour, respectively.

The detective responded that he "could do 140." He was told to head to a hotel at 86th Street and Zionsville Road, and to pick up a bottle of Gatorade on the way.

Before he arrived, he received a text asking if he was law enforcement. He said he was not. He then received a text directing him to the Fairfield Inn on West 86th Street.

When he arrived, the detective spotted a man, later identified as Jason Young, sitting in a black sedan smoking.

As he approached the room number he'd been given, the detective received another text. This one told him he'd been given the wrong address. He needed to go to the InTown suites next door.

By the time he got back to the parking lot, Young was gone. Another detective confirmed Young had relocated to the parking

lot of the InTown Suites.

In a probable cause affidavit later filed in the case, the detective noted that prostitution promoters, or pimps, often serve as lookouts to ensure the customer is not a police officer.

"With Backpage, we would subpoena the ads and it would tell a lot of the story. Also, with the ads we would catch our victim at a hotel room, which would give us a crime scene."

When the detective got to InTown Suites he was directed to Room 117. There, a woman who identified herself as Britni opened the door. After a brief discussion about what services the detective would get for his $140, Britni instructed him to lay the cash on the TV stand. As he did, he gave the signal for other officers to move in and arrest Britni.

As soon as police moved in, Young sped out of the parking lot. Two other detectives pulled him over a short distance away and placed him under arrest.

Once both were in custody, the detectives asked Britni who Young was to her. She said he was her boyfriend, and that he was the one who arranges the meetups.

"I post, he texts," she told officers.

She also told them all the money she makes – minus a small amount for expenses for her children – goes to Young. If the detective had been a real john, she said, the money she made that night would have gone to Young to pay for another night at the hotel.

Young, for his part, denied any knowledge of what Britni was doing at the hotel.

Detectives found $849 in cash in Young's wallet and pockets. Britni told them she had made it for him through prostitution. All of the money was seized to be held for forfeiture.

Young pleaded guilty in April to promoting prostitution, a level 5 felony, and was sentenced to 3 years in community corrections with 148 days of jail credit.

Britni pleaded guilty in January to one count of prostitution and was sentenced to time served for 54 days already spent in the Marion County Jail.

A civil forfeiture action remains pending against the $849 seized in the case.

## For Some Women, It's Back to the Streets

"We assume it's a great thing that Backpage closed down," Stefanie Jeffers said. "And it is, because it's horrible that Backpage existed and so much trafficking occurred through the users of Backpage. But I do think that it comes with its dangers too."

Jeffers, the founder of the nonprofit Grit Into Grace, works with women who are engaged in street prostitution in Indianapolis to help them get out of the life. She says Backpage's closure came as a shock to the women she talked to.

"The couple of women that I've talked to have said, 'Well now

we're going to have to go out on the streets, and we haven't been on the streets in years,'" Jeffers said.

**Stefanie's Story** | A single mom becomes a stripper, and then a prostitute

Loading video...

For those who have a pimp – and many women working in prostitution don't – the loss of Backpage doesn't mean they get a pass on bringing in money.

"But especially if they have a pimp, then that becomes extremely dangerous for them," Jeffers said.

The streets come with their own set of challenges. Daggy says he hasn't seen a street pimp since he was a uniformed officer working the Near Eastside in the 90s. Over there, where IMPD works the bulk of its prostitution cases every year, addiction drives the sex trade, not pimps.

"The street girls, they're mostly focused on just getting enough money for their next fix," Daggy said. "They're almost, I would say 99 percent of those girls are addicted to opiates or meth. I would say one I know of is just an alcoholic. We just don't see… not that it doesn't happen, but we just don't see pimps on the street like you do in the shows. They're hiding in cyberspace and at the hotels."

Backpage was shut down while one woman Jeffers works with was being held at the Marion County Jail. Jeffers said the

closure wasn't welcome news.

"It was definitely a shock to the women I know, and it's definitely going to change things for them," she said. "Pimps are still going to make their money, traffickers are still going to make their money, it's just going to change things for the women. And I wouldn't assume for the better."

## A Change of Perspective

Shortly after Indianapolis hosted the Super Bowl, Daggy was invited to give a presentation at the Conference of Attorneys General.

"I was badmouthing Backpage big time," he said, "because, you know, we were getting all of our arrests off there. We made over 60 arrests and caught four human trafficking cases during the Super Bowl."

After he presented, Daggy says the website's lawyer came up to speak to him.

"She came up to me and said, 'You know, if we shut down, the ads will go offshore and someone else will pick them up,'" Daggy said.

That's when Daggy started viewing Backpage as a trap – a useful tool for police trying to find victims who rarely self-report, and perpetrators who rarely come out in the open.

"I've got a 100-year-old book talking about a girl being taken up from Cincinnati to Chicago... The guy up there partied with her,

Case 1:18-cv-01552-RJL    Document 34-9    Filed 08/31/20    Page 51 of 61

wined and dined her, and then put her into prostitution."

"They're there. They've been there forever," Daggy said. "I've got a 100-year-old book talking about a girl being taken up from Cincinnati to Chicago on a train, and the same thing happened: tricked into prostitution. The guy up there partied with her, wined and dined her, and then put her into prostitution. You would think it was written today, but this book is over 100 years old."

Daggy says he expects IMPD to make at least a few more promoting prostitution arrests before the end of the year, but he's worried that the degradation of the cases they're able to present because of Backpage's loss will cause departments to refocus resources in the long-term to easier-to-prosecute areas like narcotics.

That's a problem for the veteran officer, who says vice cops like him are already in short supply. He's worried that without a repository of possible trafficking cases like Backpage, human trafficking investigations will revert to the less-proactive style that was common when he first became a vice cop.

"Ethically, I get it" Daggy said. "But it's not safer for our kids by being shut down."

*This article is the third in a series documenting the sex trade in Indianapolis.*

**PART I: 'Becoming Carmen'** | *Sex work took her name, then everything else. Now she helps women take life back.*

**PART II: 'Dear John'** | When men buy sex, it's the women who

pay for it.

Jordan Fischer is the Senior Digital Reporter for RTV6. He writes about crime & the underlying issues that cause it. Follow his reporting on Twitter at @Jordan_RTV6 or on Facebook.

Exhibit 5

washingtonpost.com

# Under attack, Backpage.com has its supporters as anti-trafficking tool. But many differ.

*Tom Jackman*

10-12 minutes

But Backpage argues there's an upside to all this and some anti-trafficking advocates agree: The site provides a responsive, reliable repository for local and federal investigators to track illegal activity, from prostitution to murder. Backpage responds quickly to subpoenas and provides testimony and research to police and prosecutors. Shutting down Backpage's "dating" section would disperse those ads to many smaller and foreign sites who might not be so helpful to American investigators trying to rescue a child or capture a pimp.

"We harness the technologies that have been created," Backpage general counsel Liz McDougall told an Arizona human trafficking task force in 2013, "and use them intelligently to find and stop the perpetrators of this horrific crime. … Backpage has no tolerance for sex trafficking. As a result, Backpage is one of the best places in America to get busted trafficking a child."

Case 1:18-cv-01552-RJL   Document 34-9   Filed 08/31/20   Page 55 of 61

Statements like these draw extreme skepticism from many anti-trafficking groups, especially those who work with girls once prostituted through Backpage. Eight civil suits have been filed this year alone by women who were underage and sold for sex on Backpage, with renowned attorney David Boies serving as lead counsel in two of them. The suits seek money and injunctions as a way to persuade Backpage to stop hosting sex ads. Five members of Congress last week called for the Justice Department to launch a criminal investigation of the site.

But it's a tougher call for law enforcement. They have worked with Backpage for years, and they have gotten information and convictions. McDougall, who declined to speak to The Post on the record, quoted numerous examples in 2013 of law enforcement officials thanking Backpage for their help.

"Mr. Ferrer," went one email from the FBI in 2011, referring to Backpage chief executive Carl Ferrer, "We want to submit your name for recognition of your assistance following this case."

"We appreciate Backpage's vigilance to help protect kids," an email from Texas said in 2011.

"Your company's level of cooperation is not the norm," said an email from a Massachusetts agency in 2011, "and makes a huge difference in our ability to target and ultimately arrest the offender."

We reached out to a number of law enforcement groups who investigate human trafficking, and several of them didn't want to discuss Backpage. Defending Backpage is "not a popular

position to take in the law enforcement world," said Kimberly Mehlman-Orozco, a human trafficking expert who often testifies in such cases. "In my talks with law enforcement, they do say they use it as a tool."

Mehlman-Orozco said of the campaign against Backpage, "If these ads ceased to exist would these women not be sold? The answer is no. There's not a single piece of empirical research to suggest that. It will simply displace these ads."

The administrator of a smaller rival site has said he is hoping that Backpage gets shut down, Mehlman-Orozco said, because they would scoop up all the sex ads and avoid American law enforcement because it is located outside the country. "Why on earth would anybody who opposes human trafficking," she said, "risk the advertisements being displaced to a non-U.S. website? It makes no sense." She also noted that social media are now involved: Facebook has been used to recruit girls for prostitution, and prostitutes now advertise their services on Twitter.

McDougall has said that the courts have repeatedly upheld Backpage's right to publish adult content and that their First Amendment right to free speech protects them. In addition, the Communications Decency Act holds that websites that merely host third-party content are not liable for that content.

But beyond legal theory, there's the actual practice, and that's where there is a stark divide. McDougall said in 2013 that "Backpage's role in the rescue of victims and conviction of

Case 1:18-cv-01552-RJL   Document 34-9   Filed 08/31/20   Page 57 of 61

predators in the United States gets short shrift — if it is mentioned at all." She said, "Backpage has developed a team and systems in order to respond to law enforcement subpoenas within 24 hours or less," and that in one case they were able to facilitate three same-day rescues of trafficked children by providing data to the vice lieutenant within an hour of his call.

Lois Lee, who has worked on the streets of Los Angeles for 38 years rescuing child trafficking victims, is a big believer in Backpage, and strongly agreed with Mehlman-Orozco that shutting one website would have no impact on child trafficking.

"The parents or lawyers are able to find these kids. I know," Lee said in a telephone interview. "Backpage becomes a place where everyone on the street can find their kid." When Backpage shut down its adult ads category in January, in response to a highly critical report from a Senate subcommittee, Lee issued a public statement calling it "a sad day for America's children victimized by prostitution." [The ads have reappeared in the "dating" category.]

Lee acknowledges that Backpage has provided significant funding to her group Children of the Night. They also allow her to post free ads on the site for teens who want to call her for help. But she said that doesn't change her view that there are many other websites where the ads can go, and the underlying problem of why trafficking happens remains unaddressed.

"Backpage is the looking glass for what is going on with adolescent sexuality in American society now," Lee said.

"Nobody wants to deal with that issue. The reaction of the government, it's almost like McCarthyism."

In Minneapolis, police Sgt. Grant Snyder has been fighting human trafficking for more than 20 years. He said Backpage is far more responsive to his requests for help than phone companies or social media, and he has run into dead ends trying to get information from non-U.S. websites. He said there were "a thousand things Backpage could do to make me more efficient," but added, "You could eradicate Backpage and it wouldn't make a difference" in trafficking. "There's an assault on our children and it has very little to do with Backpage."

That's because the problem is on the demand side, Snyder said. "The demand absolutely drives this problem," Snyder said. "And it's guys like me. White, middle-aged, educated. How is it they're unreachable? I don't believe it. We're targeting the source of ads, and not putting the blame where it belongs. On men."

Both Andrea Powell, the executive director of FAIR Girls, and Lisa Goldblatt Grace, director of My Life My Choice, two groups which fight trafficking and help its victims, agreed with Lee and Snyder about the underlying problems of trafficking. But they said Backpage is not helping. Powell said FAIR asked Backpage to require age verification for its advertisers, and submit ads to law enforcement in advance, but they refused. "Be a positive force," Powell has told Backpage. "They chose not to."

"This is really about a multi-billion dollar sex industry preying on the most vulnerable in our communities," Grace said. "And Backpage is a key part of this unfair fight."

Powell said 90 percent of the girls they help were trafficked on Backpage. The practices of scrubbing questionable words from ads but leaving the ads online, of soliciting sex advertisers and customers from other sites, "make it more difficult for law enforcement," Powell said. "They're not helping. They're acting criminally. You can't light a whole bunch of matches in a box and say, 'Hope you find the fire.' You made the fire."

Other trafficking experts agreed, saying the isolated cases where Backpage helps are overwhelmed by the numbers who remain victimized. Rutgers University professor emeritus James Finckenauer, who co-authored a book on human trafficking and served on a trafficking task force, said, "If you had a number of the potential pool of people victimized, versus the number of cases which you received assistance, I think there'd be a large number in the former and less in the latter. This argument that they're helpful to law enforcement is specious."

Finckenauer added, "These folks are in business to make money. I understand that. There's also areas where business runs into the innocent. At some point. Somebody has to say, 'Hey, you crossed the line.'"

Plenty in law enforcement are ready to say that, if only because prostitution itself is illegal and cops oppose illegal things. Both Sheriff Tom Dart of Cook County, Ill., who has tried a couple of

Case 1:18-cv-01552-RJL   Document 34-9   Filed 08/31/20   Page 60 of 61

different ways to stop Backpage through the courts and failed, and Lt. Barry Hill of the Los Angeles County Sheriff's Department human trafficking bureau, said they had never gotten a call from Backpage alerting them to illegal activity.

"If they were the least bit proactive in any form or fashion," Dart said, "there might be something to this argument. If they were calling me saying 'We've found a pattern' or something like that, but I've never received a phone call from them." He said he had written them suggesting ways to actually detect illicit activity, including hiring retired police detectives to monitor the ads and removing (rather than just editing) problem ads, "they theoretically could be a great partner. But that requires activity, not just press releases."

Boies, the lawyer who represented the Justice Department in the break-up of Microsoft, said his firm researched Backpage for a year before filing civil suits in Arizona and Florida earlier this year. He acknowledged that "closing up Backpage is not going to solve the entire problem. But it will save thousands and thousands of lives."

Boies echoed many in the police world when he said, "The fact that taking out one sex trafficker doesn't solve the problem doesn't mean you shouldn't take it on, particularly when it's the most pervasive. And then work on some of the others. It may be we're going to need additional tools to take out some of the other websites. We can deal with that as we go after them. We need to deal with the websites now that we can deal with."

Dart said, "We can't have something that's right in front of our faces, so actively involved with different crimes. We can't just stand there and do nothing. It could get worse? It's already pretty bad."

*Note: This post has been updated.*