**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| WOODHULL FREEDOM FOUNDATION, *et al.*, | |
| *Plaintiffs*, | Case No. 1:18-cv-1552-RJL |
| v. | |
| UNITED STATES OF AMERICA, *et al.*, | |
| *Defendants*. | |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Civil Rule 7(h)(1) of the Rules of the United States District Court for the District of Columbia, defendants the United States of America and William P. Barr, in his official capacity as Attorney General of the United States, (collectively, "Defendants") hereby submit the following response to Plaintiffs' Statement of Undisputed Material Facts [ECF 34-2] in connection with their opposition to Plaintiffs' motion for summary judgment.[1]

As an initial matter, Defendants hereby object to Plaintiffs' Statement for failure to identify facts that are genuinely material to its motion. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986) (explaining that a fact is "material" only if it "might affect the outcome of the suit under the governing law"). In particular, Plaintiffs' attempt to counter Congress's judgment with testimony of experts and fact witnesses is inconsistent with authority recognizing that "Congress is entitled to exercise latitude in forming predictive judgments about possible evasion and

---

[1] Defendants have submitted a Statement of Material Facts Not in Dispute [ECF 35-2] in connection with Defendants' Motion for Summary Judgment [ECF 35] and hereby incorporate that Statement herein in opposition to Plaintiffs' Motion.

circumvention of the law and is able to act accordingly to prevent such abuse." *McConnell v. FEC*, 251 F. Supp. 2d 176, 665 (D.D.C. 2003); *see also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994) (recognizing "Congress' predictive judgments are entitled to substantial deference," and that a court's "obligation to exercise independent judgment when First Amendment rights are implicated is not a license to reweigh the evidence de novo, or to replace Congress' factual predictions with [the court's] own"). For purposes of ensuring that Defendants' Response is primarily factual in nature, Defendants do not separately set forth any objection to materiality for each individual factual statement below. This Response should not, however, be construed as conceding that any of Plaintiffs' factual statements are indeed material.

Defendants also object to Plaintiffs' Statement insofar as it cites or relies on testimony of witnesses, including expert witnesses, that Defendants have not had an opportunity to cross-examine through written discovery or depositions. When the parties conferred regarding further proceedings after the Court of Appeals' remand, counsel for Plaintiffs did not indicate that Plaintiffs intended to offer their own testimony, or the testimony of third party witnesses or experts, in support of their facial constitutional challenges. As indicated in Defendants' request in the alternative for a stay of proceedings under Rule 56(d), and the accompanying Declaration of Kathryn Wyer, Defendants' ability to respond to factual assertions in Plaintiffs' Statement that rely on Plaintiffs' declarations is constrained by the lack of any opportunity to cross-examine as well as insufficient time within the summary judgment briefing schedule to seek potential rebuttal experts.

Additionally, Defendants hereby object to Plaintiffs' Statement to the extent it cites or relies on statements in the Declaration of Kate D'Adamo [ECF 34-3] that in turn rely on articles, comments, and other material written by others and are offered for the truth of the matters asserted.

*E.g.*, D'Adamo Decl. ¶¶ 12-24. Such statements are inadmissible hearsay. *Democracy Forward Found. v. Pompeo*, No. 1:19-cv-1773, 2020 WL 4219817, at *10 (D.D.C. July 23, 2020) (citing *Atkins v. Fiscer*, 232 F.R.D. 116, 132 (D.D.C. 2005)).

Defendants also object to Plaintiffs' Statement to the extent it cites or relies on statements in the proffered expert Declarations of Dr. Kimberly Mehlman-Orozco [ECF 5-9] and Alexandra Yelderman [ECF 34-8] that set forth statutory interpretations. *E.g.*, Mehlman-Orozco Decl. ¶ 15; Yelderman Decl. ¶ 8. Such interpretations constitute inadmissible legal conclusions. *E.g., Convertino v. U.S. Dep't of Justice*, 772 F. Supp. 2d 10, 13–14 (D.D.C. 2010) (striking expert designation and report where "the bulk of [the proffered expert's] Declaration is nothing more than a legal analysis of the Privacy Act and a legal conclusion that the actions of the defendants amounted to a violation of that Act").

Subject to these objections, Defendants hereby respond as follows:

**1.** In reaction to the Allow States and Victims to Fight Online Sex Trafficking Act of 2017, Pub. L. No. 115-164, 132 Stat. 1253 (2018) ("FOSTA"), online service providers that enabled interpersonal communication by users – including many lacking a connection to sexual material – removed content, eliminated entire sections of websites, or were shuttered altogether. Declaration of Kate D'Adamo ("D'Adamo Decl.") ¶¶ 9-13 (attached as Ex. A); Declaration of Dr. Jessica P. Ashooh ("Ashooh Decl.") ¶¶ 2-3, 5-7 (attached as Ex. B); About FOSTA, CRAIGSLIST, https://www.craigslist.org/about/FOSTA.

> **RESPONSE:** Disputed to the extent Plaintiffs seek to suggest that FOSTA required or could reasonably be deemed the cause of online service providers' decisions to remove content that was protected by the First Amendment. D'Adamo concedes that websites and online services changed their policies, removed services, or shut down both before and

after FOSTA's enactment and that she does not know the reasons for these decisions. D'Adamo Decl. ¶ 10 (stating what "appeared" to her to be the case without citing any evidence to support that conclusion). Ashooh, the Director of Policy at Reddit, identifies FOSTA as "a factor" in Reddit's decision to update its use policy but does not suggest it was the only factor. Ashooh Decl. ¶ 5. Ashooh generally refers to FOSTA's "vagueness and scope of liability" but does not explain what statutory terms she regards as vague, or what she believes the scope of liability is. *Id.* ¶ 6. As a matter of law, FOSTA's terms on not vague. Based on Ashooh's description the subreddit that Reddit banned, focusing on "education, safety, and health" for escorts, did not allow solicitations of illegal prostitution or sex trafficking. *Id.* ¶ 7. If that is the case, any conclusion by Reddit that this subreddit should be banned does not appear to be attributable to FOSTA.

2.     Experts have observed there is no rigorous quantitative data to suggest FOSTA has had or will have a significant impact in reducing the prevalence of sex trafficking, nor any criminological theory to support the hypothesis that FOSTA will have a significant impact in reducing the prevalence of sex trafficking. Declaration of Dr. Kimberly Mehlman-Orozco in Supp. of  Mot. for Prelim. Inj. ("Mehlman-Orozco PI Decl.") (ECF No. 5-9) ¶¶ 21, 23.

RESPONSE: Disputed. Defendants have not had an opportunity to cross-examine Plaintiffs' putative expert or seek a rebuttal expert. However, Plaintiffs' putative expert concedes that "[t]he Internet as a whole has facilitated . . . commercial sex exchanges," including sex trafficking, and that sex trafficking occurs on many websites and virtual platforms. Mehlman-Orozco PI Decl. ¶¶ 19-20. Moreover, the Backpage investigation and prosecution highlighted some examples of conduct by Internet intermediaries that could facilitate and promote illegal prostitution and sex trafficking. Indictment [ECF 3], *United*

*States v. Lacey*, No. 2:18-cr-422 (D. Ariz. filed Mar. 28, 2018) (describing extensive criminal conduct by Backpage officers and employees); *see also* Equality Now, Amicus Br., *Woodhull II*, at 8-9 (D.C. Cir. filed Apr. 22, 2019) (listing additional actions taken by Backpage including "removing phone numbers, email address, IP addresses, and metadata from sex ads to frustrate the pursuit of sex traffickers by law enforcement," "deliberately removing advertisements posted by anti-trafficking groups and law enforcement agencies seeking to aid sex trafficking victims," and "allowing traffickers to pay for ads with prepaid credit cards and cryptocurrencies to evade law enforcement"). FOSTA targets such intentional and knowing conduct.

**3.**     Experts and observers have reported that FOSTA has had an adverse effect on online services relevant to sex workers, on the ability of sex workers who relied upon them to stay safe and to share information, and on harm-reduction tactics in which sex workers previously engaged. D'Adamo Decl. ¶¶ 17-19; Ashooh Decl. ¶¶ 6-7; Declaration of Dr. Alexandra Lutnick ("Lutnick Decl.") ¶¶ 11-13, 15 (attached as Ex. C); Declaration of Alexandra Frell Levy Yelderman ("Yelderman Decl.") ¶ 7 (attached as Ex. D); "The Loss of Sex Work Friendly Resources," https://hackinghustling.org/online-platforms-sex-worker-discrimination.

**RESPONSE:** Disputed. Defendants have not had an opportunity to cross-examine Plaintiffs' putative experts and witnesses or seek rebuttal experts. However, FOSTA's plain language does not require the removal or elimination of First Amendment-protected content from the Internet, nor is such a response reasonable due to technological limitations. To the extent this testimony focuses on safety and harm-reduction for sex workers, rather than free expression, it is also immaterial because it relates to policy concerns rather than First Amendment-protected interests.

4.      A study by an organization that provides housing to those who need it, including individuals described as victims of sex trafficking, reported that FOSTA led to an increase in violence against sex workers and made it more difficult for law enforcement to pursue trafficking. D'Adamo Decl. ¶ 23; *Research Brief After FOSTA-SESTA*, The Samaritan Women's Institute for Shelter Care (2018) at 4-6, https://thesamaritanwomen.org/wp-content/up- loads/2020/02/After-SESTA-FOSTA.pdf.

> **RESPONSE:** Disputed. The cited document is itself inadmissible hearsay, and it concedes that it largely offers "conjecture" and anecdotal statements by others, which are further layers of inadmissible hearsay. *See id.* In addition, the document concludes that "victim service providers offering care to exploited/prostituted/trafficked persons in the U.S. have *not* been unduly burdened in their outreach, referral base, or operations because of the FOSTA-SESTA legislation." *Id.* at 6 (emphasis added).

5.      Experts and other observers have noted FOSTA's detrimental impact on the ability of law enforcement to pursue sex trafficking crimes. Mehlman-Orozco PI Decl. ¶¶ 16, 24-25, 28, 31; D'Adamo Decl. ¶ 24; Yelderman Decl. ¶ 6; Lutnick Decl. ¶¶ 16-19.

> **RESPONSE:** Disputed. Defendants have not had an opportunity to cross-examine Plaintiffs' putative experts and witnesses or seek rebuttal experts. However, these witnesses' reports of the views of law enforcement officers and prosecutors are inadmissible hearsay. Plaintiffs cite no testimony before Congress by law enforcement officers or prosecutors indicating that they would prefer not to have legislation prohibiting Internet intermediaries from engaging in conduct intended to promote or facilitate illegal prostitution or sex trafficking.

6.      The Plaintiffs in this case who operate online platforms or services depend upon

immunity provided by 18 U.SC. § 230 to host third-party content. Declaration of Jesse Maley ("Maley Decl.") ¶¶ 25-26 (attached as Ex. E); Declaration of Ricci Levy in Support of Mot. for Prelim. Inj. ("Levy PI Decl.") (ECF No. 5-2) ¶ 43; Declaration of Brewster Kahle ¶ 15 (attached as Ex. F).

> **RESPONSE:** Disputed. Defendants have not had an opportunity to cross-examine Plaintiffs. However, their cursory assertions do not support this statement. Moreover, § 230 has never immunized owners, managers, and operators of Internet platforms from federal criminal laws, including the Travel Act, 18 U.S.C. § 1591, and now 18 U.S.C. § 2421A.

7.      The Plaintiffs have had their speech chilled and/or have self-censored as a direct result of FOSTA's enactment. Maley Decl. ¶¶ 32-34, 37-38, 40, 43-48; Declaration of Ricci Levy in Supp. of Mot. for Summ. J. ("Levy SJ Decl.") ¶¶ 16, 21-23, 27 (attached as Ex. G); Levy PI Decl. ¶¶ 32-34.

> **RESPONSE:** Disputed. Defendants have not had an opportunity to cross-examine Plaintiffs. However, FOSTA's provisions focus on conduct by owners, managers, and operators of Internet platforms that is intended to promote or facilitate specific acts of illegal prostitution or knowing participation in a sex trafficking venture.

8.      Plaintiffs who had used online platforms that hosted Plaintiffs' content lost the ability in the wake of FOSTA to use those platforms, either in full, Declaration of Eric Koszyk ("Koszyk Decl.") ¶¶ 1-2, 7-9, 11-13, 20 (attached as Ex. H), or in part. Levy SJ Decl. ¶¶ 10-15, 17, 21, 24 & Ex. 1.

> **RESPONSE:** Disputed to the extent Plaintiffs seek to attribute decisions of Internet platforms to remove entire sections from their websites to FOSTA's provisions, which do

not require such removal, but instead focus on conduct by owners, managers, and operators of Internet platforms that is intended to promote or facilitate specific acts of illegal prostitution or knowing participation in a sex trafficking venture.

9.      Plaintiffs who lost access to online platforms in the wake of FOSTA have been unable to find adequate substitutes, Koszyk Decl. ¶ 24, as were other users of those platforms. Id.; Levy PI Decl. ¶ 29.

**RESPONSE:** Disputed. Defendants have not had an opportunity to cross-examine Plaintiffs. However, the existence of other platforms that could be used for advertising massage therapy services—such as Yelp, Nextdoor, Facebook, etc.—is generally known. The Facebook "Community Standards" that Levy identifies—which prohibit a broad range of sexual content and imagery—do not appear to respond to FOSTA's provisions, which focus on conduct by owners, managers, and operators of Internet platforms that is intended to promote or facilitate specific acts of illegal prostitution or knowing participation in a sex trafficking venture. It is generally known that many other websites on the Internet allow posting of sexual content and imagery.

10.      Plaintiff Eric Koszyk, owner and sole proprietor of Soothing Spirit Massage and a licensed massage therapist since 2006, used Craigslist prior to the enactment of FOSTA as the primary way of finding massage clients. Koszyk Decl. ¶¶ 1, 7, 8.

**RESPONSE:** Undisputed.

11.      On Friday, April 6, 2018, in the wake of Congress' passage of FOSTA, Koszyk learned Craigslist had removed his most recent ad for Soothing Spirit and had shut down its Therapeutic Services section. *Id.* ¶ 20.

**RESPONSE:** Undisputed

12.     Since FOSTA's enactment, Koszyk has been unable to advertise his therapeutic massage business on Craigslist, and thus has been prevented from reaching the same audience of potential customers as prior to the law's passage. Id. ¶ 2.

> **RESPONSE:** Disputed. The existence of other platforms that could be used for advertising massage therapy services—such as Yelp, Nextdoor, Facebook, etc.—is generally known.

13.     Koszyk has not learned of any other website that would allow him to post similar ads and to reach a similar sized audience as he did using Craigslist. Nor has Koszyk been able to use any combination of multiple advertising websites to reach potential customers. Id. ¶ 24.

> **RESPONSE:** Disputed. The existence of other platforms that could be used for advertising massage therapy services—such as Yelp, Nextdoor, Facebook, etc.—is generally known.

14.     . It is Koszyk's understanding that Craigslist publicly committed to reinstate the sections it removed as a result of FOSTA if the law changes, and if it does so as to therapeutic services, Koszyk intends to immediately resume posting on Craigslist. Id. ¶ 3.

> **RESPONSE:** Disputed. Koszyk's understanding of Craigslist's position, if offered for the truth of the matter asserted, is inadmissible hearsay. Defendants have not had an opportunity to cross-examine Koszyk or Craigslist officers in order to assess their current status and future intentions.

15.     Plaintiff Jesse Maley, who in working as a community organizer and advocate for sex workers—including as co-founder, director, employee, or volunteer for organizations that directly service sex workers and advocate on broader issues impacting them—identifies herself as Alex Andrews, is a member of the board of directors of the Sex Workers Outreach Project USA ("SWOP USA"), a national social justice network dedicated to the fundamental human rights of people involved in the sex trade and their communities. Maley Decl. ¶¶ 2-3.

**RESPONSE:** Undisputed.

16.    Maley helped create Rate That Rescue (www.ratethatrescue.org), an online resource for sex workers to learn more about organizations that provide services to them, operating as a sex worker-led, public, free website that seeks to help share information about both the organizations they can rely on, and those they should avoid, including through posts by third parties and organizations. Id. ¶¶ 13-19. The site has expanded to include reviews of all types of services that sex workers and the broader public use, including Twitter, Wix, and PayPal. Id. ¶ 24. The site generates no revenue, is run by volunteers, and is unable to actively or comprehensively review, edit, or moderate user-generated content. Id. ¶ 26.

**RESPONSE:** Undisputed.

17.    Maley helped lead SWOP USA efforts to purchase an in-development mobile app and website dedicated to increasing sex worker safety, whose features would include allowing sex workers to report violence, harassment, and other harmful behavior against them via the app; maintaining a database of the reports that other sex workers could query; and sending notifications to others near the location of the sex worker who reported the incident. Id. ¶¶ 34-36. More than two years after FOSTA's passage, SWOP USA did not purchase the app due to the change in law, and has no plans to develop any similar service in the future. Id. ¶¶ 37, 42.

**RESPONSE:** Disputed. Defendants have not had an opportunity to cross-examine Maley in order to evaluate these assertions.

18.    Maley's work has encompassed in-person, direct service to sex workers, including communicating health and safety information and directing them to services in their community. Though it would be easier to convey this information timely and accurately if Maley could engage in more digital outreach to her constituency, especially during the public health crisis as a result

10

of the novel Coronavirus (which only heightens needs for this type of information), Maley has refrained from creating any tool or online service to provide that outreach due to concerns about FOSTA. Id. ¶¶ 43-48.

**RESPONSE:** Disputed. Defendants have not had an opportunity to cross-examine Maley in order to evaluate these assertions.

19.     Woodhull Freedom Foundation ("Woodhull") uses various online technologies to conduct business and organize events, such as Google Docs, Formidable form generator, and online databases and cloud storage, as well as social media like Facebook, Twitter, Instagram, Hootsuite (for post-scheduling) and Bitly (for link-shortening) to promote the organization and its events. Woodhull also uses online ticketing to register attendees for events, a mobile event app called YAPP, and Youtube.com to store and publish workshop presenter videos, which include information about presenters. Levy PI Decl. ¶¶ 10-15.

**RESPONSE:** Undisputed.

20.     Woodhull's signature event, a multi-day Sexual Freedom Summit ("Summit") held annually in Washington, DC that engages educators, therapists, legal and medical profes- sionals, and advocacy leaders to strategize, share information, and work collaboratively to protect the rights to information, health, and pleasure, has come to include a "sex worker" track involving workshops devoted to issues impacting sex workers, including but not limited to harm reduction, disability, age, health, and personal safety. Id. ¶¶ 7, 16-20, 22.

**RESPONSE:** Undisputed.

21.     Woodhull promotes the Summit on its own website, and promotes most, if not all, of the workshops on social media like Facebook, Instagram, and Twitter, with posts that link to presenters' workshops and biographies. Id. ¶¶ 23-24. On FOSTA's passage, Woodhull ceased

online promotion of the 2018 Summit's sex work track, blocked all information associated with its workshops from the Summit website, and restrained publication of workshop titles, biographies and contact information, restoring the material only after joining a legal challenge to FOSTA. Id. ¶¶ 32-34.

> **RESPONSE:** Disputed. Defendants have not had an opportunity to cross-examine Levy in order to evaluate these assertions.

22.     Woodhull currently uses Facebook to livestream video of Summit programs, Facebook and YouTube to archive the videos, and Zoom or Streamyard to connect panel participants via videoconference. In 2020, due to the COVID-19 pandemic, Woodhull has had to present the Summit and its workshops exclusively online. Levy SJ Decl. ¶ 9. Woodhull found promoting the Summit on platforms such as Facebook and YouTube difficult due to content moderation policies imposed on them since FOSTA's enactment. Id. ¶¶ 10-11, 17. Attempts to advertise the 2020 Summit repeatedly have been rejected by Facebook, even though Woodhull had posted similar Facebook ads for sexually-oriented Summit programs which were not rejected prior to passage of FOSTA. Woodhull expects Facebook will likewise reject similar future attempts by Woodhull to promote the Summit, potentially risking permanent termination of its account and loss of over 7,800 followers. Id. ¶¶ 13-15 & Ex. 1. As a result, Woodhull has censored its Facebook ads which has hampered its ability to promote the Summit. Id. ¶ 16.

> **RESPONSE:** Disputed in part. Defendants have not had an opportunity to cross-examine Levy in order to evaluate these assertions.

23.     Similarly, fearing termination of its YouTube channel with over 11 years' worth of archived videos, Woodhull has chosen not to "livestream" its Summit programs on YouTube in 2020 due to the platform's broad post-FOSTA restrictions. Specifically, Woodhull concluded that

livestreaming its content would call more attention to the archived materials and potentially risk termination of its channel by YouTube. Id. ¶ 21.

> **RESPONSE:** Disputed. Defendants have not had an opportunity to cross-examine Levy in order to evaluate these assertions.

24.     Woodhull has postponed or abandoned Summit programs in 2020 relating to human sexuality, sex work, and/or prostitution due to concerns over removal of the material or termination of its accounts by Facebook, YouTube, Zoom, and/or Streamyard. Id. ¶ 22.

> **RESPONSE:** Disputed. Defendants have not had an opportunity to cross-examine Levy in order to evaluate these assertions.

25.     Though Woodhull originally intended to develop and launch its own online video sharing platform to conduct its virtual Summit in 2020, after evaluation of the legal risks—and in particular FOSTA's broad prohibitions on operating a computer service that could be alleged to promote or facilitate prostitution, the various civil claims brought against online platforms under FOSTA, and the pending criminal prosecution against cityxguide.com based on alleged violation of 18 U.S.C. § 2421A as added by FOSTA—Woodhull's Board of Directors voted not to proceed due to fears of criminal prosecution or civil liability under FOSTA. Id. ¶¶ 23-24.

> **RESPONSE:** Disputed. Defendants have not had an opportunity to cross-examine Levy in order to evaluate these assertions.

26.     The Internet Archive seeks to prevent Internet and other "born-digital" material from disappearing by offering permanent access for researchers, historians, scholars, people with disabilities, and the general public to historical collections that exist in digital format, consisting of texts, audio, moving images, and software, as well as archived web pages.   Kahle Decl. ¶¶ 4-5.   In doing so, it collects and displays web materials on behalf of the Library of Congress, the

National Archives, most state archives and libraries, and universities and other countries. Id. ¶ 6.

**RESPONSE:** Undisputed.

27.     The Internet Archive regularly gathers "snapshots"—accessible copies—of content on the World Wide Web through "crawling" and indexing processes, currently crawling and archiving more than 80 million web pages per day. Id. ¶ 7. It also scans and digitizes over one thousand books a day on behalf of libraries, museums, and authors, id. ¶ 10, and the general public uploads over 2,000 items per day. Id. ¶ 13.

**RESPONSE:** Undisputed.

28.     The Internet Archive currently maintains over 330 billion web pages archived from 1996 to (nearly) the present from web sites around the world, including archives of third- party content posted to web sites like craigslist.org. The vast majority of the material in the Internet Archive's collection is authored by third parties. Id. ¶¶ 4, 8. It circulates over 17 million texts, 5 million audio items, and 4 million video items that are downloaded by tens of millions of users each month. Id. ¶ 12. Currently, the Internet Archive has over 1.4 million unique users per day across all of its services and adds over 100,000 registered users per month. Id. ¶ 11.

**RESPONSE:** Undisputed.

29.     While the Internet Archive does at times remove content, it has no practical ability to evaluate the legality of any significant portion of the third-party content it archives and makes available. Id. ¶ 14.

**RESPONSE:** Undisputed.

30.     Human Rights Watch, Inc. ("HRW"), a 501(c)(3) tax-exempt organization that monitors human rights conditions worldwide and advocates for cessation and remediation of violations, including as pertain to rights of sex workers, has since 2013 urged decriminalization of

sex work. Declaration of Dinah PoKempner ¶ 2 (attached as Ex. I). Each year, HRW produces and publishes many hundreds of reports, press releases, videos, podcasts and other online documents on its website and social media accounts, including research and advocacy on behalf of the rights of sex workers and the decriminalization of sex work, and relies  heavily on individuals spreading its reporting and advocacy through social media platforms and websites that host, disseminate, or allow users to post HRW's reports and advocacy materials. Id. ¶¶ 5, 9.

> **RESPONSE:** Disputed in part. Defendants have not had an opportunity to cross-examine PoKempner in order to evaluate her assertions regarding HRW's reliance, cited in the last sentence.

Dated:   October 9, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch

*/s/ Kathryn L. Wyer*
KATHRYN L. WYER
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Room 12014
Washington, DC   20005
Tel. (202) 616-8475 / Fax (202) 616-8470
kathryn.wyer@usdoj.gov
*Attorneys for Defendants*